IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA, Charlotte Division

ILONKA AYLWARD
1645 Scotland Avenue
Charlotte, N.C. 28207,

                Plaintiff

 vs.

CITY OF CHARLOTTE
600 East 4th Street
Charlotte, N.C. 28202

and

CHARLOTTE MECKLENBURG
STORMWATER SERVICES (a.k.a.
"Charlotte Stormwater Services"
"Charlotte/Mecklenburg Storm Water"
"Charlotte Storm Water Services"
"City of Charlotte Storm Water Services")
600 East 4th Street
Charlotte, N.C. 28202 &
2145 Suttle Avenue
Charlotte, N.C. 28208

and

ARMSTRONG GLEN, P.C.
9771-d Southern Pine Blvd
Charlotte, NC 28273 &
P.O. Box 7326
Charlotte, NC 28241

and

Joseph ("Josh") H. Letourneau, P.E.,
c/o Armstrong Glen, P.C.
9771-d Southern Pine Blvd
Charlotte, NC 28273

                Defendants.

Civil Action No._____
       Jury Trial Requested

Ilonka Aylward ("Plaintiff-Landowner" or "Plaintiff") hereby alleges:

# I.                     NATURE OF THE CASE

1. This is a Section 505 citizen suit seeking declaratory and injunctive relief, civil penalties, damages and attorney's fees for discharge of pollutants into a jurisdictional 303(d) listed stream that flows through Plaintiff's land and for violation of transparency requirements of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C.§§ 1251 et seq.

2. This is also a 42 U.S.C. § 1983 federal civil right action challenging the City of Charlotte's policy and practice of mandating "gag provisions" that condition multi-million dollar employment contracts with professional engineers on such engineers' silence regarding "any issue which is in the City's judgment, likely to cast doubt on the competence and integrity of the City or Engineer." These "gag provisions" violate the First Amendment to the United States Constitution and the freedom of speech provisions of the North Carolina Constitution, and are against public policy, including the Rules of Professional Conduct of Professional Engineers adopted in accordance with N.C. § 89C-20.

3. Finally, this is a 42 U.S.C. § 1983 federal civil right action under the Due Process and Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the North Carolina State Constitution, challenging Defendants' arbitrary and selective disregard of environmental laws, Defendants' discriminatory policies and practices and Defendants free speech restraints.

# II.        NATURE OF THE VIOLATIONS

## Clean Water Act

4. Acting arbitrarily and with intention to injury, and with no rational relation to a valid state objective and in violation of the Clean Water Act and of the implementing local legislation, including North Carolina Sedimentation Pollution Control Act of 1973, the implementing Charlotte City Ordinances, and the conditions of their Clean Water Act permits,

(A) Defendants persist in a construction design that violates Clean Water Act.

(B) Specifically, Defendant's imminent construction commonly known as Hinsdale-Tinkerbell Stormwater Drainage Project violates several engineering erosion-preventing requirements, which are incorporated into and made part of the conditions of Clean Water Act construction permits and of the implementing local laws.

(C) Defendants ignore the warning of two sealed opinion letters prepared by authoritative professional engineer Mr. Johnny H. Denton of Diamond Engineering, PLLC.

(D) Diamond Engineering, PLLC is well-respected Civil Engineering Firm. Its principal Johnny H. Denton, P.E., PLS, specializes in municipal engineering, construction inspection, site planning, conceptual large project planning, site and subdivision planning, water and sewer design, storm water design and management, flood studies, erosion control, earthen dam design and breaching, roadway design.

(E) Defendants refuse Johnny Denton P.E.'s alternative design which would have reduced erosion, stabilized stream bank and in several instances saved Defendants' costs.[1]

(F) <u>Sealed Opinion Letters of December 6, 2018 & June 17, 2019 by Johnny H. Denton, P.E., Diamond Engineering PLLC</u>, warning that Hinsdale-Tinkerbell Project construction plan at the tributary slope downstream of Hinsdale Street Culvert at 2183 Hinsdale St., Charlotte, N.C. ("the Slope") threatens slope erosion and slope failure both during the construction and long-term are attached as **Exhibit 1** and **Exhibit 2** and incorporated herein by reference.

(G) Defendants' violation will cause continuous erosion, which will pollute the Hinsdale culvert tributary, located on Plaintiff's land, and ultimately discharging into the Catawba River.

(H) Additionally, Defendants violate Clean Water Act requirements of transparency, truthfulness, accurate self-reporting and "informing and involving" the public to enable citizen enforcement.

(I) Defendants City of Charlotte and Charlotte Mecklenburg Stormwater Services adopted policy and practice of impeding public access to mapping and construction information and to the fact and content of Clean Water Act agencies' assessment information. Defendants' policy and practice of withholding information empowers them to obfuscate, mislead and even misinform the unaware public and the citizen landowners affected by stormwater construction.

---

[1] To be complete, the Diamond Engineering PLLC's sealed Opinion Letters did serve as a catalyst for Defendants' partial compliance with the CWA. After Diamond Engineering warned that Defendants' land-disturbing activities had "significant probability" of "soil settlement either during or after construction," Defendants abandoned inserting 12 foot deep manhole and wing-wall deep into the slope, although did not abandon digging slope with intent to destroy.

4

(J) Defendant City of Charlotte not only failed its transparency obligations under the Clean Water Act, but affirmatively adopted a policy of concealing from the public and the press any and all construction mistakes, evidence of incompetence and intentional misdeeds.

(K) The engineers of Defendant Armstrong Glen — the very engineers who draw, design, draft *and seal* millions dollars' worth of the City stormwater projects — are silenced about the City's and its own incompetence and lack of integrity.

## 42 U.S.C. § 1983

(L) The "gag provision" of Armstrong Glenn PC's Contract for Engineering Services is a unilateral material condition inserted by the City of Charlotte to ensure that the press and the public are kept in the dark about any engineering mistakes, misdeeds and / or intentional bad acts and violations of engineers who build stormwater projects around the city of Charlotte — the engineers of Armstrong Glen P.C., who drafting and seal the designs, as well as Defendant Charlotte Mecklenburg Stormwater and the City Engineer. Armstrong Glen's silence has been bought by a multimillion dollar contract, and the engineers of Armstrong Glen has been "gagged" or, in the alternative, conspired to stay silent since at least 2011. If any of Armstrong Glen's engineers' fesses up to a construction defect, the City of Charlotte's contractual recourse is to fire Armstrong Glen. On information and belief, the City of Charlotte has inserts such gag provision in its contracts with all or many other engineering firms. City of Charlotte - Armstrong Glen, P.C., "Contract for Engineering Services. Project: Various Storm WaterServices" (entered in 2011 and renewed by four amendments to 12/31/2022) is attached and incorporated by reference as **Exhibit 3.**

5

(M) This contractual gag (in the alternative, a conspiracy) endangers the operations and safety of the State and City's infrastructure, illegally restricts free speech and contravenes North Carolina state law and several major public policy interests, including (1) accountability of the City and Charlotte Mecklenburg County Stormwater's, and community trust in safety of our roads, culverts, driveways, waters and bridges, and (2) professional integrity of the engineers and safety of the infrastructure, which has been recognized by the State of North Carolina to be "subject to regulation in the public interest," N.C. Gen. Stat. §89C-2, and (3) the goal of combating erosion sedimentation and pollution, legislated by the Clean Water Act and legislatively recognized by the City of Charlotte itself as "vital to the public interest" and "necessary to the public health and welfare." *City of Charlotte Soil Erosion and Sedimentation Control Ordinance*, Section 17-2.

(N) In violation of the Fourteenth Amendment to the United States Constitution and the North Carolina State Constitution, Defendants arbitrary and selectively disregard environmental laws, apply laws and policies in discriminatory way and implement discriminatory policies and practices.

# III.      JURISDICTION, VENUE

### Hinsdale-Tinkerbell Project

5. "Hinsdale-Tinkerbell Storm(water) Drainage Improvement Project" a.k.a. "Hinsdale-Tinkerbell Stormwater Project," a.k.a "Hinsdale-Tinkerbell Storm Drainage Improvement Project," a.k.a "Hinsdale-Tinkerbell Stormwater Project," a.k.a. Hinsdale-Tinkerbell Storm Drainage CMSWS Project is a common plan and development with a total projected cost of

6

estimated in the end of 2019 at $7,900,000, and presently estimated at $13,200,000.00, impacting approximately 240 square acres of the McMullen Creek watershed basin[2] or in any event in excess of 5 square acres (the "Hinsdale-Tinkerbell Project" or the "Project"). Construction is imminent or has started.

6. Plaintiff's land, impacted by the Hinsdale-Tinkerbell Project saddles downstream plot on both sides of the Hinsdale Street Culvert over a McMullen Creek tributary.

7. The tributary flows through the Hinsdale Street Culvert and continues for approximately 1,000 feet South-West until, as an uninterrupted surface stream, it meets the 303(d) impaired McMullen Creek. McMullen Creek flows into the 303(d) impaired McAlpine Creek, which ultimately discharges into the Catawba River.

8. The tributary is not monitored for pollution, by Defendants' own admission, is likely also impaired.

9. Uninterrupted surface flow of the nation's waters rendered Defendants' construction jurisdictional, as already confirmed by the U.S. The U.S. Army Corps of Engineers has made the determination that "Hinsdale-Tinkerbell Storm Drainage CMSWS Project" "involves impacts to waters of the United States."

10. This Court has original federal question jurisdiction over the Section 505 of the Clean Water Act action and over the federal civil rights case under 42 U.S.C. § 1983, pursuant to 28 U.S.C. §§1331, 1343 because Plaintiff's claims present substantial, disputed questions of

---

[2] The acreage and estimated cost as provided on the City of Charlotte Stormwater Services Website at https://charlottenc.gov/StormWater/Projects/Pages/HinsdaleTinkerbell.aspx, accessed on 02/18/2021

7

federal law arising under the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C.§§ 1251 *et seq*. and the Constitution of the United States.

11. This Court has jurisdiction over citizen suit pursuant to Section 505 of the CWA, *See 33 U.S.C. §1365(a)(1).*

12. This Court has jurisdiction over Plaintiff's requests for declaratory and injunctive relief pursuant to and 28 U.S.C. §2201 and 2202.

13. A genuine and justiciable controversy exists between the parties in that Plaintiff contends that Defendants are acting and threatening to act in violation of the Clean Water Act, and the Constitutions whereas, upon information and belief, Defendants contend that their actions are legal.

14. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. 1367(a) because they are so related to Plaintiff's federal claims that they form part of the same case and controversy under Article III of the United States Constitution and should be tried in a single action.

15. The Court has subject matter and personal jurisdiction over the parties.

16. Venue is proper in the Western District of North Carolina pursuant to section 505(c)(1) of the Clean Water Act, 33 U.S.C. §1365(c)(1) and the source of violations is located in this district, Defendants are located, incorporated, maintain an office and/or are doing business in the Western District of North Carolina and events giving rise to this action occurred in the Western District of North Carolina. 28 U.S.C. §1391.

17. Plaintiff is a citizen and resident of the Western District of North Carolina. Defendants are located, incorporated, maintain an office and/or are doing business in the Western District of

North Carolina. The Source of effluent standard violation is located in the Western District of North Carolina.

18. All conditions precedent to the filing of this lawsuit have been performed and occurred.

19. A copy of this Complaint has been served on the Attorney General and on the Administrator. 33 U.S.C. §1365 (c)(3).

## Notice of Intent to Commence Civil Action

20. As required by the Clean Water Act and its implementing regulations, 33 U.S.C. §1365(b), Plaintiff has provided Defendants City of Charlotte, Charlotte-Mecklenburg Stormwater Services (i.e. Charlotte-Stormwater Service and Mecklenburg County Services), Armstrong Glen, P.C. and Joseph ("Josh") H. Letourneau, P.E with written notices of Plaintiff's intent to bring this action, giving Defendants the opportunity to remedy the violations that are subject matter of this suit.

21. The Notice of Intent informed Defendants of their violations of the Clean Water Act, of the location and the nature of the violations, and of Plaintiff's intention to file this lawsuit.

22. The Notice was delivered by certified mail to Defendants Defendants City of Charlotte, Charlotte Mecklenburg Stormwater Services on or about December 5, 2019 and to Defendants Armstrong Glen, P.C. and Joseph H. Letourneau, P.E on or about March 4, 2020.

23. Plaintiff sent copies of the Notice to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of the EPA Region VI, the Secretary of the North Carolina Department of Environmental Quality, the Water Resources Director of the North Carolina Department of Environmental Quality. the Secretary of the North Carolina

Department of Natural Resource, as required by section 505(b) of the CWA, §33 U.S.C. 1365(b)(1)(A).

24. Along with documentation of receipt, copies of the Notices are attached to this Complaint as collective **Exhibits 4 and 5** and incorporated herein by reference.

25. In addition to the minimum statutory required addressees, Plaintiff served copies of the Notice on the Chair Person of the North Carolina Sedimentation Control Commission, all Clean Water Agents in charge of the Hinsdale-Tinkerbell Project, Charlotte City Attorney, Charlotte City Manager, Charlotte City Mayor, and Charlotte City Engineer, and on 01/27/20, at the City business meeting, personally delivered a copy to each member of the Charlotte City Council (who also received a summary prepared for their convenience).

26. Plaintiff also applied her best efforts to discuss the matters contained in this Complaint and Notice with Charlotte City Engineer Michael Davis, representatives of Charlotte Mecklenburg Stormwater Services: Project Manager John Keene, Sr. Project Manager Doug Lozner, assistant manager Darryl Hamock and Deputy City Attorney James Concepcion, and repeatedly but unsuccessfully attempted to discuss the City Council Member Tariq Bokhari, the Council in charge of her district.

27. More than sixty days have passed since the Notices were served on the Defendants and the State and Federal Agencies.

28. Neither EPA nor the State of North Carolina have commenced or is diligently prosecuting an action to redress the violations alleged in the Notice and this Complaint. See 33 U.S.C. §1365(b)(1)(B). This action is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. §1318(g).

# IV.         PARTIES AND STANDING

## A.    PLAINTIFF AND STANDING

29. Plaintiff Dr. Ilonka Aylward, Esq., is a natural person, a Charlotte homeowner whose tract of land (i) has suffered, suffers and is threatened to suffer from erosion caused by the existing illegally designed stormwater outfall and (ii) by imminent land-disturbing activities threatened by Defendants during their execution of the Hinsdal-Tinkerbell Construction Project.

30. Plaintiff is and at all times relevant to this action has been a resident of the City of Charlotte. Plaintiff is a citizen of the State of North Carolina and of the United States. As explained below, Plaintiff has been injured by Defendants' illegal rules, policies, practices, acts, and omissions, and Defendants are prepared to severely damage Plaintiff unless enjoined by this Court.

31. Congress intended that citizen enforcement of Clean Water Act play a vital role in ensuring the cleanup of nation's waterways, because there are insufficient government resources available to monitor all activities that have potential adverse environmental impact and to enforce the law to stop them.

32. Subsection 505(a) grants citizens the right to sue any person for violating an effluent standard or limitation, or an order issued with respect to an effluent standard or limitation. 33 U.S.C. §1365(a)(1).

33. North Carolina Sedimentation Pollution Control Act of 1973 authorizes private citizens's civil suits for violation of the North Carolin Act, as well as violation of related local

11

legislation, and of conditions of erosion and sedimentation control plans. N.C. Gen. Stat. § 113A-66.

34. Plaintiff Plaintiff has suffered and will suffer (1) injury in fact (2) traceable to conduct of Defendants and (3) redressable by orders of this Court. Defendants' land-disturbing activities and policies and practices are the direct cause of Plaintiff's existing injury and imminent injury.

35. As a proximate result of the Defendants' unlawful acts and omissions, Plaintiff has suffered irreparable harm, injuries and damages; and Defendants imminent conduct, which Defendants have commenced will, if not enjoined further subject Plaintiff to additional irreparable injuries, harm and damages as detailed in this Complaint.

36. As detailed in this Complaint, Defendants' conduct is willful, malicious, retaliatory, arbitrary, in bad faith, for improper purpose, and wholly without justification in fact or law or relation to any legitimate governmental purpose.

37. Defendants' land-disturbing activity threatens do destabilize the slope supporting foundation of Plaintiff's house, casing permanent erosion on Plaintiff's land, polluting the stream, and threatening the foundation of the house.

38. Under the Clean Water Act and the implementing State Statutes and City and County ordinances, Plaintiff's injury from Defendants' land-disturbing activities is three-fold.

39. Plaintiff's economic interests are injured in that Defendants' land-disturbing activity undermines the structural safety and, consequently, diminishes the value and enjoyment of Plaintiff's house.

12

40. Plaintiff's health, safety and well-being is injured in that Defendants' land-disturbing activity creates hazard of physical injury to Plaintiff and her family and guests.

41. Finally, Plaintiff's esthetic and recreational interests as well as her use and enjoyment of her backyards and her stream are already injured in that the stream bank is eroded by illegally designed stormwater outfall, and further injury is threatened because Defendants plan deforestation of the wooded slope and grade twenty plus foot slope without terraces and at unsustainable angles, which will cause destabilization and disfigurement by unsightly erosion.

42. Plaintiff injuries are traceable to Defendants land-disturbing activity and policies and practices, as discussed below.

43. Existing injury. Defendant City of Charlotte has been for many years violating Clean Water Act by operating an illegally designed storm water outfall. Said outfall causes turbulence, which results in erosion and, consequently in pollution, in violation of the Clean Water Act.

44. Stormwater outfall designs which comply with Clean Water Act must direct stormwater into receiving waters gradually (gradual confluence, and prohibition of turbulence is a condition of Defendants' construction permit). In contrast, the outfall in question sends stormwater at a nearly ninety degree angle.

45. As a result, the stream bank under Plaintiff's house into which the faulty outfall shoots has already severely eroded and continues to erode. Instead of correcting the faulty design, Defendants plan to replicate it in the Hinsdale-Tinkerbell Project.

46. Imminent injury. Defendants have commenced or are about to commence their Hinsdale-Tinkerbell Project, on Plaintiff's land. Defendants' Project threatens imminent violations of

13

Clean Water Act via planned land-disturbing activity which will erode stream bank on which Plaintiff's house sits, threaten stability of the house foundation and cause pollution of the stream by at least the following non-exclusive acts:

(a) replicating the existing erosive, turbulence and pollution causing design of a the stormwater outlet;

(b) wedging an access to construction site on the steep (at points nearly vertical), tall stream bank slope, between the stream and Plaintiff's house — despite the fact that an easier, cheaper access to construction site is available from the opposite, flatter, shorter bank, which is owned by Plaintiff.

(c) vibrating high steep slope with heavy machinery. Defendants' plan is to grade, bulldoze, destroy vegetation, change land contours far above and long downstream beyond its construction site, all the way to Plaintiff's house, threatening the retaining walls and house foundation, all performed at heights and angles, which are specifically prohibited by the Clean Water Act and violating implementing laws, ordinance and engineering and construction mandates, as discussed below.

(d) abandoning the destroyed steep slope to erode. Having caused erosive damage by stripping steep slope of vegetation, bulldozing out terraces and re-contouring the slope to unsustainable angles and hight specifically prohibited by the Clean Water Act, Defendants plan to abandon the damaged stream bank slope without permanently securing the area, causing permanent erosion.

(e) unjustified bedrock destruction

(f) filling stream without permit with materials that will wash out and pollute the stream

47. Plaintiff's injuries are redressable by this Court's injunction forbidding Defendants from land-disturbing activities in violation Clean Water Act and the conditions of Defendants' permits, which incorporate engineering principles and requirements.

48. Plaintiff is also injured and continues to be injured by Defendants' non-transparent, deceptive and discriminatory practices of excluding landowners, citizens and the public from full and timely information about Defendants' construction's compliance with Clean Water Act Permits and making misrepresentation about the same, and by Defendants' discriminatory practices in construction, described herein.

49. Plaintiff's injury is redressable by injunction from this Court mandating Defendants to timely make available (by posting on Defendants' Construction Project websites) all Clean Water Act related information, including the pertinent permits and requirements, true and updated maps, notices of intent to be covered under permits, pre-construction meetings with Clean Water Act agents (schedules and results) and the like, mandating transparency of personnel and forbidding City of Charlotte's policy and practice of rubber-stamping any construction design prepared by Charlotte-Mecklenburg Stormwater, and by declaring void Defendants' contractual agreement to conceal from public and the press all engineering blunders in construction of the City of Charlotte.

50. The City of Charlotte's contract with Armstrong Glen, P.C. that silences the latter's engineers as to all defects in construction likewise injured and continue to injure Plaintiff's First Amendment rights to receive information and ideas. The gag provision of the contract, which prohibits Armstrong Glen engineers from disclosing anything that might "cast doubt" on

15

"competence" and "integrity" of construction in Charlotte continuously restricts free speech. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("Constitution protects the right to receive information and ideas.") *Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748 (1976) (the government may not keep pubic in ignorance of information which a licensed professionals might bring).

51. The First Amendment is intended to protect the recipients of information. *Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748 (1976) (the government may not keep pubic in ignorance of information which a licensed professionals might bring).

52. Defendants' practices of selectively and arbitrarily destroying land of selected landowners also have injured and continue to injure Plaintiff's constitutional rights under the Fourteenth Amendment by depriving Plaintiff of her equal protection rights, in violation of the Equal Protection Clause of Article 1, Section 19 of the North Carolina Constitution.

53. Plaintiff was injured in relation to the Hinsdale-Tinkerbell Project and Defendants' construction in the City of Charlotte, and this injury has occurred and is ongoing, so long as Plaintiff is the resident of Charlotte and landowner of the land suffering from Defendants' construction.

54. Plaintiff's injury is redressable by injunction from this Court declaring unconstitutional "gag" provisions in City of Charlotte's contracts with Armstrong Glen P.C. and other private engineers who build the City of Charlotte and mandating Defendant to disclose and make publicly available all heretofore concealed information about instances that might "cast doubt" on "competence" and "integrity" of engineers involved in Charlotte City projects.

16

## B.    DEFENDANTS

55. Defendant The City of Charlotte, North Carolina ("City" or "The City of Charlotte" or "Charlotte") is a North Carolina Municipal corporation chartered as prescribed by Chapter 160A of the North Carolina General Statutes with the capacity to sue and be sued pursuant to N.C. Gen. Stat. §160A-11, and a "municipality" existing as defined in Section 502(4) of the Clean Water Act, 33 U.S.C. 1362(4) and, therefore, a "person" subject to citizen suits within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. 1362(5); 33 U.S.C. 1365 (a) (1).

56. As a condition of its Clean Water Act "MS4 Permit," the City of Charlotte must enact and enforce local ordinances, rules and regulations implementing the Clean Water Act.

57. In addition, in its proprietary function, the City of Charlotte owns and operates municipal separate storm water system ("MS4"), as well as conducts extensive construction, including stormwater-related construction, which also require permitting under the Clean Water Act.

58. The City of Charlotte delegates stormwater-related construction, including the role of acting as *the named permittee* under the Clean Water Act to its co-Defendant Charlotte-Mecklenburg Stormwater Services, a government instrumentality or an association.

59. Defendant Charlotte-Mecklenburg Storm Water Services, which uses for the purpose of Clean Water Act permitting for the the Hinsdale-Tinkerbell Project the following names: "Charlotte/ Mecklenburg Storm Water," "Charlotte Storm Water Services" and "City of Charlotte Storm Water Services" (hereafter, "Stormwater") — has its principal offices and is doing business in Charlotte, North Carolina, and is, on information and belief, a *government instrumentality* and therefore subject to citizen lawsuit under Section 505(a)(1)(ii), 33 U.S.C. 1365(a)(1)(ii)

or an *association*, and, therefore, a "person" within the meaning of Section 502(5) of the Clean Water Act, and, capable of being a defendant for the purposes of citizen's suit under Section 505(a)(1). 33 U.S.C. 1365(a) (1), 33 U.S.C.1362(5).

60. Defendant Armstrong Glen, P.C. is a South Carolina professional corporation with the principal office in Charlotte, North Carolina and doing business in Charlotte, North Carolina, licensed with the North Carolina Board of Examiners for Engineers and Surveyors, and authorized to practice engineering and land surveying under the provisions of Chapter 89C and 55B of the General Statutes of North Carolina, under license No. C-1856, which was issued on 06/09/2020 and expires on June 30, 2021.

61. Armstrong Glen, P.C. has contracted with the City of Charlotte to provide "various stormwater services" under a contract with cumulative payment of not less than $3,000,000.00 under which Armstrong Glen, P.C. is responsible for construction analysis, drafting and sealing the engineering plans for the Hinsdale-Tinkerbell Storm Drainage Improvement Project. **Exhibit 3**

62. Defendant Joseph ("Josh") H. Letourneau, P.E., is a natural person and, on information and belief, a resident and citizen of Charlotte, North Carolina. Mr. Letourneau serves as a project manager for Armstrong Glen PLLC. Defendant Joseph ("Josh") H. Letourneau is licensed with the North Carolina Board of Examiners for Engineers and Surveyors, and authorized to practice engineering under the provisions of Chapter 89C of the General Statutes of North Carolina, under license No. 029996, which is current and which expires on December 31, 2021. Mr. Letourneau is the engineer responsible for preparation and review of construction drawings, Hinsdale-Tinkerbell Project, and is the engineer placing his sealing on the Project.

63. Clean Water Act allows Section 505 suit against any "person" which is interpreted broadly, to include an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body, 33 U.S.C.1362(5), as well as government instrumentalities or agencies to the extent permitted by the eleventh amendment to the Constitution. 33 U.S.C. 1365(a)(1).

# V. CLEAN WATER ACT: STATUTORY AND REGULATORY BACKGROUND

## A. EROSION AS A MAJOR POLLUTION CONCERN

64. Erosion of land results in sedimentation of streams. It is a major environmental concern nationwide.

65. As stormwater runoff flows over the ground, it accumulates debris, chemicals, pathogens, metals, sediment, or other pollutants that harm water quality, increasing turbidity and chemical pollutants in the receiving water.

66. Fourth District underscores that even "…seemingly benign substances like rock, sand, cellar dirt and biological materials are specifically designated as pollutants under the Clean Water Act." *U.S. v. Deaton*, 209 F.3d 331, 336 (4th Cir., 2000) (*citing* 33 U.S.C. §1362(6))

67. "Sediment depositions destroys fish spawning beds, reduces the useful storage volume in reservoirs, clogs stream, may carry toxic chemicals, and requires costly filtration for municipal water supplies. Suspended sediment can reduce in-stream photosynthesis and alter a stream's ecology." North Carolina Sedimentation Control Commission, North Carolina Department of Environment and Natural Resources, & North Carolina Agricultural Extension

19

Service, *Erosion and Sediment Control Planning and Design Manual,* ch. 2, at 2.5 (May 2013).

68. Sediment impacts are insidiously dangerous because, although ultimately severe, they are "Many environmental impacts from sediment are additive, and the ultimate results and costs may not be evident for years. The consequences of off-site sedimentation can be severe and should not be considered as just a problem to those immediately affected." *Id.*

69. Indeed, deleterious effect of erosion and sedimentation of streams continues long after erosive activity is over, and is so costly that erosion control is considered vital and necessary to the public interest and welfare nationwide.

70. Construction is the major culprit of erosion because "[I]ncreased volume and duration of flows resulting from removal of vegetation and soil compaction that accompany construction activities can contribute to significant increases in soil erosion and transport and discharge of pollutants to surface waters. EPA has authority to promulgate non-numeric effluent limitations that regulate internal processes at construction sites in order to control and minimize the discharge of pollutants to surface waters. *Effluent Limitations Guidelines and Standards for the Construction and Development Point Source Category*, EPA Rule, 79 FR 12661 (2014).

71. Construction is, therefore, scrupulously regulated under the Clean Water Act.

72. For the streams of Charlotte, where every major stream is contaminated by at least one pollutant, and all tributaries are also likely contaminated, although not monitored, with pollutants ranging broadly from fecal coliform to copper, it is the sedimentation burden that constitutes the "major pollution problem," — so oppressive, that the City Charlotte enacted a

dedicated ordinance, *Soil Erosion and Sedimentation Control ordinance* to combat sedimentation pollution in particular. Code 1985, § 18-22

73. "Sediment is the number one pollutant for surface waters throughout the City of Charlotte and Mecklenburg County," announces City of Charlotte Charlotte-Mecklenburg Storm Water Services Surface Water Quality Soil Erosion & Sediment Control page.

74. McMullen creek is on the 303(d) "impaired" list with classification "poor," for the entire length of the creek, from its source to McAlpine Creek, which is also a 303(d) "impaired" stream.

75. Recognizing that the damage from sedimentation in the waters of the City and the State is expensive both economically and environmentally, and that **combating erosion**[3] is "vital to the public interest" and "necessary to the public health and welfare," legislators of the State of North Carolina, County of Mecklenburg and the City of Charlotte, all implemented Clean Water Act through State laws, and County and City Ordinances.

76. The State of North Carolina put it bluntly: "The Sedimentation of streams, lakes, wetlands and other waters of this State constitutes a major pollution problem. Sedimentation occurs from the erosion or depositing of soil and other materials into the waters, principally from construction sites and road maintenance. The continued development of this State will result in an intensification of pollution through sedimentation unless timely and appropriate action is taken. Control of erosion and sedimentation is deemed vital to the public interest and necessary to the public health and welfare, and expenditures of funds for erosion and sedimentation control programs shall be deemed for a public purpose. It is the purpose of this

---

[3] All emphasis in the citations used in the Complaint is mine, unless otherwise specified. IA

Article to provide for the creation, administration, and enforcement of a program and for the adoption of minimal mandatory standards which will permit development of this State to continue with the least detrimental effects from pollution by sedimentation. In recognition of the desirability of early coordination of sedimentation control planning, it is the intention of the General Assembly that preconstruction conferences be held among the affected parties, subject to the availability of staff." N.C. Gen. Stat. §113A-51.

77. Mecklenburg County and the City of Charlotte adopted ordinances that adopted the language almost verbatim, emphasizing that "control of Erosion and Sedimentation is deemed vital to the public interest and necessary to public health and welfare," constitutes "public purpose," and creation, administration, and enforcement of the program through procedures and for the adoption of mandatory standards that will permit development of this City / County to continue with the least detrimental effects from pollution by Sedimentation." Code 1985, § 18-21, Mecklenburg County Soil Erosion and Sedimentation Control Ordinance.

78. The local legislation has been incorporated into Defendants' applications for Clean Water Act permits, and requirements of the local laws and ordinances became conditions of Defendants' Clean Water Act permits. Thus, violation of a local law results in violation of conditions of the Clean Water Act permit, and consequently of the Clean Water Act, as explained more fully below.

79. In cases of construction, Clean Water Act and implementing local laws set out mandatory requirements for sustainable engineering design, serving as non-numeric effluent standards or limitations.

80. Relevant to this case, Clean Water Act regulates: the maximum steepness of graded slopes unsupported by retaining walls, the frequency of terraces required on graded slopes, the angles of stormwater outfalls. The part of Defendants' Hinsdale Tinkerbell Project that is on Plaintiff's land on its face defies several engineering requirements. This violations has already resulted and will result in sedimentation pollution.

81. Defendants intentionally, arbitrarily, in bad faith and without legitimate governmental objective, pursue the injurious and illegal construction design, and refuse to adopt an alternative design.

## B. STRICT LIABILITY OF CLEAN WATER ACT OF 1972 AND THE MANDATORY ENGINEERING STANDARDS FOR CONSTRUCTION

82. Federal Water Pollution Control Act of 1972 ("The Clean Water Act") instituted strict liability for discharge of pollutants in excess of effluent limitations.

83. Clean Water Act of 1972 is a comprehensive statute designed to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. 1251(a). The Clean Water Act establishes a national goal of eliminating the discharge of pollutants into navigable waters. 33 U.S.C. 1251(a)(1).

84. In 1972, the Clean Water Act introduced "a major change in the enforcement mechanism of the Federal water pollution control program from water quality standards to effluent limits." *American Petroleum Inst. v. Train*, 526 F.2d 1343, 1344 (10th Cir. 1975).

85. Prior to the adoption in Clean Water Act of 1972, the focus of federal efforts to abate water pollution was on measurement of the quality of receiving waters, — a mechanism that was found "inadequate in every vital respect.

86. The Clean Water Act of 1972 shifted the focus of federal enforcement to "effluent limitations."

87. Whereas the previous scheme required *proof of actual injury* to the *receiving body of water* to by enacting the Clean Water Act, Congress instituted a regime of *strict liability for discharge of pollutants. Friends of the Earth Inc. v Gaston Copper*, 204 F.3d 149, 151 (4th Cir. 2000).

88. Instead of having to search for a precise link between the act of pollution and the decreased water quality, the inquiry now under liability under Clean Water Act is established when alleged violator is shown to empty more pollutants into the water than the Act allows.

89. This sea change is especially important where, as here, Defendants violate non-numeric effluent limitations, i.e. standards of performance or engineering standards of land-disturbing activities.

90. For land-disturbing activities, like construction, Clean Water Act effluent limitations are expressed in engineering standards and limitations, which are regulated through a system of permits. Plaintiff here does not need to prove that receiving water quality is diminished, but only that Defendants violate engineering, construction, land-disturbing standards.

## C.        CLEAN WATER ACT & THE SYSTEM OF PERMITS

91. To achieve its goal of eliminating pollution, Section 301(a) — the centerpiece of Clean Water Act, — prohibits discharge of *any* pollutant into the waters of the United States by any person *unless* such discharge complies with various enumerated conditions, including compliance with sections 402, 404 and 401. See 33 U.S.C. 1311(a).

24

92. In Sections 402, 404 and 401, the Congress established a system of enforcing conditions to discharge *limited* amounts of pollutants, according to construction plans which, in the case of construction, such as Hinsdale-Tinkerbell Project are individually reviewed and approved. These conditions are known as "Permits."

93. Despite the name, Construction Permits does not give the permit holder "any inherent rights" to use our waterway to discharge whatever wastes it see fit in its construction area.

94. Instead, a construction permit is a system of limitations and principles which the permittee is obligated to follow. Construction designs must be approved by Clean Water Act agents for each project and must be built as approved.

## D. DEFINITIONS RELEVANT TO CLEAN WATER ACT PERMITS

95. When rain water flows from a site where land disturbing activities have been conducted, — such a grading and clearing, — this water is a pollutant under the Clean Water Act. *North Carolina Shellfish Growers v. Holly Ridge Assocs., LLC*, 278 F. Supp. 654, 678 (E.D.N.C. 2003).

96. The Clean Water Act defines "discharge of pollutants" as "any addition of pollutant to navigable waters from any point source." 33 U.S.C. §1362(12); 40 C.F.R. 122.2

97. "Pollutant" is broadly defined under Clean Water Act 502 and includes "dredged spoil, solid waste, incinerate residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discharged equipment, rock, sand, cellar dirt and industrial, municipal and agricultural waste, discharged into water."

98. *Sediment*, which is primarily composed of *sand* and *dirt* is a pollutant. See *North Carolina Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC*, 278 F. Supp. 2d 654, 676 (E.D.N.C. 2003); *Driscoll v. Adams*, 181 F.3d 1285 (11th Cir. 1999) (sand, silt, mud in stormwater are pollutants.)

99. The term "point source" is defined broadly as any "discernible, confined and discrete conveyance, including, but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation or vessel or other floating craft, from which pollutants are to may be discharged." 33 U.S.C. 1362(14); 40 C.F.R.122.2

100. Construction site is itself a single point source. *North Carolina Shellfish Growers v. Holly Ridge Assoc*, 278 F. Supp. 2d 654 (E.D.N.C. 2003)

101. "Waters of the United States," i.e. "navigable waters" as defined by Section 502(7) include "tributaries" to "navigable waters." 33 U.S.C. 1362(7); 33 C.F.R. 328.3(a)(3); 33 C.F.R. 328.3(c)(12); 40 C.F.R. 120.2(1)(ii); 40 C.F.R. 120.2(3)(xii)

102. Catawba River, including its tributaries constitutes "waters of the United States" within the meaning of within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. 1362(7).

103. The unnamed tributary flowing through the Hinsdale Street culvert and on the land known as 2813 Hinsdale Street, Charlotte, North Carolina, flows uninterrupted approximately 1000 feet to McMullen Creek, then continues into the McAlpine Creek, which ultimately empties into the the Catawba River.

104. The unnamed tributary flowing through the culvert under 2813 Hinsdale Street, Charlotte, North Carolina constitutes "waters of the United States" within the meaning of 33 U.S.C. 1362(7), and is "jurisdictional."

105. All waterbodies described herein constitute "navigable waters," "waters of the United States" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. 1362(7).

## E.     DEFENDANTS MUST SATISFY CONDITIONS OF THE PERMITS UNDER CLEAN WATER ACT, SECTIONS 402, 404 AND 401

106. Permits under three separate Clean Water Act sections are in play for the Hinsdale-Tinkerbell Project, which it is a common plan disturbing over five acres of land: Section 402, Section 401 and Section 404.

107. Section 402 of the the Clean Water Act requires NPDES permit for storm water discharges associated with construction activities, including clearing, grading, and excavation that are a part of a larger common plan if the larger common plan will ultimately disturb more than one acre or five acres. See 33 U.S.C. 1311; 40 C.F.R. 122.26(b)(14)(x);122.26(b)(15)(i).

108. Section 404 of the Clean Water Act requires permits for the discharge of dredged and or fill materials, including redeposit of sediment during construction.

109. Section 401 requires Defendants to obtain certification from the State in which the discharge originates that the discharge complies the applicable water quality standards. This certification is a condition of the U.S. Army Corps of Engineers Section 404 permit.

## 1.     Section 402 of the Clean Water Act — the National Pollution Discharge Elimination System ("NPDES")

27

110. Section 402 sets up the National Pollutant Discharge Elimination System (NPDES), the permit program that enforces Clean Water Act's effluent limitations. 33 U.S.C. 1342.

111. Permit holders must strictly comply with the conditions of their NPDES permits. "Congress now instituted a regime of strict liability for illegal pollution discharges." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 151 (4th Cir. 2000).

112. Defendant City of Charlotte is a permittee under section under Section 402 in two different capacities — as a construction operator and as an entity that regulates construction operators.

**NPDES General Permit No. NCG010000**
(City of Charlotte as a Contractor-Developer)

113. Both the EPA and the individual States (with the EPA approval) may issue NPDES permits. Accordingly, the State of North Carolina, acting under the authority of the federal Clean Water Act, by the authority of the the North Carolina Environmental Management Commission, the State of North Carolina Department of Environmental Quality, Division of Energy, Mineral and Land Resources, issued general NPDES Permit No. NCG010000 to discharge stormwater (issued April 1, 2019, expires March 31, 2024).

114. When the City of Charlotte builds its own projects (i.e. Hinsdale-Tinkerbell), it must comply with conditions of NPDES General Permit No. NCG010000 ("**NPDES General Permit No. NCG010000**") A true and correct copy of NPDES General Permit No. NCG010000 is attached as **Exhibit 6** and incorporated herein by reference.

115. Defendants must comply with all the conditions of **NPDES General Permit No. NCG010000** in the same manner as do similarly situated private contractors subject to the

28

North Carolina Sedimentation Pollution Control Act. See Permit NCS000240 Part II, Section F(5) at 7.

116. The only difference between the City of Charlotte and the private contractors is that the City Engineer may not act as enforcement authority of NPDES General Permit No. NCG010000 when City of Charlotte is the contractor, in order to avoid conflict of interests.

117. In order to comply with the Clean Water Act, any "owner and operator" who conducts in the City of Charlotte "construction, … including clearing, grading or excavation activities resulting in disturbance of land greater than or equal to one acre, or that is part of a common plan of development of that size" must receive coverage under an NPDES Permit, notify the Clean Water Act agent of the exact design that it plans to build, receive approval, and build in exact accordance with the approved design, in addition to abiding by conditions of the permit.

118. Violation of conditions of the NPDES General Permit No. NCG 010000 constitute violations of the Clean Water Act.

## NPDES Permit No. NCS000240
### (City of Charlotte as Legislator and Enforcer of Clean Water Act)

119. Additionally, Defendant City of Charlotte, in its capacity of a legislator, enforcer and the operator of municipal separate storm sewer systems ("MS4"), must comply with NPDES Permit No. NCS000240, a permit to discharge stormwater issued by the North Carolina Division of Energy, Mineral and Land Resources, by the Authority of the Environmental Management Commission, effective October 10, 2018. "NPDES Permit No. NCS000240."

120. Administrator of EPA may delegate to the States his authority to issue and enforce the Section 402 NPDES Permits for discharge of stormwater within their jurisdiction. In turn,

States may delegate enforcement responsibilities to Cities under periodically renewable NPDES permits. Accordingly, the State of North Carolina, acting under the authority of the federal Clean Water Act, by the authority of the the North Carolina Environmental Management Commission, the State of North Carolina Department of Environmental Quality, Division of Energy, Mineral and Land Resources, issued to the City of Charlotte NPDES Permit No. NCS000240 to "operate, administer, and enforce Construction Site Runoff Control and Post Construction Site Runoff Control Programs," provided that the City is in compliance with the Permit Conditions. A true and correct copy of the **Permit No. NCS000240** is attached as **Exhibit 7** and incorporated herein by reference. NPDES Permit No. NCS000240 must be periodically renewed.

121. Most recently, the City of Charlotte successfully applied for renewal in 2017. *City of Charlotte, NPDES MS4 Permit Renewal Application & Stormwater Management Program Report* (2017) is attached as **Exhibit 8** and incorporated by reference and also accessible in the provided link.[4]

122. All obligations contained in *City of Charlotte NPDES MS4 Permit Renewal Application and Stormwater Management Program Report* are incorporated by reference into **NPDES Permit No. NCS000240.** Thus, a breach of promises the City made in its *Application* constitutes violation of the permit and, consequently, violation of the Clean Water Act.

---

[4] *City of Charlotte NPDES MS4 Permit Renewal Application & Stormwater Management Program Report* (2017) *is accessible through:* https://charlottenc.gov/StormWater/SurfaceWaterQuality/ Documents/Charlotte%20NPDES%20MS4%20Permit%20NCS000240%20Renewal%20App-SWMP%20Report-Aug%202017%20-%20FINAL.pdf (last accessed 05/12/2021)

123. As a condition of NPDES Permit, the City is required to maintain "regulations, ordinances, policies and procedures to implement all provision of the Stormwater Plan." NPDES Permit No. NCS000240, Part II, Section A(1), at 1 of 16.

124. As conditions of the Permit, the City must comply with the Chapter 4 and Title 15A of the North Carolina Administrative Code, with the North Carolina Sediment Pollution Control Act of 1974 and City's own Ordinances listed in its permit application.

125. Violation of the Section 402 NPDES Permit No. NCS000240 not only constitutes violation of the Clean Water Act, but also is grounds for rescission of the City's authority to supervise private construction, which it enjoys under Permit NCG010000.

## 2.                 Section 404 of the The Clean Water Act

126. Section 404 prohibits discharge without permits of "dredged and fill materials" into the "waters of the United States," including the tributaries to such waters.

127. "Dredged and fill" includes re-deposited materials, including dirt, rock, sand.

128. Section 404 conditional permits of the Clean Water Act are overseen by the U.S. Army Corps of Engineers.

129. Department of the Army the US Corps of Engineers issued RGP-163 effective April 24, 2017, expiring after 5 years.

130. Defendant Stormwater, under the name "Charlotte Storm Water Services" is the permittee of Regional General Permit 2016-00163 (RGP 163). A copy of RGP-163 is attached hereto as **Exhibit 9,** and incorporated herein by reference. (The actual Hinsdale-Tinkerbell Project was

31

reviewed under another Stormwater's other name, — Charlotte-Mecklenburg Storm Water Services.)

### 3.                                Section 401 of the Clean Water Act

131. For projects eligible for Section 404 permits, the State of North Carolina oversees compliance with water quality standards through a system of State Water Quality Certifications. North Carolina Department of environmental Quality, Division of Water Resources Agent in charge of Section 401 compliance issues and enforces Approval of construction projects on a case by case basis. Defendant Stormwater, under the name "Charlotte Storm Water Services" is the permittee of the Water Quality general Certification No. 4147, attached hereto as **Exhibit 18** and incorporated herein by reference.

### 4.        Notification and Approval of construction projects by Clean Water Act Agencies, or "permit verifications" or "permit approvals"  is known as "receiving permits"

132. The existence of conditional general permits is not sufficient to start construction.

133. In order to comply with the conditions of their Permits, Defendants must submit detailed accurate information about their proposed construction to the Section 401, 402, and 404 Agents. Once proposals are approved, Defendants must build in accordance with the approved design. Permittees of construction projects over one acre, such as Hinsdale-Tinkerbell Project must submit to the Clean Water Act Agents drawings, maps, soil analysis, and the like details of their individual construction project for review and approval, — which is the process known in the industry as "permit approval" or "permit verification." Conditions of approval of the individual construction projects become condition of Permittees'

compliance with Clean Water Act. Deviations are not allowed without a fresh review and approval by the Agencies.

### 5. Defendants-Permittees must Comply with mandatory land-disturbing standards which are incorporated into State, County and City laws and ordinances enacted to implement Clean Water Act

134. The City of Charlotte is required by the conditions of it Permit NCS000240 to implement and enforce compliance with construction and post-construction site runoff control within its jurisdiction. Failure to do so will result in loss of the City's ability to oversee builders and developers in the Charlotte area.

135. In compliance with Permit NCS000240, the City of Charlotte enacted *ordinances* and developed local engineering *manuals* which promulgate "mandatory standards [for] development of this City with the least detrimental effect from pollution by Sedimentation." Code 1985, § 18-22. Many of the Manuals are a joint effort with the Mecklenburg County.

136. In compliance with permits under Section 401, 402 and 404 of the Clean Water Act, the permittees must abide by the *North Carolina Sedimentation Pollution Control Act of 1973* (N.C. Gen. Stat. §113A-50) which dictates **mandatory** land-disturbing engineering requirements, and comply with requirements of State and local dynamic engineering design manuals.

137. Construction in violation of the following local laws, ordinances and manuals constitutes violation of conditions of the permit and the Clean Water Act.

138. For Hinsdale-Tinkerbell Project, controlling local ordinances include:

*Charlotte Stormwater Pollution Control Ordinance*, Code 1985, § 18-1

33

*City of Charlotte Soil Erosion and Sedimentation Control Ordinance,* Code 1985, § 18-21

*City of Charlotte and Mecklenburg County Soil Erosion and Sedimentation Control Ordinance* Policies and Procedures (2018)[5]

*Post Construction Controls Ordinance, Ord. No. 3764, § 1(101), 11-26-2007*

139. Controlling manuals include:

City of Charlotte, *Land Development Standards Manual* (Rev. 20, January 29th. 2021)

Mecklenburg County, *Land Development Standards Manual* (Rev. 2020)

*The State of North Carolina Erosion and Sediment Control Planning and Design Manual.* North Carolina Sedimentation Control Commission, North Carolina Department of Environment and Natural Resources, & North Carolina Agricultural Extension Service, *Erosion and Sediment Control Planning and Design Manual,* ch. 2, at 2.5 (May 2013).

Charlotte Chamber Design Manual Task Force, City of Charlotte Engineering Department, Mecklenburg County Engineering Department, Debo and Associates & Ogden Environmental and Engineering Services, *Charlotte-Mecklenburg Stormwater Design Manual* (Rev. Jan1, 2014).

140. **The more restrictive of State and Local standards is to be used.** City of Charlotte & Mecklenburg County, *Soil Erosion and Sedimentation Control Ordinance Policies and Procedures*, Section 17-3(c) (2018).

---

[5] Implementation of dynamic "Policies and Procedures" is mandated by Section 17-33.1 of the *City of Charlotte Soil Erosion and Sedimentation Control Ordinance* and Section 8(a) of the Mecklenburg County Soil Erosion and Sedimentation Control Ordinance. Mike Davis, the City Engineer of the City of Charlotte & Ebenezer Gujjarlapudi, County Engineer, "Policies and Procedures." https://charlottenc.gov/StormWater/Regulations/Documents/SECPoliciesandprocedures.pdf (July, 2018)

34

141. Applying for its *NPDES MS4, the* City of Charlotte recognized that "[i]mproper erosion control practices at construction sites can result in sediment discharges to the storm drainage system." Combatting construction erosion is a condition of its permit.

142. In addition, Charlotte recognized that uncontrolled volumes of stormwater runoff can cause scouring of stream banks resulting in increased sediment volumes in streams and combatting scouring of stream banks is also a condition of its Section 402 permit. *City of Charlotte NPDES MS4 Permit Renewal Application*, Section 7.1.2, Table 7-2, at 22. (August 2017).

**6. Clean Water act, the implementing local laws and the conditions of Defendants' permits require defendants to follow erosion-controlling engineering principles**

143. Defendants' construction on Plaintiff's land will disturb jurisdictional, "impaired" water-side slope.

144. In grading the Slope along the stream, as they threaten to do, Defendant are required to abide by engineering principles explained below in order to comply with the Clean Water Act.

145. By Defendants' own calculations and admissions, they propose to grade the Slope at an angle of 1.5-1, without terracing and without structural stabilization, although at least two terraces are required.

146. Additionally, Defendants intend to replicate stormwater outfall that shoots stormwater across the main creek at the opposite bank at a nearly perpendicular (90 degree) trajectory, and has already caused channel degradation and scour. **Exhibit 20, Photos 10 A & B**

147. The following erosion control land development principles, standards and mandates are in play:

35

### a. Clean Water Act mandates: Defendants must minimize disturbing the slope, must stabilize steep slope they do disturb with *adequate* erosion-controlling devices, and must abide by the requirements of 2:1 maximum steepness & every 10 feet minimum terracing

148. Sloped terrain is a highly erodible area.

149. Construction must minimize disturbance of steep slopes. 40 CFR 450.21(a)(4).

150. If disturbance of slopes is unavoidable, conditions of Defendants' Clean Water Permits incorporate mandatory state and local requirements for land-disturbing activities explained below.

151. Ensuring that slopes do not erode as a result of land-disturbing activity is such an important goal, that it is prominently restated in Federal law, state law, local ordinances, state and local manuals and conditions of Defendants' Clean Water Act permits.

152. North Carolina Statute law (incorporated into the conditions of Defendants' permits) dictates **mandatory standards for land-disturbing activity**: The angle for graded slopes and fills shall be no greater than the angle that can be retained by vegetative cover or other adequate erosion-control devices or structures. Slopes will be provided with temporary or permanent ground cover, devices, or structures sufficient to restrain erosion. N.C. Gen. Stat. §113A-57(2)

153. Steepness of the slope is expressed as a ratio of horizontal travel to vertical rise.

154. For instance, a "4:1 slope" is the slope which for every 4 feet of horizontal travel has only 1 foot rise.

155. "Steep" slopes in Charlotte area are defined as slopes steeper than 4:1 (4 feet horizontal run for every 1 foot vertical rise).

156. "2:1" slope (2 feet horizontal run for every 1 foot vertical rise) is the maximum (steepest) slope that typically can be stabilized by *vegetation* alone, without structural support.



157. Additionally, minimum terracing requirements must be met.

158. *Charlotte-Mecklenburg Stormwater Drainage Manual* (incorporated into conditions of Defendants' permits) mandates: "Channel side slopes shall be stable throughout the entire length and slope **shall be no steeper than 2:1**." Charlotte Chamber Design Manual Task Force, City of Charlotte Engineering Department, Mecklenburg County Engineering Department, Debo and Associates & Ogden Environmental and Engineering Services, *Charlotte-Mecklenburg Stormwater Design Manual* ch 3, §3.2.1(1), at 3-2 (Rev. Jan1, 2014).

159. The *City of Charlotte Land Development Standards Manual* (incorporated into conditions of Defendants' permits) mandates: "All graded creek banks and slopes **shall be at a maximum of two (2) feet horizontal to one (1) foot vertical (2:1)** and not exceed 10 feet without **terracing**…"

160. The City of Charlotte and Mecklenbug County illustrate these requirements in City of Charlotte Slope Stability land development standard, prepared by the City of Charlotte itself, Std. 30.16. **Exhibit 10** shows the requirements that slope angles must be 2:1 or flatter, and that terracing must be provided at least every ten feet.

37

161. As detailed below, Defendants' design violates both of these requirements, grading significantly steeper that the maximum 2:1, and without any terracing on the slope where at least two terraces are required.

162. Even stricter warning that the 2:1 requirement must me met is contained in the *City of Charlotte and Mecklenburg County Soil Erosion and Sedimentation Control Policies and Procedures. Policies and Procedures* (incorporated into conditions of Defendants' permits) mandates "Enhanced Erosion Control Requirement" for 303(d) "impaired" creeks that "slope steepness shall be limited to 2:1" and that "slopes steeper than 3:1 must be terraced…" *Policies and Procedures, Section* 17-32(a)(11).

163. All major streams in Charlotte are impaired listed, and all tributaries are likely impaired, but not monitored. McMullen Creek is listed for benthos impairment.

164. The 2:1 maximum slope steepness and mandatory terracing are "Slope Stability Standards," i.e. land development standards mandated by City of Charlotte, *Land Development Standards Manual,* Std. No. 30.16, Rev. 12 (Rev. 20, January 29th. 2021), and also Mecklenburg County Land Development Manual, Std. No. 30.16. **Exhibit 10**

165. "Slope Stability Standards" are incorporated by reference through implementing local and State laws and made conditions of the City of Charlotte's MS4 Permit NCS000240 and NPDES Permit NCS0000100, Charlotte Stormwater Services' RGP 163 and Section 401 certifications No. 4147 and 4133.

166. NPDES Permit NCS100 mandates and underscores again: "the angles for graded slopes and fills shall be no greater than nan be retained by vegetative cover or other erosion control devices." Part II, Section B(3), at 5 of 26. (citing to N.C. Gen. Stat. 113A-57(2)).

38

167. Any slope steeper that 2:1 requires stabilization by a *retaining structures* to prevent erosion. "Erosion control structures" include concrete retaining walls, culvert wing-wall extensions and culverts extensions. Both terracing and structural support are required to stabilize a graded slope over 10 foot at an angle steeper than 2:1. Ground stabilization must withstand storm.

168. It is a violation of the Clean Water Act, of the North Carolina Sediment and Pollution Control Act of 1973 to abandon graded slope steeper than 2:1 and exceeding ten feet without terracing and without providing structural support.

169. Slopes steeper than 2:1 and / or exceeding 10 feet must be designed by a geotechnical engineer.

170. Allowing contractor to make decisions about constructions and storage on slopes exceeding 2:1 as part of contractor's "ways and means" violates Clean Water Act and the conditions of construction permits.

**b.     Clean Water Act mandates that Defendants must preserve natural vegetation to the maximum degree possible**

171. Removing the vegetative cover and altering the soil structure by clearing, grading and compacting the surface increases the area's susceptibility to erosion.

172. Clearing existing vegetation … increases runoff velocities and volumes. North Carolina Sedimentation Control Commission, North Carolina Department of Environment and Natural Resources, & North Carolina Agricultural Extension Service, *Erosion and Sediment Control Planning and Design Manual*, ch. 2, at 2.8 (May 2013)

173. Clean Water Act requires vegetation to be preserved to the maximum degree possible. *Id.* at 2.7 (May 2013).

174. Tree and shrub cover along the stream stabilize the stream banks and prevent erosion. Tree and shrub cover should be retained as much as possible in order to stabilize the ground and prevent erosion. Unnecessary bulldozing off trees and shrubs on stream banks violates Clean Water Act and the conditions of Clean Water Act permits.

### c. **Clean Water Act mandates that Defendants must design smooth and gradual transitions of stormwater into main stream and / or place culvert end-wall in a way dissipate stormwater energy**

175. Improperly designed stormwater structures can cause or contribute to turbidity, scouring of stream banks, channel destabilization, degradation and, therefore, to the sediment pollution.

176. The City of Charlotte acknowledged that "uncontrolled volumes of stormwater runoff can cause scouring of stream banks resulting in increased sediment volumes in streams" and made it a condition of its permit to take measures. City of Charlotte, *NPDES MS4 Permit Renewal Application* and *Stormwater Management Program Report,* Section 1.4, at 4-5, Section 7.1.2, Table 7-2, at 22 (August 2017).

177. Turbidity in the streams is one of the primary pollutants in navigable waters flowing through Charlotte.

178. Engineering principles for avoiding turbidity are incorporated into conditions of Defendants' permits.

179. Stormwater outlets must be aligned to allow smooth flow of stormwater into the receiving channel.

180. "Transition from closed systems to channel sections (or between transitioning channel sections) shall be smooth and gradual, with a minimum of 5:1 taper." Charlotte-Mecklenburg Stormwater Design Manual, Ch. 3, §3.2.1(4), at 3.2 (Rev. January 1, 2014)

181. "A stable channel is defined as a channel which is nonsilting and nonscouring." *North Carolina Erosion and Sediment Control Planning and Design Manual,* Appendices, 8.05, at 8.05.1

182. As a practical matter, *Charlotte-Mecklenburg Stormwater Design Manual* has been offered by Defendants to the 401 and 404 Agents as an authority for the design requirements in discussing the Hinsdale-Tinkerbell Project.

### d. Clean Water Act mandates that Defendants must minimize destruction of bedrock in the stream

183. Unjustified bedrock blasting and destruction by non-conventional methods is prohibited by the Clean Water Act and the conditions of Defendants' permits.

### 7. Clean Water Act, the implementing local laws and the conditions of their permits require defendants to be transparent with private citizens

184. Transparency requirement of Clean Water Act requires construction operators to provide to the public all information necessary for enforcement of the act.

185. Conditions of its NPDES Permit requires Defendant City of Charlotte to create mechanisms for informing its citizens and for providing them an opportunity for input. 33 U.S.C. §§ 1365 (a), Section 308(b)(2), 308(a) of Clean Water Act, NPDED Permit No. NCS000240, N.C. Gen. Stat § 113A-54.1(a).

41

# VI.                  FACTUAL BACKGROUND

186. Plaintiff's house, guarded by two retaining walls, sits on a tall, steep slope (the "Slope") on

the southwest corner of Hinsdale Street culvert over a McMullen Creek tributary. The Slope is

so steep that an average man can not walk down on a straight line from the house to stream-

bed 25-30 feet below.[1]



**Photo 1**
2813 Hinsdale Street, Charlotte, North Carolina 28210
Hinsdale St. Culvert over McMullen creek tributary (behind the mailbox/lion)

---

[1] Illustrative photographs are included in the text for convenience of the Court. Photographs as also submitted as a separate exhibit, per court rules. **See Exhibit 20**

187. Slope angles between Plaintiff-Landowner's house (the "House") and the McMullen Creek

tributary stream-bed range from 45 to 90 degrees (vertical).

188. A narrow terrace winds along the Slope above the bedrock-encased bottom of the McMullen



**Photo 2**
Defendants intend to bulldoze the slope from stream-bed below up to
the retaining wall

Creek tributary (the Stream).

189. The existing terracing, tree roots and shrubbery, and boulders on the Slope are critical for

holding up the Slope.

190. Defendants' stated construction purpose is improving the Hinsdale Culvert and stream-bed, below.



**Photo 3**

View from P's House down, at the Stream. Hinsdale culvert is the pipe below, left. Defendants intend to bulldoze the Slope from stream-bed to the retaining wall, shown

191. Defendants have no legitimate purpose in destroying the Slope 25-30 above their construction at Hinsdale culvert.

192. Nevertheless, Defendants in bad faith, arbitrarily and with deliberate intent to do harm insist on grading up, vibrating, destroying the steep Slope, all the way up to the retaining wall, which is needed for supporting the foundation of Plaintiff's house.

## A. DEFENDANTS' DESIGN OF HINSDALE-TINKEBELL PROJECT ON PLAINTIFF'S SLOPE VIOLATES CLEAN WATER ACT AND THE CONDITIONS OF DEFENDANTS' PERMITS. DEFENDANTS PERSIST IN THEIR UNLAWFUL DESIGN WITH THE INTENT TO INJURE THE ENVIRONMENT AND DAMAGE PLAINTIFF'S PROPERTY

193. The process of grading is in itself dangerous both for the environment and for the structural safety of structures.

194. Defendants gratuitously multiply the danger of grading beyond their legitimate construction area, and also refuse to provide adequate post-construction stabilization.

195. Defendants will rip out the long established roots of old trees, rip out shrubbery destroy the terracing and then abandon the slope without the necessary terracing and retaining walls, at angles too steep to withstand erosion.

196. Photo 2 illustrates the view from Plaintiff-Landowner's house down at the stream. Defendants plan to ravage the Slope by grading all the way between the stream and the retaining wall.

197. In 2018, Plaintiff retained Diamond Engineering PLLC to review Defendants' designs.

198. On 12/06/2018 and 06/17/2019, Diamond Engineering, PLLC issued two sealed opinion letters, presenting Defendants with corrections of two separate defects of their design. **Exhibits 1 and 2.**

199. Diamond Engineering, PLLC corrections would minimize disturbance, reduce erosion of the Slope and reduce construction cost.

200. Diamond Engineering, PLLC warned that Defendants plan "…poses substantial risk to the structural integrity of [Plaintiff's House], both during construction and in later years."

**Exhibits 1**

201. Diamond Engineering, PLLC warned that the Defendants' 1:1-5 design is unstable, reminded that "[a] 2:1 slope (a slope that drops 1' within 2' of travel) is the maximum slope which is typically considered stable." **Exhibits 1**

202. Diamond Engineering, PLLC warned that Defendants should not touch the slope, because it will likely collapse if they do: "The steepness of this slope makes any construction in this area difficult, expensive, and subject to erosion and slope failure." **Exhibit 1**

203. Diamond Engineering PLLC warned that Defendants' plan makes "the probability of soil settlement either during or after construction is significant." **Exhibit 1**

204. Diamond Engineering PLLC warned that Defendants' should not dig sewage line under bedrock because "rock removal using either blasting or another nonconventional construction method … will also increase the probability of damag[e]." **Exhibit 1**

205. On June 17, 2019, Diamond Engineering PLLC issued a second Opinion Letter an again warned that "slopes steeper than 2:1 are subject to slope failure and erosion due to their inability to obtaining and maintain[ing] an adequate vegetative cover." **Exhibit 2**

206. Defendants' proposed slope is at least as steep as 1.5:1. Defendants insist on grading the Slope in a manner that will cause it to erode and fail.

207. Diamond Engineering PLLC again warned that Defendants' plan to grade "unstable slope" "uncomfortably close" to the House warranted a redesign. **Exhibit 2**

208. Diamond Engineering PLLC warned that "grading in that area will destroy the existing stable vegetation and structures and will subject the house foundation to blasting and vibration from moving construction equipment." **Exhibit 2**

209. Diamond Engineering, PLLC underscored that Slope steepness exceeds "maximum slope that is … considered stable" and, therefore, Defendants' "plan … poses a substantial risk … both during construction and in the later years." **Exhibit 1**

210. Diamond Engineering, PLLC reminded that "A typical and maintainable maximum slope for soils in the piedmont of North Carolina is 2:1, then noted that, according to Defendants, the "slope closest to the [House] is proposed to be 1.5-1. **Exhibit 2**

211. Diamond Engineering, PLLC warned that 1.5-1 is "subject to erosion due to the inability to obtaining and maintaining an adequate vegetative cover." **Exhibit 2**

212. Diamond Engineering, PLLC then offered two design changes that eliminated the need for grading Slope at erosive angles **Exhibit 1 and 2**

213. In response to Diamonds' letters, Defendants made several iterations of design. While Defendants mostly agreed to remove their own structures out of the unstable slope, they *increased* their original grading of the Slope, thus increasing threatened erosion to the slope and damage to Plaintiff's house and structure, and to the environment.

214. Defendants initial design included cutting structures into the Slope. They had designed to cut in a sewage line, sewage manhole(s) and a flared wing-wall deep and high into the Slope.

215. Johnny Denton of Diamond Engineering, PLLC designed alternative placements for these structures, which would eliminate the need to disturb the Slope and even decrease Defendants' cost. **Exhibits 1 & 2**

216. Eventually, Defendants (partially) agreed with Diamond Engineering to reposition their structures, but refuse to leave alone the Slope.

217. Although the ostensible purpose of interfering with the Slope (inserting structures) is no longer is present, Defendants continue to insist on damaging the slope and causing instability and erosion. Defendants are acting in bad faith, arbitrarily, and with intent to injure.

218. Indeed, Defendants deliberately, arbitrarily and in retaliatory *increased* the graded area under Plaintiff's house by approximately 7 times.

219. Before Diamond Engineering PLLC's letter, Defendants' design positioned new 12 foot deep sewage manhole(s) at the hight of 24 feet, inside the Slope.

220. Diamond Engineering, PLLC summarized Defendants' plan: "Sewer manhole #2 on sheet U1, which is closest to [Plaintiff's] residence, will be approximately 12' deep and and will be constructed on a 24' high slope that exceeding 2:1 in slope. A 2:1 slope (slope that drops 1' within 2' of travel) is the maximum slope that is typically considered stable. The steepness of the slope makes any construction in this area difficult, expensive and subject to erosion and slope failure. This proposed manhole, — observed Diamond Engineering, — is within 24' of the corner of [Plaintiff'] foundation which is 12' above the proposed manhole. Considering all these factors, the probability of soil settlement either during or after construction is significant." **Exhibit 1**

221. Diamond Engineering, PLLC delivered a sealed opinion with this warning: "[Defendants'] plan, as it is currently proposed, poses substantial risk to the structural integrity of [Plaintiff's] residence, both during construction and in the later years." **Exhibit 1**

222. In addition to precariously forcing a sewer manhole into the Slope under the corner of Plaintiff's house, Defendants' design added a leg of sewage line, that would traverse the stream under the bedrock.

223. Defendants' underwater, under bed-rock sewage crossing required bedrock blasting.

224. Additional blasting was planned to return the sewage line back to the bank opposite of Plaintiff's house, from which the line had started.

225. "Sewage in the unstable Slope" design was interposed with the deliberate intent to injure the environment and Plaintiff's property.

226. Defendants first presented the "Sewage in the unstable Slope" design to Plaintiff in 2017, but until Plaintiff-Landowner "engineered up," Defendants refused to give up their "zig-zagging sewage high into Slope."

227. When Plaintiff pointed out the obvious design defect, instead of acknowledging their, Defendants initially responded by extortion in the amount of a little over $28,000.

228. On March 12, 2018, Project Manager John Keene emailed Plaintiff indicating that Defendants *might* agree to remove the sewage manhole from her House foundation and refrain from destabilizing the slope, but there would be, per Keene, "a catch."

229. "It is possible that I may have better news regarding the sanitary sewer … that would move the new sanitary sewer to the opposite side of the creek, per your suggestion, — wrote Keene, — but "[t]here would be a catch regarding the possible redesign of the sanitary sewer." The "catch" was that Defendants would not correct design defect unless Plaintiff to "donated" the entire cost of easement.[2]

---

[2] 3/12/2018 John Keene's email to Aylward

230. Plaintiff refused to pay this blackmail.

231. As a result, Defendants refused to correct their obvious design defect, and scheduled condemnation of Plaintiff's land for City vote to occur on or about December 10, 2018.

232. As a result of Defendants' insistence on this absurd design, Plaintiff was forced to seek review of Diamond Engineering, PLLC.

233. Defendants took the condemnation from the schedule only when, by his December 6, 2018, sealed opinion, Diamond Engineering PLLC confirmed that if they insisted on their plan, "the probability of soil settlement either during or after construction is significant."

234. The sealed opinion of Diamond Engineering, PLLC recommended to relay the sewage line straight, without the zig-zagging it away from its natural course and without cutting it into the Slope right under the corner of Plaintiff's house.

235. Diamond Engineering, PLLC proposed a straightforward design correction: "The sewer line currently zig-zags back and forth and crosses the creek in two locations. … Charlotte-Mecklenburg Storm Water Services should relay the sewer line on the northeast side of the creek from sheet U-6 up to and into the proposed manhole 4 on sheet U-1. The topography along the northeast side of the creek is flatter and lower and will allow for easier construction and reduced construction cost." **Exhibit 1**

236. Diamond Engineering, PLLC opined that running the sewage line *straight* down the left bank would "eliminate both unnecessary creek crossings, secure the lines from potential washout and damage from floating debris, reduce construction cost, and eliminate potential damage to [Landowner's] residence." **Exhibit 1**

50

237. Denton, P.E. of Diamond Engineering designed the proper, straight, alignment for the sewage and personally delivered it to Mr. Keene not later than 1/23/2019.

238. On or about April 11, 2019, Defendants agreed to a partial correction of their sewage zig-zag design defect.

239. Corrections recommended by Diamond Engineering PLLC were based on the foundational principles of engineering: water does not run uphill; sewage lines should not be zig-zagged up into steep slope; blasted bedrock must be avoided; sewage lines underwater must be avoided; sewage manholes high up in unstable slopes lead to slope erosion, and placing sewage inside unstable eroded slope is undesirable.

240. Corrections recommended by Diamond Engineering, PLLC would minimize environmental impact, save Defendants' construction costs and protect the structural integrity of Plaintiff's House.

241. Until Plaintiff "engineered up," Defendants had pressed their defective and injurious design, with the intent to injure the environment and Plaintiff's property, notwithstanding the fact that "Sewage Zig-Zag in the Slope" design increased City of Charlotte's cost of construction and threatened the security of the sewage lines.

242. In the end, Defendants only partially followed Diamond Engineering recommendation.

243. Defendants did abandon the plan of cutting sewage manhole into the steepest, tallest part of the Slope and move the manhole downstream to a lower, flatter part of the southwest, (right, when facing downstream) bank.

51

244. However, Defendants continue to refuse to eliminate the unnecessary zig-zag underwater sewage crossings. As a consequence, Defendants will use undisclosed non-conventional methods for blasting bedrock.

245. **Exhibit 11** prepared by Stormwater's Project Manager John Keene illustrates the straight placement of the sewage line designed of Johnny Denton of Diamond Engineering PLLC — the design, which Defendants refuse to adopt (straight red line that follows left bank of the stream) vs. Defendant's zig-zag placement of the sewage line under bedrock. Orange line is Defendant's pre-Diamond Engineering plan that involved sewage cut deep into the slope.

246. In May of 2019, Plaintiff alerted the United States Army Corps of Engineers' Agent Chrystal Amschler to Defendants' plan of sewage zig-zag and bedrock blasting.

247. As a result, the United States Army Corps of Engineers' Agent Chrystal Amschler had a private discussion (without Plaintiff) with the Hinsdale-Tinkerbell Project manager Mr. John Keene.

248. Following that discussion, on or about May 22, 2019, the USACE Agent Chrystal Amschler emailed Defendants and the Section 401 Agent Alan Johnson warned that blasting without justification violated Defendants' permit requirements, and that alternative solutions were required, writing: "The other thing that [Stormwater's Project manager] John [Keene] mentioned was the need to potentially blast or cut through bedrock to bury a water line for the City. I told him, that blasting has potential issues, including fracking and loss of stream flow, and we would require justification on why the utility line couldn't be aerial or otherwise installed without blasting or with less intrusive methods …

just wanted to put that on everyone's radar as well. I assume that the utility line would be wrapped into a permit with the rest of this project, correct?"

249. In response, Defendants openly and rudely rebuffed the United States Army Corps of Engineers, and announced their disregard for Clean Water Act Agents' instructions and contempt for Clean Water Act Agents' warnings. At the time, Plaintiff was not copied and not aware of the exchange.

250. Responding to USACE Agent Chrystal Amschler on May 22, 2019, the Stormwater's Project Manager John Keene led Defendants in their demonstration of contempt for the Clean Water Act Agencies.

251. Project Manager John Keene e-mailed back to USACE Agent Chrystal Amschler, copying her colleague Bryan Roden Reynolds, the Section 401 Agent Alan Johnson, and multiple Defendants' staff, including Erin Shanaberger, Isaac Hinsaonand Doug Lozzner. In his May 22, 2019 e-mail, Mr. Keene bluntly and rudely rebuffed Agent Amshler, effectively saying the line was sewer (not water) and Stormwater would blast if they wanted: "It's a sanitary sewer line, instead of water line, that has the potential for blasting. … since the City cannot dictate the contractor's means and methods … I don't see the need to change the plans…" **Exhibit 12**

252. On information and belief, all of Mr. Keene's colleagues silently approved of his expression of Defendants' contempt and disregard for the Agencies' comments, and the Agencies shied away from discussion about blasting at that time.

253. On information and belief, Defendants never admitted to the Agencies that there was no justification to blasting and zig-zagging sewage under water, that environmentally

preferable alternative existed, and that Defendants refused to adopt the environmentally preferable alternative for arbitrary and bad faith reasons.

254. In conversations and e-mails with Plaintiff, Stormwater Project Manager Mr. Keene emphasized Stormwater's lack of accountability and informed Plaintiff that he refused to "grant" Plaintiff's "requests."

255. On or about 12/03/2019, Plaintiff served her Notice of Intent to Commence Civil Action by which, among other demands, Plaintiff asked for sewage alignment that eliminated blasting and zig-zagging sewage under water. In response, Defendants agreed to substitute blasting by an undisclosed unconventional means of bedrock cutting, to be determined by the contractor.

256. The City Engineer stated that the undisclosed method of bedrock destruction would be louder than blasting, but represented to Plaintiff that he lacked knowledge of the specific technology, and that such technology would not be chosen by any engineer, but would be the contractor's choice.

257. In their final Pre-Construction Notification (PCN) application, Defendants failed to provide justification or in any way address the Hinsdale culvert bedrock destruction and failed to disclose the existence of environmentally preferable alternative.

258. When Clean Water Act Agents (Section 401 and 404) asked Defendants to justify blasting and cutting bedrock, Defendants (listing *other parts* of the Hinsdale-Tinkerbell Project) omitted the Hinsdale culvert bedrock work, and misled the Clean Water Act Agencies by omission.

259. In addition to the "sewage in the Slope zig-zag," Defendants' original design included another gratuitous structural insertion: Defendants insisted on flaring the right wing wall of the Hinsdale Culvert and inserting it high up and deep into the Slope.

260. On or about May 02, 2019, Plaintiff invited Stormwater's Project Manager John Keene and Stormwater Manager Doug Lozner to view the Slope, and to discuss options for reducing damage from Defendants' construction.

261. The Slope proved so steep that Keene and Lozner were not able to walk straight down the Slope. With great difficulty, they walked down using the winding terrace, and could not reach the bottom of the creek under the Plaintiff's because of the vertical drop.

262. Plaintiff expressed her concern that Slope this steep should not be disturbed and pointed out to Keene and Lozner that the area of grading should be minimized.

263. Keene and Lozner responded that Plaintiff should give up complaining and just sign over the easement, because Stormwater had absolute discretion, which nobody could challenge.

264. Looking ahead, Keene and Lozner turned out to be absolutely correct: the City of Charlotte affords Stormwater absolute discretion to arbitrarily violate Clean Water Act and ignore all engineering principles, if Stormwater wishes to do so.

265. There is no use complaining, because "it all comes back to us, anyway," cynically boasted Stormwater's Mr. Lozner, and added that Stormwater was unconcerned with post-construction damage, and that Stormwater was not concerned even with any litigation that could result because it damaged Plaintiff, because such litigation would be City's expense, and would not come out of not Stormwater's, budget.

266. Lozner then boasted about his own extensive experience with similar litigation, predicted that Defendants would win and advised Plaintiff to give in, because, he said, "You're never gonna prove it."

267. Stormwater staff deliberately created injurious designs and openly bragged to Plaintiff that Stormwater had full discretion to injure her land and the environment, and enjoyed construction without oversight.

268. On June 17, 2019, Johnny Denton of Diamond Engineering, PLLC, sealed his second opinion letter. **Exhibit 2**

269. Diamond Engineering reminded again that Slope was too steep to disturb: "the slope closest to [Plaintiff's] residence is proposed to be 1.5:1. … A typical and maintainable maximum slope for soils in the piedmont of North Carolina is 2:1. Slopes steeper than 2:1 are subject to failure and erosion due to inability to obtaining and maintain[ing] an adequate vegetative cover. The proposed unstable slope is uncomfortabl[y] close to [Plaintiff's] residence and it is my recommendation that a redesign in this area is warranted. Grading in this area will destroy the existing stable vegetation and structures and will subject the house foundation to blasting and vibration from moving construction equipment." **Exhibit 2**

270. Having concluded that "redesign was warranted," Diamond Engineering, PLLC recommended to "rotate wing wall **toward** the creek… This would **reduce the cut**, **reduce the slope**, and … **protect** the bank in the area. This … **shouldn't cost any additional money** to construct, and can be constructed below the 616 contour, which will **limit danger** to [Plaintiff's] house and **reduce the city's easement cost**." **Exhibit 2**

271. Diamond Engineering, PLLC's June 17, 2019 redesign proposal would have decreased erosion without increasing Defendants' cost.

272. It is Defendants' responsibility to find design solutions that minimize erosion.

273. Nevertheless, Defendants have fought hard and continue to fight to preserve their bad designs — even when Plaintiff presented them with a good designs at no cost to them.

274. After she was rebuffed by Stormwater staff Keene and Lozner, in June of 2019, Plaintiff-Landowner reached out directly to the City Engineer for the City of Charlotte, Mr. Michael Davis, providing Diamond Engineering, PLLC's sealed opinions that environmentally preferred alternatives were amiable and asking for Mr. Davis's review, copying Kruty Desi, Stormwater Program Administrator. **Exhibit 13**

275. As Keene and Lozner of Stormwater correctly warned Plaintiff, City Engineer ultimately responded by abdicating his decision powers, and embracing Stormwater's discretion.

276. In late August of 2019, Mr. Daryl Hammock of Stormwater returned a redesign of Hinsdale Culvert and Slope, which corrected wing-wall alignment, but increased injury to the Slope.

277. Diamond Engineering, PLLC had recommended to re-align the wing-wall with the goal of "reduce the cut, reduce the slope, … protect the creek bank … The proposed change shouldn't cost any additional money and can be constructed below the 616 contour, which will limit the danger to your house and reduce the city's easement cost." **Exhibit 2**

278. In contrast, Mr. Daryl Hammock of Stormwater did rotated the wall, but refused to reduce the cut, reduce the slope, … protect the creek bank, grade under contour 616."

279. Stormwater refused to reduce the grading.

280. Instead of reducing the grading, Daryl Hammock's redesign arbitrarily and retaliatory increased grading and introduced two new design defects, both of which increased erosion.

281. First, and astonishingly, instead of leaving the Slope alone (now that no structures were cutting into the Slope) Daryl Hammock's design gratuitously *increased* the grading area. The grading continued to reach contour 622, with no change from it was before the Hammock redesign, — at least six foot higher than necessary. In addition, Hammock's redesign gratuitously *widened* the grading area by approximately 7 times.

282. Second the newly introduced design defect by Daryl Hammock's was to shorten the Hinsdale culvert wing wall.

283. Instead of following Diamond Engineering PLLC's design of angling wing wall to "protect the creek bank in that area" by using right wingwall as a retaining wall for the Slope (as Diamond Engineering had suggested), Hammock shortened the culvert wingwll in order to preventing wing wall from serving to stabilizing the Slope, with the bad faith intention of destabilize the Slope, increasing erosion and damaging the environment and Plaintiff's property, health and welfare.

284. Both design defects introduced by Hammock were a mockery of Diamond's proposal — Hammock "agreed" to change wing wall alignment, but deprived the design from its purpose. Stormwater's actions were arbitrary, intentionally harmful and not related to any legitimate government purpose.

285. Again, Plaintiff reached out to the City Engineer.

286. On or about November 21, 2019, the City Engineer met with Plaintiff at the Hinsdale Culvert.

287. During that field meeting, the City Engineer expressed astonishment at the proposed grading dimensions. The City Engineer expressed to Plaintiff-Landowner his agreement that Plaintiff's designs correction requests were "of the type routinely allowed." At the conclusion of the meeting, the City Engineer again indicated to Plaintiff that he lacked the power to make the decision without approval of an unnamed team (on information and belief, Defendant Stormwater).

288. As noted earlier, on or about 12/03/19, Plaintiff served her Notice of Intent to Commence Legal Action.

289. As a result of Plaintiff's Notice of Intent, Defendants abandoned the above-described design defect invented by Hammock: Defendants agreed not to shorten the culvert shortening, and returned the culvert to its pre-Hammock position.

290. However, Defendants never abandoned Hammock's defect of arbitrary increased grading.

291. Defendants continue to insist on grading the Slope seven times wider than before Plaintiff complained to the the City Engineer.

292. On information and belief, these injurious changes were made in retaliation for Plaintiff's complaining to the City Engineer about Stormwater's design defects.

293. Between the years of 2017 and the time of this filings, Defendants deliberately invented and pushed a variety of intentionally injurious designs changes aimed at eroding steep Slope and undermining structural stability of Plaintiff's house.

294. Between the years of 2017 and 2020, Plaintiff repeatedly attempted to find a legitimate reason that may have caused Defendants to desire grading the Slope high above their legitimate construction area.

295. In early Spring of 2019, Plaintiff discussed the issue with Project Manager Keene and again with Keene and Lozner during the meeting at the Slope.

296. Both Keene and Lozner admitted that Stormwater's motive in destroying the upper part of the Slope unrelated to the construction area was "to provide contractor with adequate *access to the work area* and to provide contractor with the necessary room to perform work."[3]

297. Keene and Lozner insisted on using the top of the Slope for storage of equipment and supplies. To use Keene' words, refused to "grant [Plaintiff's] request" to abide by the Clean Water Act and leave the Slope alone. **Exhibit 14**

298. Keene and Lozner repeatedly and bluntly demonstrated that in the City of Charlotte, Defendant Stormwater enjoys absolute, arbitrary, uncontrolled discretion to ignore the Clean Water Act and the implementing laws, because nobody challenges its arbitrary decisions.

299. Eroding unstable Slope to use its very top as access and storage for construction that is over twenty feet below at the bottom of the creek is unjustified, arbitrary, intentionally damaging.

300. Defendants have no legitimate goal in using slope so steep that safe access from its top to the construction area below is impossible. Keene and Lozner realized as much, and joking that

---

[3] 4/30/19 e-mail from the Hinsdale-Tinkerbell Project Manager John Keene to Plaintiff

the stored materials would have to be thrown down or helicoptered down. Defendants are acting in bad faith and for retributive and injurious reasons.

301. Meanwhile, the left bank (when facing downstream, on the other side of Plaintiff's house) provides a convenient, environmentally preferable access.

302. Clean Water Act does not consider "saving cost of construction" as a defense to environmental damage, but in this instance, using left bank is also happens to be cost-efficient, as confirmed by sealed opinion of Diamond Engineering. Protecting the environment would cost Defendants less than damaging it, as they insist.

303. Left stream bank is low enough and flat enough (2:1) that a man can walk down to steam-bed on a straight line and Plaintiff owns a large flat piece without structures. There are no structures on the left bank, making it a convenient access point.

304. In addition to cutting and vibrating steep Slope, Defendants arbitrarily, injuriously and bizarrely designated the top of steep Slope as the storage and "staging" area for their construction materials.

305. "Staging" (i.e. displaying, storing, adding, retrieving, stockpiling) materials and equipment on top of steep slope necessitates heavy, vibrating machinery traveling up and down the slope to access materials, causing erosion and damage to the Slope.

306. Southwest (right) Slope is the steepest, tallest, most vulnerable to erosion part of land in the entire Hinsdale-Tinkerbell project. As such, it is the least appropriate place for "staging."

307. Plaintiff-Landowner repeated offered a flat, convenient land for "staging" the materials and equipment — across the creek on her own land.

308. Defendants refused.



**Photo 4.**
Stable and low left bank is a convenient area for access to the Hinsdale culvert
construction area and for storage of materials and equipment. (Green arrows mark
Plaintiff's land, which Plaintiff offered)
Hinsdale Culvert crossing Hinsdale street (marked with white dashed line)

309. In his June 17, 2019 sealed option letter Diamond Engineering, PLLC stated the obvious:

"The only possible location for [storing materials and equipment on Plaintiff-Landowner's

property] would be across the creek from [Plaintiff-Landowner's] house on the triangular lot

of your property bounded by the creek, the road, and your property line." **Exhibit 2**

310. Defendants never offered written (or oral) opinion by any engineers that meaningfully

refuted Diamond Engineering PLLC's opinion above, or, in fact, any of opinions contained in

Diamond Engineering sealed letters.

311. Defendants' insistence that they will not "grant [Plaintiff's request] of "staging" materials

and heavy vibrating equipment on a flat, plot of land with a convenient access to construction

area, but instead will haul the materials and heavy vibrating equipment to the top of unstable Slope goes against basic engineering principles, against the Clean Water Act and State and local implementing laws, is not justified by any legitimate government purpose, is arbitrary, and is made with deliberate intent to injure the Slope and Plaintiff's property[4] and / or with deliberate indifference to consequences of their actions.

312. Stormwater Keene and Lozner openly admitted that Stormwater's decision to "stage" materials on top of the Slope is discretionary, controlled completely by the contractors' whim. Contractors might spare the Slope, or not — "no guarantees," said Keene.

313. Likewise, Keene and Lozner openly admitted to Plaintiff that Slope grading was part of "contractor's means and methods," not an engineering decision.

314. By Keene and Lozner's admission, it is the City's and Stormwater's policy and practice to neglecting basic engineering requirements and defer to contractor's "means and methods" as a way to save cost.

315. It is a requirement of Clean Water Act that on slopes steeper than 2:1, stabilization must be designed by geophysical engineers and must not be disturbed. Stormwater's policy and practice to cut project cost by allowing contractors full discretion to "stage" materials and equipment wherever they like and to grade steep slopes as it sees fit, Defendants act in blatant disregard of engineering requirements and the law.

316. As a matter of law, construction on steep slopes (including grading) must be avoided.

---

[4] After Plaintiff served Notice of Intent, Defendants modified their intention to stockpile materials and equipment by a mocking notation on the map of the top of the Slope: "no storing or stockpiling materials and equipment for work *not occurring at this location,*" as though they did Plaintiff a favor by refraining from piling up on top of the Slope materials for work locations ten miles away.

317. If impossible to avoid, land-disturbing activity on steep slopes must be designed by professional engineers and slopes must be stabilized by proper means.

318. In addition to leaving alone the areas of the Slope alone which are *outside* of their legitimate construction area (at the very least, Defendant have no business above contour 616), Defendants must stabilize the areas of the Slope which are *within* their construction area.

319. Considering the steepness and the height of the Slope, it can not be stabilized with vegetation alone. Stabilization requires structural means.

320. According to Defendants' maps, proposed Slope is 1.5-1.

321. In Charlotte, maximum stable steepness of non-impaired slope is 2:1, and terracing must be included every ten feet.

322. This alone is sufficient to necessitate structural stabilization and terracing of the Slope.

323. In Charlotte, 303(d) impaired streams are under additional protection of mandatory steepness limit of 2:1 and mandatory terracing requirements.

324. The Slope is a stream bank of an impaired tributary that flows into a listed 303(d) impaired stream.

325. Defendants are aware of the impaired status of the tributary that flows through Hinsdale Culvert.

326. Reporting on Surface Water Quality at the 3/18/21 meeting of Charlotte-Mecklenburg Storm Water Advisory Committee, Jordan Miller (with City Permitting and Compliance) openly announced: "all of the major [Charlotte's] creek basins are impaired for at least one pollutant. Tributaries are likely impaired, but not monitored."

327. Defendants' proposed Slope is unstable, subject to erosion and designed in violation of the Clean Water Act and mandatory requirements of the implementing local laws. To correct these defects, it must be structurally stabilized.

328. 1.5-1 slope that Defendants say it is would be too steep to be stable unless structurally stabilized.

329. But Slope is much steeper than accounted for by Defendants' maps.

330. Slope erosion has caused the southwest bank to collapse.

331. True slope grade is not 1.5-1, as Defendants assert on their maps and represented to the Clean Water Act Agents, landowners and the member of the City Council.

332. Instead, the actual slope grade is as steep as 0:6, i.e. vertical 6 foot high drop along the stream, as shown on **Photo 5**, below.





333. In places along the stream, the Slope eroded beyond vertical, to the point of concave, as shown on **Photo 6**, above.

334. This erosion is caused (or contributed to) by the stream turbidity resulting by the improperly positioned outfall at the Hinsdale culvert, — the illegal design which Defendants constructed previously, and which Defendants insist on replicating in their Hinsdale-Tinkerbell Project.

335. By classification of Wildlife Engineering, who had prepared the Channel Stabilization Report for Defendants's Hinsdale-Tinkerbell Project, the entirety of the southwest stream

bank on Plaintiff's property is classified as "eroded," with most of the Slope classified as "severely eroded."

336. Vertical and concave slopes can not be stabilized by vegetation alone. They will erode.

337. Vertical and concave slopes require stabilization by retaining walls and like concrete structures.

338. Proper application of the the law and of the basic engineering requirements mandates stabilization of Slope through terracing and structural means.

339. Extending the culvert, or aligning the right culvert wing-wall along the stream and elongating it, and terracing or adding retaining wall mid-slope are routinely used means, which are available to Defendants to stabilize the Slope and to reduce slope steepness to legal limits.

340. In discussion with Plaintiff, Defendants' employees did admit that these stabilization means are available to them and would stabilize the slope and reduce the steepness.

341. Nevertheless, Defendants arbitrarily and with deliberate intent to do harm refuse to stabilize the Slope.

342. After Plaintiff served the 12/03/2019 Notice of Intent to Commence Civil Action, City Engineer invited Plaintiff to his offices on January 09, 2020 for the stated purpose of discussing the design.

343. Also present at the January 9, 2020 meeting were Stormwater staff and Josh Letourneau, PE of Armstrong Glen P.C.,[5] the drafting engineer of the project.

_____

[5] The January 09, 2020 meeting was the only time an Armstrong Glen P.C.'s representative was briefly available to answer Plaintiff-Landowner's specific question about Defendants' Hinsdale Culvert design. Outside of that time, Armstrong Glen P.C. and its engineers ignored all Plaintiff's contact attempts.

344. As is their pattern and practice, Defendants' staff refused to engage in any meaningful discussion.

345. Instead, the City Engineer forced Plaintiff to repeat her entire statement of design defects again, as did Defendants' staff representatives before him for many years.

346. This repetition request is part of Defendants' intimidation and frustration practice. Defendants forced Plaintiff to repeat the same statement over and over again since 2017 to multiple "lines of defense" which Defendants sent out to "handle" her: first, to the City's real estate agents (who were the only point of contact at the initial stage), next, to Project Manager John Keene, then to Doug Lozner, Daryl Hammock, next to the City Engineer.

347. As did all of Defendants' "handlers," the City Engineer then reminded Plaintiff that City had absolute power to take her land, and Plaintiff's resistance was futile.

348. On information and belief, Defendants have honed the policy and practice of meeting all complaints about their construction defects with the same scheme: first, they force landowners to repeatedly state the same requests over and over again, each time introducing new members of Defendants' staff, new "handlers."

349. As is Defendants' pattern and practice, each "handler" insist on restatement of the problem from the beginning, saying: "I want you to be heard," and finishes the conversation with pointing out that resistance to Defendants to futile.

350. On information and belief, Defendants' script of dealing with landowners' dissatisfaction is designed to demoralize and exhaust landowners, by forcing to repeat the same complaints over and over again to new handlers, meeting with "resistance is futile" response each time.

351. Over the years of 2017 to 2020, Defendants followed the same plan, design and scheme.

352. Defendants only made minor design corrections as a result of Plaintiff's "engineering up" and "lawyering up," i.e. serving Notice of Intent.

353. At the January 9, 2020 meeting, Plaintiff attempted to push the meeting off Defendants' script by requesting to speak directly to Josh Letourneau, P.E. and to discuss the possibility of changing the design.

354. At that meeting, Defendants arranged the seating to maximally separate Plaintiff-Landowner from Josh Letourneau, P.E.

355. When Plaintiff directed her questions to Mr. Letourneau, P.E., the Stormwater staff interjected and made it impossible for Mr. Letourneau to respond, answering for him.

356. Only after Plaintiff repeatedly insisted that she wanted to speak to the Mr. Letourneau, because he was the drafter of the Project, Stormwater staff and City Engineer briefly allowed Mr. Letourneau to speak. A few minutes later, the City Engineer shut down the conversation and asked Plaintiff to leave, saying that the rest of the discussion would include Clean Water Act Agents, and that he prohibited Plaintiff from participating in further discussion.

357. During the brief discussion, Josh Letourneau willingly answered Plaintiff's questions, providing information and even suggesting his own solutions for stabilizing the stream bank.

358. At the January 9, 2020 meeting, Plaintiff-Landowner queried engineer Josh Letourneau whether, in Letourneau's professional opinion, there was any *engineering* reason that

69

precluded Defendants from stabilizing the Slope and reducing its steepness to within the legal and engineering requirements.

359. Letourneau, P.E. admitted that slope stabilization decisions were available to Defendants, but underscored that Armstrong Glen did not make design decisions of this magnitude, but, instead, only "followed client's orders."

360. Letourneau, P.E. admitted that if Defendants extended the culvert or elongated the right wing-wall of the culvert, that design decision would stabilize the Slope, reduce the Slope steepness, and reduce erosion. He then reiterated that he would only make these corrections if they were "client's orders."

361. Letourneau, P.E. made his own suggestion for reducing slope steepness and stabilization of the slope, — to add a retaining wall mid-slope, along the slope, and to thus create terracing and eliminating steep angles ("Letourneau Retaining Wall"). He again reiterated that he would only make these corrections if they were "client's orders."

362. Summarizing the January 9, 2020 discussion, the City Engineer confirmed and acknowledged that elongating the culvert wing wall, adding the "Letourneau Retaining Wall," would eliminate or reduce the steepness of the slope and minimize slope disturbance.[6]

363. There is no engineering or regulatory impediment to stabilizing Slope by culvert extension and/or wing wall extension and/or retaining wall. Stabilization is required to reduce erosion.

---

[6] 01/10/2020 e-mail from City Engineer to Plaintiff

364. Defendants arbitrarily refuse to stabilize Slope by any structural means, and, without judicial intervention, will leave it to erode.

365. In their final design, Defendants not only refused to elongate the right wing-wall so it could serve to stabilize the Slope, but deliberately precluded even the existing length of the wing-wall from serving as a retaining wall by tapering the right wing-wall to near nothing.

366. At the downstream end, defendants tapered the wing-wall to approximately 2.5 foot high — at the 607 contour line. Meanwhile, erosion is 6 foot hight, and Defendants' grading is approximately twenty feet high, up to the 622 counter line.

367. In contrast, all wing walls in all other culverts in the Hinsdale-Tinkerbell project are taller, better suited to serve as retaining wall than the right wing-wall on the Slope, despite the fact that the Slope is the highest, steepest and most eroded part in the Project.

368. Defendants's disfigurement of the right Slope wing-wall is arbitrary, bad faith and serves no legitimate government or engineering purpose.

369. In their other stormwater construction, Defendants routinely use culvert extensions and wing wall elongation to stabilize slopes on the land of similarly situated landowners.

370. For instance, according to its website, Armstrong Glen, P.C. stabilized stormwater slopes by elongating culverts, in constructing Gaynor Storm Drainage Improvement Project[7], East Providence Storm Drainage Improvement Project[8],  and multiple other projects.

───────────────

[7]Armstrong Glen, P.C., Portfolio https://armstrongglen.com/portfolio-posts/gaynor-storm-drainage-improvement-project/, accessed 04/09/2021

[8] Armstrong Glen, P.C., Portfolio, https://armstrongglen.com/portfolio-posts/east-providence-capital-improvement-project/ accessed 04/09/2021



**Photo 7**
A typical culvert extension routinely used to stabilize steep slopes
Here, used at CMSWS Cherokee / Scotland Project for a relatively low slope

371. During the Cherokee/ Scotland Storm Drainage Improvement Project (completed several years ago) Charlotte-Mecklengburg Stormwater Services routinely stabilized slopes by elongating culverts of several landowners on the short stretch of lower Scotland Avenue alone.

372. On information and belief, Defendants on occasion have refused to stabilize steep slopes with appropriate means structural means when property belonged to landowners unsympathetic to Defendants' staff, but stabilized the same land by proper structural

means as soon as the same property changed hands, if new landowner was sympathetic to Defendants' staff.

373. On information and belief, whether or not Defendants use proper structural stabilization often reflects Defendants' sympathy to or dislike of certain landowners. Defendants have a policy and practice of constructing to erode in those instances when they dislike landowners.

374. For instance, in the course of their Cherokee/Scotland Project, Defendants excluded one of several similarly situated landowners from proper stabilization, based on dislike. While Defendants stabilized eroding stream slope with culvert extension for the similarly situated land both upstream and downstream, Defendants left to erode the stream on the land of one selected "unlucky" landowner, whom Defendants disliked.

375. After the property ownership changed, Charlotte-Mecklenburg Stormwater Services corrected the damage they had caused, adding wing wall elongation along the entire length of the previously "unlucky" property, and finally properly stabilizing the bank, — even though the Cherokee-Scotland Project had long since ended.

376. On information and belief, landowner in possession during the Cherokee-Scotland project was unsympathetic to the employees of Charlotte-Mecklenburg Stormwater Services, while the owner who took over possession years after the Cherokee-Scotland project had ended, was sympathetic, resulting in proper stabilization of his stream bank.

377. Defendant Stormwater enjoys full and arbitrary discretion in deciding whether to stabilize slopes by structural means, or leave the slopes to erode. Similarly situated landowners are either "lucky" to be "treated" to the proper engineering decisions, or are "unlucky," — all

based on the whims of the Defendants' staff. As Stormwater's Keene put it, Defendants enjoy the power to "grant" or deny proper engineering solutions, all at will.

378. The Slope downstream of Hinsdale culvert on Plaintiff's land is "unlucky." Defendants arbitrarily and in bad faith refuse to stabilize the 5-6 foot vertical/concave erosion drop because Plaintiff is unsympathetic to Defendants.

379. Indeed, Defendants refuse to even property reflect the terrain on construction maps. Even though the land is vertical to concave drop, Defendants' maps falsely shows gentler slope.

380. Plaintiff repeatedly brought to Defendants' attention that their contour maps and, consequently, their construction design maps do not correctly account for the actual erosion — the 5-6 foot drop of the bank along the stream on Plaintiff's property.

381. Plaintiff invited Stormwater staff to visit and even requested the City Engineer to encourage the drafting engineers of Armstrong Glen to make a field visit to observe the terrain, because maps err.

382. The City Engineer declined on Armstrong Glen's behalf, while Armstrong Glen did not respond to Plaintiff's emails and phone messages.

383. Proper construction design can not be made based on faulty contour maps, and Clean Water Act permitting process requires correct contour maps and penalizes faulty maps both civilly and criminally.

384. On or about 01/27/2019, Stormwater's Doug Lozner admitted that instead of stabilizing the eroded bank, Defendants planned to place fill in the stream. In response to Plaintiff's "don't you need a Permit for that?!" Stormwater's Doug Lozner responded "No."



385. **Photo 8**, above, shows concave eroded bank. Defendants intention to surreptitiously add fill inside the stream bed adjacent to the eroded bank without obtaining a permit is in violation of their permit conditions and of the Clean Water Act.

386. The fill which Defendants intend to place will be washed down the stream, causing sedimentation pollution and increasing erosion, especially considering the terrain (bedrock in the stream, turbulence from improperly installed outfall, steep angle of the fill).

387. Defendants concealed from the Clean Water Act agents their plan to add fill in the stream, and did not receive the necessary approvals.

388. Defendants, through use of inaccurate maps and photographs intend to conceal and concealed from the Clean Water Act Agents the existence of the 5-6 feet of vertical / concave erosion drop exists along the Slope, or encouraged the Agents and gave the Agents an opportunity to turn a blind eye to the fact.

389. On or about July 17, 2020, Defendant Stormwater responded to the United States Army Corps of Engineers' and Department of Water Resources' *Pre-Construction Notification Comments to the Hinsdale-Tinkerbell Project*.

390. At least the two agencies — the the USACE Chrystal Amschler (Section 404) and the DWR Alan Johnson (Section 401) directly inquired into the downstream of Hinsdale culvert channel dimensions, bank work, and whether slope was "gentle" *or* required fill placement[9]. **Exhibit 15**

---

[9] Section 401 and 404 Agents shared their pre-construction comments, but Section 402 Agents so far refused to share Pre-Construction comments with Plaintiff. **Exhibit 15** is the file titled by US Army Corps of Engineers as "SAW-2020-01043 Hinsdale-Tinkerbell Stormwater Improvement F1," and attached in its entirety. Agents' comments are cited to Exhibit 15, Kelly Thames, Environmental Project Manager, June 17, 2020 e-mail to Clean Water Act Agents Crustal Amschler and Alan Johnson, titled "Responses to USACE and DWR Pre-construction Notification Comments Hinsdale-Tinkerbell Storm Drainage Improvement Project (SDIP) SAW-2020-01043," at 31-35.

391. In response to this direct request for information, Defendants deliberately obfuscated, misinformed / mislead the Agents and / or helped Clean Water Agents to turn a blind eye to the erosion that has occurred, the erosion that is threatening to occur and the unpermitted fill which Defendants intend to place in the stream in order to create Potyomkin village of stabilization, that will quickly wash away.

392. Reviewing Defendants' Pre-Construction Notification Application, the USACE Chrystal Amschler (Section 404 Agent) made a request for clarification, noting that Defendants's "plan sheets [do not] show impacts along the banks for benches."

393. USACE Chrystal Amschler (Section 404 Agent) requested that Defendants provide "profile show[ing] the event of bank work and benches as well. Also, bank stabilization / benches should be included as permanent non-loss impacts for bank stabilization."

394. Defendants did not satisfy USACE Chrystal Amschler's direct request for information as to the Slope.

395. Defendants concealed the intended bank work / fill downstream on the Slope.

396. Defendants obfuscated: "in areas where bedrock is encountered underlying bottomless culverts, material will not be added to create a low flow channel," but Defendants said nothing about the intended fill or other intended work in areas of vertical / concave erosion.

397. Likewise, Defendants did not truthfully respond to request for information from the DWR Agent Alan Johnson (Section 401).

398. DWR Agent Alan Johnson directly asked Defendant whether the contour maps correctly reflected the slope of the bank around the Hinsdale Culvert (the "Impact 2").

77

399.    DWR Agent Alan Johnson directly asked Defendant whether the slope of the bank around the Hinsdale Culvert ("Impact 2") "required riprap" OR was "gently sloped," writing: "**Impact #2**, the channel is cut… is that to have riprap? The slope may be gentle enough not to require [riprap], but you know how plans are. Sometimes the scale throws you off."

400.    Responding to the direct alternative question whether "**Impact #2**" was "gentle" or required riprap, Defendants dodged and offered unresponsive commentary that *other parts* of the project were gentle enough not to require riprap, writing: "No rip rap is proposed at … **Impact 1** and **Impact 3**" Defendants' response to USACE's comment #2 **Exhibit 15**, at 34.

401.    Additionally, both DWR and USACE Agents explicitly requested an assurance that riprap "backfilled with soil to fill voids" would not "stay in place" (DWR) but, instead, would "quickly wash away and end up in downstream reaches" (USACE).

402.    Responding to direct request for assurances, Defendants again obfuscated or concealed their intent to place fill in the (bedrock encased) stream downstream of the culvert, and to pile dirt along the eroded bank, on bedrock. Defendants did not admit to their plan of filling the stream. Again, they dodged and offered unresponsive commentary, stating that "materials will not be added" *under* culverts *if* "bedrock is encountered."

403.    In addition to obfuscating their plan to fill the stream in violation of the permit, Defendants obfuscated their intention to destroy bedrock in violation of the permit.

404.    Reviewing *Defendants' Pre-Construction Notification Application* in 2020, the Clean Water Act Agent Chrystal Amschler repeated her May 2019 warning that Defendants must

refrain from bedrock blasting and avoidable stream crossing in the Hinsdale-Tinkerbell Project.

405. Clean Water Act Agent Chrystal Amschler demanded that Defendants provide adequate justification that bedrock destruction was unavoidable or refrain from destroying bedrock.

406. Clean Water Act Agent Chrystal Amschler underscored the requirements of the Clean Water Act: "As you know, we require that impacts be avoided and minimized to the maximum extent possible."

407. Demanding *justifications* for bedrock blasting, Agent Chrystal Amschler repeated her concern with "potential risk of fracking" and demanded that Defendants "explain how the areas will be backfilled."

408. In response, Defendants did not disclose that the final design downstream of Hinsdale culvert included bedrock destruction in the stream by non-conventional means inappropriately left to the discretion of the contractor.[10]

409. Nor did Defendants offer justification for refusing to use the technically simple and cost-efficient straight sewage alignment along the left (facing downstream) bank (which would not place sewage underwater and save bedrock from destruction.)

410. Responding to direct request for justifications, Defendants again obfuscated or concealed their intent to unnecessarily destroy bedrock by unconventional methods at Hinsdale Culvert. Defendants' response only concerned blasting, open cut and chemical reaction /

---

[10] Earlier, the City Engineer e-mailed to Plaintiff: "I wanted to just alert you that the tradeoff in eliminating the blasting is that it increases the likelihood that noise impacts associated with alternative methods could be worse…" (e-mail from City Engineer on 01/10/2020), and that "[a]s it relates to blasting and its alternatives, we do not prescribe the means and methods a contractor uses. I don't want to try to guess at what those options might include." (e-mail from City Engineer on 02/22/20).

drilling in other, unrelated, ares of the Hinsdale-Tinkerbell project. Defendants' response to USACE's comment #5, **Exhibit 15, at 33**

411. Any bedrock destruction is dangerous as a potential contamination source of the surface water and the environment.

412. Defendants' design that zig-zags sewage under water and requires bedrock destruction is unjustified.

413. Leaving the decisions about whether to cut bedrock to contractor's discretion violates the Clean Water Act and the conditions of Defendants' permits.

414. Defendants' responses obfuscated Defendants' intention to violate the law, and misled the Clean Water Act agents or enabled and encourage the Clean Water Agents to look the other way, as Defendants violate the Act and the conditions of their permits.

415. Over the years of discussing the Project, Plaintiff repeatedly asked Defendants for justification of the zig-zag sewage under bedrock.

416. Project Manager Johne Keene repeatedly told Plaintiff that the arbitrary zig-zag design was motivated by Defendants' decision to move the entire length of sewage on Plaintiff's land, and away from her neighbor's land, because of personal sympathies.

417. David Czerr, Deputy Director Charlotte Water and Letourneau of Armstrong Glen offered an alternative theory: the bedrock destruction, the unnecessary sewage crossings under water and the resulting bedrock bedrock destruction were a "cost-saving measure." Mr. Czerr and Mr. Letourneau did not explain how using these extreme construction detours instead of laying sewage straight down the soft left bank could "save cost." Mr. Czerr and Mr. Letourneau were unable to estimate the cost that would be "saved."

418. Clean Water Act is a strict liability statute. Neither achieving preferential treatment of a sympathetic landowner, nor saving cost constitutes an acceptable justification for avoidable environmental impact.

419. Defendants' decision to zig-zag the sewage pipe is arbitrary and made with intentional internet to injure the environment and Plaintiff's property, or with deliberate disregard to the injury.

420. Moreover, construction cost of laying sewage straight in soft soil, as Plaintiff and Diamond engineering requested is *lower* than laying sewage pipe on a zig-zag, under water, and under bedrock which requires blasting or destruction by other non-conventional methods.

421. Laying sewage straight will decrease maintenance cost in the long run.

422. Laying sewage in the ground instead of zig-zagging under water will decrease environmental impact will considerably decrease maintenance cost and the environmental cost of potential washout and damage to sewage form floating debris.

423. Responding to the Section 404 and 401 Clean Water Agents Defendants did not offer "justification" of "saving cost" or "preferring one landowner over the other," because these are not valid justifications under the Clean Water Act, demonstrating that Defendants knew and are aware that their defective design in unjustified.

424. Defendants' design violates the conditions of their permit and the requirements of Clean Water Act in one more serious respect: it is not tied to the soil type.

425. Defendants performed the necessary soil sampling and analysis under all other culverts of the Project, but purposefully singled out and excluded the Hinsdale culvert. Defendants admitted to singling out the Hinsdale Culvert. **Exhibit 16**

426. As a result Defendants intend to build without learning whether the soil under culvert is bedrock, no bedrock, or partial bedrock, and without preparing proper construction drawings.

427. Defendants acknowledged that soil sampling under the culvert is necessary and that violates the engineering requirements. **Exhibit 17**

428. Back during the 2018 pre-construction field visit, Agent Crystal Amschler (US Army Corps of Engineers) expressed concern that the bedrock in the channel would prevent Defendants from building per plan, and that Defendants might not be able to "construct what it shown on the plans…"[11]

429. Agent Crystal Amschler, (US Army Corps of Engineers) requested Defendants to create alternative designs for alternative soil conditions, "a contingency plan."[12]

430. Defendants ignored Agent Crystal Amschler's concern and request.

431. Defendants knew that Agent Crystal Amschler, (US Army Corps of Engineers) warned that "*if* [Defendants] *get all the way through construction and it doesn't work, Clean Water Act Agents will make* [Defendants] *fix it.*"

---

[11] September 5, 2018 e-mail from Stormwater's Erin Shanaberger to Stormwater's Project Manager John Keene, reporting Clean Water Act Agent's criticism at the second field review of Hinsdale-Tinkerbell Project after meeting with the US Army Corps of Engineers' Section 404 Crystal Amshler and the Section 401 Agent Alan Johnson.

[12] Stormwater employee Erin Shanaberger documented: "[w]e started at the Hinsdale St culvert and observed the **bedrock**… Since there was all that concrete at the outlet, the agencies were **concerned** with **what might be below the culvert** and how it will look once we place the conspan. They basically asked if we have a contingency plan."

432. Defendants continue to insist on environmentally damaging design decisions on Plaintiff-Landowner's land, despite availability of design with less environmental impact.

433. Defendants' plan on Plaintiff's land includes: unjustified and unnecessary grading, bedrock destruction, vibrations of heavy machinery on the steep Slope, "staging" heavy materials and equipment on top of steep Slope, refusing to stabilize the Slope, cutting Slope at unpermitted and unsustainable angles and without terracing, placing fill into the stream and proceeding to construction without design that would be properly tied to the terrain (and, therefore, is incapable of being "constructed as designed").

434. The cumulative effect of Defendants' plan is the deliberate and unjustifiable injury to the environment and Plaintiff's property. Defendants' injurious actions are deliberate, and / or without concern to the consequences. Defendants have not completed their injurious plan as of this filing. If not enjoined, Defendants' threatened damage is believed to be equal or exceed the cost of Plaintiff's property.

435. Defendants are treating Plaintiff's land differently than land of similarly situated landowners, without justification for the disparity.

**B.    DEFENDANTS' POLICY AND PRACTICE OF REFUSING TO MAKE RELEVANT CONSTRUCTION INFORMATION TIMELY AVAILABLE TO THE PUBLIC AND TO THE LANDOWNERS AFFECTED BY DEFENDANTS' CONSTRICTION ULTIMATELY ENABLES DEFENDANTS TO SIDELINE THE PUBLIC AND THE AFFECTED LANDOWNERS FROM ENFORCEMENT OF CLEAN WATER ACT.**

436. Defendants use the informational dearth, which they themselves create, to get away with violating the Clean Water Act by bamboozling, extorting and bullying the affected landowners, by disobeying  the instructions of the Clean Water Act Agencies and, ultimately,

by proceeding with unlawful construction designs, all while Charlotte City Council implements its policy of turning a blind eye to all clean water act violations in defendants' construction and rubber-stamping all and any defects in defendants' designs.

**1.    In violation of the Clean Water Act and the conditions of their permits, Defendants aggressively exclude landowners from the information exchange with the Clean Water Act Agents and deliberately and completely conceal all Clean Water Act compliance information from the public and the affected landowners.**

437.    In constructing the Hinsdale-Tinkerbell Project, Defendants are required, as a condition of their permits, to provide the public and the affected landowners with the information about their compliance with the Clean Water Act.

438.    In order to comply with this requirement, Defendants must and do maintain a public website.

439.    Defendant's public website, which purports to provide information about various Defendants' projects, including the Hinsdale-Tinkerbell Project,[13] intentionally makes no mention of the Clean Water Act, the enabling state laws or city ordinances, the permits with which Defendants are required to comply.

440.    Defendants' construction website, multiple postcard mailers, meetings held about Hinsdale-Tinkerbell Project between the start of the project in 2011 and the present failed to even reference the Clean Water Act much less to educate the public on the steps Defendants need to make to assure the Project is in compliance.

---

[13] https://charlottenc.gov/StormWater/Projects/Pages/HinsdaleTinkerbell.aspx, accessed 04/12/2021

441. An average citizen / homeowner is not familiar with the process and demands of the Clean Water Act permitting. Per the conditions of their permits, is Defendants' obligation to educate homeowners and the public. Defendants failed to do so.

442. Instead, Defendants aggressively conceal everything related to the Clean Water Act permitting process from the public and the affected homeowners.

443. As a matter of policy and practice, Defendants conceal from the general public and from the affected landowners even the fact that Defendants' construction must go through a review and permitting process and obtain approvals by the Section 401, 402 and 404 Clean Water Act Agents.

444. Defendants failed and refused to make available to the affected landowners and the general public the contact information for Clean Water Act Agents in charge of Hinsdale-Tinkerbell Project.

445. Instead, at the meeting with landowners, Defendants employed misdirection, stating that "city inspectors" would review all construction compliance.

446. The scheduling of the field reviews with the Clean Water Act agents, the results of the Clean Water Act Agents's reviews, the submission of permit applications, the Clean Water Act Agents' comments, requests for justification, and even the answer to the question whether or not Defendants submitted and the Clean Water Act Agents received the necessary Pre-construction Notification Application with final designs and whether Clean Water Act Agents gave their approval of the project — all this information is unavailable to the affected landowners and the public on Defendants' website or through any other means that would give access on unrestricted, up-to-date, contemporaneous basis. Indeed,

Defendants aggressively guard this information and deliberately preclude the public from obtaining access to this information.

447. For the affected landowners and the public, educating themselves about the Clean Water Act and following the cumbersome procedure of submitting FOIA document requests is the only way to obtain information about the ongoing critical comments of the Clean Water Act Agents. This state of affairs violated the Clean Water Act and conditions of Defendants' permits.

448. Contacting Clean Water Act Agents is the only way for the affected homeowners and the public to find out whether or not the Project had been submitted for Clean Water Agents' review.

449. Defendants keep secret the schedule of their submissions to and of field meeting with the Agents.

450. Moreover, when the schedule of discussion with Clean Water Act Agents is discovered by a homeowner, Defendants' policy to declare "secret," to push the affective landowners out of the meeting with Clean Water Act Agents, and to refuse to inform landowner about the results and details of the "secret" meetings, all in violation of the Act and the conditions of Defendants' permits.

451. Defendants' "postcard mailers" that are purported to inform the affected landowners about the Hinsdale-Tinkerbell Project, fail to list any steps involved for the Clean Water Act permitting. Instead, the mailers employ misdirection, describing "federal permits" as for some reason, "railroad permits."

86

452. Updating Hinsdale-Tinkerbell Project Website and all similar Defendants' construction websites with true and timely Clean Water Act compliance information is not a burdensome requirement.

453. On information and belief, Defendants deliberately fail and refuse to provide Clean Water Act permitting information to the affected landowners and the public.

454. This deliberate failure to inform enables Defendants to avoid private citizens' enforcement and to easier shirk compliance with the Clean Water Act.

455. Against the backdrop of the informational dearth, Defendants' staff are able to and, in fact, do bluntly misrepresent to the affected landowners the Clean Water Act approval status of their construction projects.

456. In the course of negotiations, at the time when Clean Water Act agents had made several unresolved critical comments about the project and Pre-Construction notification had not yet been submitted, Defendants attempted to extract Plaintiff's agreement to give up her easement by falsely representing to Plaintiff-Landowner that Plaintiff's efforts to correct the construction design defects were "too late" because Clean Water Act agents had already approved the project and would not agree to any changes in the design.

457. On information and belief, Defendants were executing their policy and practice of extracting construction easements from the affected landowners, using misinformation and concealing all projects' faults as identified by the Clean Water Agents.

458. As a matter of policy and practice, Defendants conceal from the public, from the affected landowners and even from the members of the City Council all critical comments regarding the design defects by Clean Water Act Agents.

459. Defendants are aided in their misinformation efforts by the tight-lipped Clean Water Act Agents. Unless and until forced by a FOIA request, Clean Water Act agents, as a policy and practice, do not reveal their own critical comments about Defendants' constructions design defects to the public and the affected landowners, even to the point of falsely stating that no critical comments are pending when, in fact, multiple critical comments are pending, and landowners are not allowed to participate in pre-construction conferences and meeting with the Clean Water Act agents.

460. On or about September 5, 2018, Stormwater's Erin Shanaberger met with Agents Crystal Amschler (US Army Corps of Engineers, Section 404 Agent) and Alan Johnson, (Section 401 Agent) at the Hinsdale Street culvert for a preliminary field review / pre-construction conference.[14]

461. 09/05/2018 was at least the second meeting with the Agents. At that meeting, the Agents repeated at least some of the same critical comments which Agents made at previous meeting(s), and which Defendants failed to address. Looking ahead, Defendants design never addressed several of the Agents' critical comments. Defendants simply ignore Agents' criticism and proceed with design in violation of the law and in defiance of Agents' prohibitions.

462. As documented by the Stormwater itself, at the 09/05/2018 field meeting / pre-construction conference, the Section 401 and 404 Agents *repeated* previously delivered *concerns* and *warnings* about defects in the Hinsdale-Tinkerbell Project design.

_____

[14] Plaintiff learned by FOIA request of 2019

463. Reporting the meeting with Clean Water Act Agents internally, Stormwater's Erin Shanaberger alerted her colleagues to numerous critical comments of Clean Water Act Agents.

464. Specifically, as to the Hinsdale culvert design (i.e. Plaintiff's land), the Agents criticized (per Stormwater's Shanaberger's): "We started at the Hinsdale St. culvert and observed the bedrock…. Since there was all that concrete at the outlet, the agencies were concerned with that might be below the culvert and how it will look once we place the conspan. They basically asked if we have a contingency plan…"[15]

465. The Agents criticized repeatedly (per Shanaberger's report): "As I stated during our May field walk, there was also concerns about the amount of bedrock in the channel and being able to construct what is shown on the plans successfully." (Id.)

466. Defendants deliberately excluded the soil under Hinsdale culvert from soil analysis, even though they had ordered the soil analysis under all other culverts of the Hinsdale-Tinkerbell project.

467. A culvert can not be designed in compliance with permitting and engineering principles without information whether culvert will be places on bedrock or not.

468. Clean Water Act Agents repeatedly expressed concern "what might be below the culvert and how it will look once we place the conspan."

---

[15] September 5, 2018 e-mail from Stormwater's Erin Shanaberger to Stormwater's Project Manager John Keene, reporting Clean Water Act Agent's criticism at the field review of Hinsdale-Tinkerbell Project after Shanaberger meeting with the US Army Corps of Engineers' Section 404 Crystal Amshler and the Section 401 Agent Alan Johnson.

469. The Agencies requested that Defendants design a "contingency plan." Defendant failed to comply with this requirement as well.

470. The final design submitted for approval to the Clean Water Agencies does not tie the design of bottomless culvert at Hinsdale to any known soil conditions. Instead, Defendants's "design" simply notates that design will *not* be followed if bedrock prevents. Defendants did not receive approval for an alternative design / modification of design.

471. The effect of Defendants's final design submission it that the Hinsdale culvert does not have a fixed approved design, but Defendants will improvise as they build, without Clean Water Act Agents' prior review or approval,

472. Defendants failed to notify the affected landowners and the public about the design issues, the and / or Clean Water Act Agents' critical comments and Defendants continued failure to comply.

473. On or about May 2, 2019, the Hinsdale-Tinkerbell Project Manager John Keene, Sr. Project Manager at City of Charlotte Doug Lozner met Plaintiff-Landowner at the culvert of Hinsdale Street.

474. In response to Plaintiff-Landowner's design change requests, Keene and Lozner falsely claimed that it was "too late" for any design changes because "all permits" had been "already approved," and Agents would not allow changes.

475. Keene and Lozner deliberately mislead Plaintiff-Landowner with the aim of demoralizing her and obtaining easement on her land without correcting the defective design.

476. Plaintiff-Landowner uncovered Keene and Lozner's falsity only later, by directly contacting the Clean Water Enforcement Agents and inquiring about the status of the Hinsdale-Tinkerbell Project.

477. At the time, all three Clean Water Act Agents revealed, that the Pre-Construction Notification application for Hinsdale-Tinkerbell Project had not yet even been *submitted* for review, much less approved.

478. The Agents then contacted Defendant Stormwater. Stormwater assured the Agents that Defendants continued their work on project designs, i.e. of the opposite of what Keene and Lozner had told Plaintiff at the May 2, 2019 meeting.

479. Because Defendants assured Clean Water Act Agents that Defendants were still working on the project designs, and would correct any errors, the Agents expressed reluctance to discuss Plaintiff's concerns about design defects. The Project had not been submitted for the Agents review, and it was "too early" to trouble the Agents, — the Agents told Landowner in 2019.

480. Nevertheless, Agent Amschler of the US Army Corps of Engineers agreed with Plaintiff and warned Defendants against replicating the scouring design of the outfall and blasting bedrock.

481. On May 23, 2019, Agent Amschler of US Corps e-mailed Stormwater employees and warned them that stormwater outfall should not "come in a 90 degree angle to reduce potential erosion on the opposite bank."

482. Agent Amschler of US Army Corps of Engineers also *privately* emailed Stormwater Project Manager John Keene and warned him that blasting "ha[d] potential issues and

[U.S. Corps] would require justification on why [Stormwater couldn't do] without blasting [the bedrock.][16]

483. In this exchange (most of which Plaintiff-Landowner only learned much later, by FOIA request) Defendants misled and / or rebuffed the Section 404 Agent Amschler of US Army Corps of Engineers and ultimately did not obey her direction to correct the design faults.[17]

484. Excluding Plaintiff-Landowner from the May 2019 design with the Clean Water Agents, as well as from all previous and subsequent discussions ultimately served to enable (or contributed to enabling) Defendants to secretly ignore or openly rebuff Clean Water Act Agent's finding of design fault.

485. To the extent Plaintiff-Landowner was not given the opportunity to sound the alarm, and Defendants refused to correct the design.[18]

486. Back in 2019, the Section 401, Section 402 and 404 Agents refused to discuss design concerns with Plaintiff-Landowner, telling her that it was "too early in the design process" for Agents to get involved. Plaintiff-Landowner should re-submit her concerns during the widow of the Agents' official review, in an undetermined future, the Agents said.

---

[16] Plaintiff only learned about the majority of Clean Water Act agents comments considerably after the fact, by receiving documents responsive to her FOIA requests.

[17] In response to Agent Amschler's criticism of the faulty stormwater outlet, Stormwater staff signaled to Agent Amschler that they intended a redesign, but immediately conspired between themselves to ignore both the Agent's warning and their own promise. In response to Agent Amschler's criticism of the blasting, Keene bluntly rebuffed her, e-mailing: "I do not see the need to change the plan."

[18] Looking ahead, the December 2019 Plaintiff's Notice of Intent did serve as a catalyst for a partial correction of the faulty design, even where Defendants ignored the Agents' criticism.

92

487. Alan Johnson, the Section 401 Agent, warned Plaintiff-Landowner that he would not change his decisions after he approved a project, so it was also important for Plaintiff-Landowner to be not "too late" to address the Agent.

488. The window of opportunity would open when Defendants would submit their final design and Pre-Construction Notification Application. The window would close after the Agent approved it.

489. The difficulty was learning when that "window of opportunity" would open, because no publicly available information is available, and Stormwater staff had already demonstrated their willingness to deceive.

490. After confirming with multiple Clean Water Act agent staff and Defendants' staff that no public website provided access to Defendants' actual applications, Plaintiff-Landowner learned that the only way to find out whether Defendants finalized their designs and submitting them for final approval was to repeatedly query the Clean Water Agents by e-mail, asking "do you have the project on your desk yet?"

491. During 2019 and the beginning of 2020, Plaintiff-Landowner repeatedly queried the Clean Agents and repeatedly learned that the Project had not yet submitted, and so it was "too early" for Plaintiff to discuss the Project faults with the Agents.

492. Eventually, Agents grew reluctant of repeatedly responding that the Project had not yet been submitted and it was "too early" and the US Army Corps of Engineers grew more and more tardy with responding to Plaintiff's periodic FOIA requests, even ignoring the compliance deadline.

93

493. Defendants, meanwhile, continued to deliberately and steadfastly prevent Plaintiff-Landowner from participating in discussions with Clean Water Agents, in deliberate violation of Plaintiff's legal rights.

494. On the single occasion when Plaintiff-Landowner did learn of an upcoming conference with the Clean Water Act agents (specifically concerning construction on Plaintiff's property), Defendants deliberately and aggressively prevented Plaintiff-Landowner from participating by unambiguously asking her to leave.

495. On 01/09/2020, the City Engineer Michael Davis invited Plaintiff for a meeting. Clean Water Act agents were scheduled to join the discussion by telephone. The City Engineer insisted that Plaintiff leave the room so that Defendants could discuss the project on her land with the Clean Water Act Agents in secret from Plaintiff-Landowner. On that date, Plaintiff was the legal owner and Defendants had no ownership of the land, disturbance of which they discussed with Clean Water Act Agents in secret from Plaintiff- Landowner. Defendants never revealed to Plaintiff-Landowner the content of this secret discussion.

496. Later, the City Engineer prevented Plaintiff from participating in discussion with the Agents by using falsity.

497. On or about February 13, 2020, the City Engineer falsely pretended to acquiesce to Plaintiff's request to be included in discussions with the Clean Water Agents. He falsely promised that from that point on, Defendants would include and contemporaneously copy Plaintiff on all Hinsdale-Tinkerbell Project-related discussions with the Clean Water Act Agents.

498. Defendants did not include Plaintiff on any of their discussions with the Clean Water Act Agents. While Plaintiff-Landowner naively and politely waited, the "window of opportunity" for providing input to the Clean Water Agents had closed.

499. By misleading Plaintiff and by failing to make information and scheduling of Hinsdale-Tinkerbell Project Clean Water Act approval by the Agents publicly available, Defendants ensured that Plaintiff-Landowner's input for consideration of the Clean Water Act agents came either "too early" or "too late," but never during the "window of opportunity," with the goal of preventing Plaintiff to meaningfully participate in discussion with the Clean Water Act Agents.

500. Defendants deliberately excluded Plaintiff from discussions with the Clean Water Agents. Because Plaintiff was excluded from meaningfully participating in project review and from timely sounding alarm about Defendants' project non-compliance, Defendant were able to offer misleading and false information or to conceal relevant information and the Clean Water Agents Agents were either be misled or enabled to turn a blind eye to Defendants' noncompliance. As a result, Defendants failed to properly correct defects of the Hinsdale-Tinkerbell Project, including the defects pointed out by the Clean Water Agents themselves, and their design violates Clean Water Act and the conditions of their permits.

501. Through U.S. Army Corps of Engineers' response to Plaintiff's FOAIA request, Plaintiff learned that she was "too late" to bring her concerns to the Clean Water Act Agents — the window had closed.

**2.    In violation of the Clean Water Act and the conditions of their permits, Defendants established and engage in policy and practice of pressuring the affected landowners and obtaining easements for Defendants' construction on private land without ever providing the affected landowners and the public with true construction maps and correct design information.**

502.    In constructing the Hinsdale-Tinkerbell Project, Defendants are required, as a condition of compliance with their permits, to provide the public and the affected landowners with information about their compliance with the Clean Water Act.

503.    In order to comply with these requirements, Defendants maintain a public website with information about their various construction, including the Hinsdale-Tinkerbell Project.[19]

504.    Hinsdale-Tinkerbell Project website fails to provide any construction maps or contour maps of the project area.

505.    Defendants refuse to make project construction maps, including Hinsdale-Tinkerbell Project, available to landowners and the public on an unrestricted, up-to-date, immediate access basis.

506.    There is no technical difficulty for Defendants to make available the up-to-date construction maps through the Project websites, so that affected landowners and the public could access the information on an unrestricted, up-to-date, immediate access basis, available 24/7 on the Hinsdale-Tinkerbell Project website.

507.    Defendants intentionally refuse to provide full, accurate and up-to-date construction maps to the affected landowners and the public.

---

[19] https://charlottenc.gov/StormWater/Projects/Pages/HinsdaleTinkerbell.aspx, accessed 04/12/2021

508. It is Defendants' policy and practice to extract construction easements from affected landowners without providing necessary construction information, including construction maps.

509. Defendants intend to conceal and are able to conceal violations and construction defects of their projects by refusing to timely provide accurate construction maps.

510. Defendants repeatedly attempted to extract easement from Plaintiff-Landowner without providing true and accurate construction maps reflecting their proposed land-disturbing activity.

511. In early October 2017, Defendants gathered landowners affected by the Hinsdale-Tinkerbell Project and requested easements.

512. Real estate agents were on hand to personally speak with each landowner and to collect signatures on the easement documents.

513. In contrast, engineers knowledgeable of the project were not available to personally respond to Plaintiff's questions about Defendants' construction.

514. Defendants piled inaccurate and incomplete construction maps and crowded landowners around the piles. The crowd of landowners had insufficient time for map review. The maps were guarded by real estate agents, untrained to answer any construction-related question. The real estate agents attempted to extracting easements from the uninformed landowners.

515. Despite Plaintiff's repeated requests, Defendants' staff refused to allow her to take maps home review maps. Moreover, Defendants' staff acted as though Plaintiff's request was an inappropriate.

516. The maps provided at the October 2017 meeting were inaccurate and incomplete.

97

517. The maps did not include critical information: proposed grading was missing. Placement of structures was not accurate.

518. Following the October 2017, meeting, Plaintiff repeated her request for review copies of construction maps relevant to the building on her land.

519. After multiple repeated requests, Defendants reluctantly provided construction maps of Plaintiff-Landowner's land which:

- entirely omitted proposed grades (no grading was shown)

- omitted and / or distorted structures

520. Based on "construction maps" produced by Defendants in 2017, no person could answer and Defendants' staff admitted that they could not answer:

- the exact dimensions of Defendants' proposed grading on Landowner's Land

- whether retaining walls were within the area of destruction and would suffer

521. Plaintiff-Landowner requested review construction maps in early October of 2017.

522. In 2017, Plaintiff asked Defendants whether the retaining walls at the top of her Slope would be affected by construction.

523. For 19 months, Defendants staff responded with a version of "I do not know, but I am working hard to find out" and "it does not exist," while pressuring Plaintiff to agree to the easement.

- To[o] close to call," admitted real estate agent Michael Ryan (the only contact given to Plaintiff) on February 9, 2018. "We will have [retaining walls] shown on the plans and how we are going to address their impact, if any."

524. Instead of providing true maps reflecting their land-disturbing activity, Defendants scheduled condemnation proceeding and tried to bully Plaintiff into signing over the easement without true information.

525. Defendant first scheduled condemnation proceeding for 12/10/2018, then rescheduled it for 12/17/2018, all while refusing to provide true construction maps.

526. But for Plaintiff-Landowner's retaining a professional engineer to assist with the negotiations, Defendants would have conducting the condemnation and taking without ever providing true construction maps.

527. Professional engineer engaged by Plaintiff-Landowner contacted Defendants in December 2018.

528. Defendants rescheduled the condemnation, but still did not the produce true and correct construction maps.

529. Defendants continued with their tactic of "I do not know, but am working very hard to find out."

- on April 13, 2019, Project Manager John Keene e-mailed to Plaintiff admitting that footprint of her house on the maps didn't "look right."

- On April 30, 2019 Project Manager John Keene e-mailed to Plaintiff that all use of slope would be contractor's decision

- On May 2, 2019, at the field meeting, Keene and Lozner admitted that retaining wall was missing from their construction plans, but insisted that grading was contractor's decision.

- Only at the conclusion of May 2, 2019, Lozner and Keene finally "remembered" that maps with proposed grading could be obtained and promised to "look for the maps."

530. Plaintiff made four additional request before Defendants provided maps that contained proposed grading contours on or about May 13, 2019.

531. Maps provided on or about May 13, 2019 confirmed that Defendants proposed grading at steep angles and without terracing in violation of Clean Water Act. These maps also for the first time revealed the extended area of the proposed grading.

532. Still, Defendants map did not provide the entirety of the of Plaintiff's property. Defendants claimed that full map was "not available" and did not provide a full contour map of Plaintiff's property until 2021.

533. Meanwhile, Defendants scheduled and rescheduled condemnation proceedings for 12/10/2018, 12/17/18, 11/25/19, 12/90/19. The City of Charlotte eventually approved the taking on 1/27/21.

534. It is Defendants' policy and practice to refuse Landowners' requests for information by an elaborate bureaucratic system with multiple "lines of defense."

535. Defendants employ multiple staff members who take turns wasting Plaintiff's time and resources and demoralizing Plaintiff-Landowners by falsely claiming that information is not available, "no changes can be made," and that "designs are already approved."

536. Real estate agent Michael Wilfong (Plaintiff's first point of contact) wasted several months of Landowner's time responding to multiple inquiries with you are "not supposed to ask," "no changes can be made," and "designs are already approved."

537. Then, Project Manager John Keene wasted several months of Landowner's time responding to multiple inquiries with you are "not supposed to ask," "no changes can be made," "contractor will decide," and "designs are already approved."

538. But for directing multiple requests to the U.S. Army Corps of Engineers and the City of Charlotte, and but for engaging a professional engineer Plaintiff would not receive information this Defendants are statutorily required to provide to the public and landowners.

539. On information and belief, Defendants created the system of misinformation and obfuscation in order to escape public and landowners' scrutiny of their construction.

540. On information and belief, construction projects in the City of Charlotte exist, which Defendants constructed in violation of conditions of their permit, and/or without appropriate Clean Water Act permit, and/or without a Clean Water Act permit, and/or without approval of Clean Water Act Agencies, and/or without knowledge of Clean Water Act agencies, where reporting was required.


**3.    In violation of the Clean Water Act and the conditions of their permits, Defendant City of Charlotte gagged Defendant Armstrong Glenn, PLLC. While the gagged Armstrong Glen, PLLC refuses all direct contact with the affected landowners, the rest of Defendants employ their clever scheme of thwarting all efforts of affected landowners to exercise their statutory right of ensuring that land-disturbing activity on private land complies with the Clean Water Act**


541. In 2011, the same year when Hinsdale-Tinkerbell project was commenced, Defendant City of Charlotte entered into a "Contract for engineering services" with Armstrong Glen, P.C., a South Carolina engineering firm ("Contract"). **Exhibit 3**

542. Under the Contract, Armstrong Glen, P.C. agreed to provide "professional engineering services for various unspecified (sic!) storm drainage projects" (Contract, Article 1, at 3).

543. Hinsdale-Tinkerbell Project is one of such projects.

544. Contract was amended several times, to extend the expiration date and increase the funding.

545. The current expiration date is December 31, 2022.

546. On information and belief, the Armstrong Glen's compensation under the Contract is not less than $3,000,000.00.

547. As a material condition of this multi-million-dollar government contract, Armstrong Glenn agreed to be gagged about any and all engineering incompetence and dishonesty in City's projects:

> As a condition of entering into this Contract, [Armstrong Glen, P.C.] … agrees to refrain from …, absent City written approval: … ***making any statements to the media or the public on any issue which is in the City's judgment likely to cast doubt on the competence or integrity of the City or [Armstrong Glen, P.C.]***. Failure to comply with this Article by [Armstrong Glen, P.C.] shall constitute a ***material breach*** and, without limiting any other remedies the City may have, shall entitle the City to terminate this Contract for default." **Exhibit 3**, at 30 (emphasis added, I.A.)

548. On information and belief, the three million dollar gag not only prevents Armstrong Glenn P.C. from disclosing or discussing the design defects of Hinsdale-Tinkerbell Project with the affected landowners, the public, members of the media, but also has the practical effect of precluding Armstrong Glenn's engineers from all unsupervised contact with the affected

landowners and / or from truthfully addressing the Charlotte City Council at the business meetings, where members of the public and the press are always present.

549. Plaintiff-Landowner repeatedly attempted to contact Armstrong Glenn P.C. by telephone and e-mail in order to request information, discuss design defect and possible solutions, but Armstrong Glen, P.C. refused all Landowner's unsupervised contacts attempts.

550. On information and belief, Armstrong Glen, P.C. has been the drafter of of the Hinsdale-Tinkerbell Project throughout the project and, as such, has been at all times, the most knowledgeable resource and in possession of the most up to date construction maps, Clean Water Act Compliance information, and information about all construction decision and defects.

551. Having gagged the engineers of Armstrong Glen, — the obvious persons with full knowledge of the project, — Defendants City and Stormwater then walled off the affected landowners from both obtaining information and offering input.

552. Defendants did that by using the scheme: every Defendants' representative who comes in contact with Plaintiff (and, on information and belief, all affected landowners) claimed that he had no direct knowledge, no direct access to information, no authority to make engineering design decisions or corrections, — then promised to reach out to undisclosed person(s) who enjoy these privileges. What followed were years of delay, obfuscation and denials, until the time was ripe to take the land by condemnation.

553. Plaintiff-Landowner repeatedly requested each Defendants' representative who contacted her on behalf of Defendants' Project with the question: "Who is in charge?" but received no answer.

554. Even the City Engineer did not admit to being in charge, but nodded at the undisclosed "team."

555. On information and belief, the impenetrable wall of defense offered by everybody who handles the affected landowners and the public, the line "I'm not in charge, I'm just a messenger" constitutes Defendants' policy and practice aimed to frustrate the transparency and citizen enforcement requirement of the Act.

556. When Plaintiff-Landowner demanded information and requested redesign of defects in the Project, Defendants responded by assigning new people to "handle" Plaintiff. Each of new people started over with the same scheme, and wasted months of Plaintiff's time.

557. Defendants first assigned to Plaintiff's case a real estate agent, who responded to most of Plaintiff's questions with "you are not supposed to know."

558. Next, Plaintiff's case was elevated to the Project Manager, Mr. John Keene, who eventually brought Mr. Lazner.

559. In response to Plaintiff's requests for information and design change, Project Manager John Keene told Landowner on more than one occasion that that he, Mr. Keene, "was on [Landowner's] side," but all decisions were up to somebody else — "Stormwater," "the City," "Charlotte Water," "*contractors*" and, that all the information was controlled by the unnamed "consultants" ("Consultants" = Defendants' secret code name for the engineers of Armstrong Glen, as Plaintiff learned much later.)

560. Until Landowner "engineered up," Project Manager Keene refused to disclose the identity of "consultants," claiming that Plaintiff was "not supposed to know that."

561. It was not until 2021 that Defendants confirmed that "consultants" was the misnomer adopted by Defendants for Armstrong Glen, the Project drafter.

562. Back in 2019, Plaintiff reached out to the City Engineer, and the City Engineer agreed with Plaintiff that the design corrections proposed by Landowner were "reasonable," but again informed Plaintiff that even he, the City Engineer, did not have decision-making powers. According to the City Engineer, the power to correct the design defects belongs with the unnamed "team" and the then unnamed "consultants."

563. The City Engineer returned Plaintiff's matter to Mr. Daryl Hammock, with Stormwater. Daryl Hammock redesigned the Project to increase the damage, instead of decreasing it.

564. When Plaintiff asked Mr. Hammock who made the decision, Mr. Hammock referred to "them" and claimed that he, Mr. Hammock, was "not even in the room" when decisions were made.

565. On the only occasion when Armstrong Glen's engineer Josh Letourneau, P.E. was allowed to briefly answer Plaintiff's questions (while heavily supervised by the City Engineer and Stormwater staff), Josh Letourneau insisted that he and his employer Armstrong Glen made no decisions either, but only followed orders "of the client."

566. Josh Letourneau, the sealing engineer of Hinsdale-Tinkerbell Project admitted that Plaintiff-Landowner's requests to correct design defects were not unreasonable from an engineering point of view, but claimed that he was powerless to make changes unless ordered by "the Client." According to the Contract, Armstrong Glen P.C.'s "client" is the City of Charlotte.

567. Closing the loop, the City of Charlotte, employs the policy and practice of rubber-stamping all and any Stormwater projects, stifling all input from homeowners and the public and refusing to consider evidence that Defendants' stormwater designs violate the Clean Water Act.

568. Defendants' scheme works because the City of Charlotte does not have a mechanism to enforce the transparency requirement of the Clean Water Act.

569. As a result, Plaintiff's efforts to correct design were in large part thwarted by Defendants' scheme where:

- Real estate agent says "you are not supposed to know, sign here."

- Project Manager nods to nonexistent builders and unnamed "consultants"

- City Engineer nods to the "the team," and the unnamed "consultants,"

- Armstrong Glen (the "consultant,") claims that it follows the orders of the "client," — the City of Charlotte,

- Closing the loop, City Council votes to "have faith" that everything will be all right.

570. This well-choreographed conning of landowners where every one of Defendants' employees and representatives falsely claims that he is "not in charge," and "does not have the information" is made possible because Defendants, in violations of the Clean Water Act, refuse to make publicly and timely available the information which they must be disclose, including:

- all relevant documents: **construction maps, soil research, expert research etc.**

- the contact information for designated person(s) **who are "in charge"** and **do** make the final engineering design decisions

- the contact information for Defendants' employees who *are* responsible for compliance with the Clean Water Act

## 4. In violation of the Clean Water Act and the conditions of its permits, Defendant City of Charlotte unyieldingly exercises its policy and practice of rubber-stamping all and any Defendants' construction projects and approving any and all environmental and property damage

571. The City of Charlotte has a "council-manager" form of government.

572. All decisions about City's constructions are put to the City Council's vote at City Business Meetings.

573. As a matter of policy, the Charlotte City Council turns a blind eye to any Clean Water Act violations and other defects of City's designs and rubber-stamps all and any designs presented to it.

574. On information and belief, the City Council has never refused to rubber-stamp a Charlotte-Stormwater design out of concern that such design violated Clean Water Act.

575. Even when presented clear, authoritative, unrefuted engineer's opinion that a design is likely to cause imminent and certain environmental and property damage, City Council follows the "see no evil" policy that requires it to approve any design and immediately condemn the property.

576. Some of the City Council members refer to this policy as the policy of "trust."

577. The policy of "trust" involves a multi-step practice of "seeing no evil."

578. To begin with, "Charlotte's Policy of Trust" stifles any complaints of violations by minimizing the information that can be presented at the public meeting of the City Council.

579. Plaintiff-Landowner experienced the scheme which, on information and belief, is the City's policy and practice:

(a) The affected Landowner or other person speaking to the City Council of potential violations is slotted *only* **3 minutes** to present his case to the City Council, regardless of the complexity and number of design defects involved. No exceptions are permitted.

(b) This **3 minute presentation** is the *only* chance for the affected Landowner to address the City Council with his concerns because:

(c) Plaintiff-Landowner is forbidden from (i) speaking in rebuttal, (ii) asking for clarification, and even from (iii) directing the attention of Council members to helpful documents in the package Landowner presented to them. Indeed, after Landowner's three minutes are up, Landowner may only speak when spoken to by the members of the Council or the Mayor.

(d) Even though one Councilperson (discussion leader) is assigned to a pre-meeting investigation, this Council person deliberately refuses all contact with the Landowner, while closely conferencing with Stormwater / City Staff, and aggressively presents to the rest of City Council the view that all Landowner's information should be disregarded.

580. In accordance with the City's policy and practice, the City Councilman Tariq Bokhari, the Councilman in charge of Hinsdale-Tinkerbell Project, refused all Plaintiff-Landowner contact attempts throughout the years preceding Business meeting.

581. At the 01/27/2019 City Council's meeting, Mr. Bokhari aggressively (and unexpectedly to Landowner) insisted that his colleagues (who expressed sincere concern after seeing the reports of Landowner's Engineer Diamond Engineering) must distrust Landowner and trust the Project.

582. After the meeting, on 02/03/20 Landowner's e-mailed Mr. Bokhari seeking to find out why Mr. Bokhari so aggressively painted Landowner as not to be trusted.

583. In her 02/03/20 to Mr. Bokhari, Plaintiff-Landowner explained her careful and extensive process of FOIA information gathering and her conscientious consultations with respected engineer, and wrote: "If Council thinks that something is incorrect in my package … could you please assist me with ascertaining what I may have gotten wrong. I take veracity of my allegations very seriously, and ask [you] to please help before I go forward." **Exhibit 19**.

584. Again, Mr. Bokhari made no response whatsoever.

585. On information and belief, in preparation for his presentation at the 01/27/20 business meeting, City Councilman Tariq Bokhari did not speak with any of the Clean Water Act Agents either.

586. At the 1/27/2019 Business Meeting, City Councilman Tariq Bokhary informed his colleagues that he had extensively spoken with Stormwater and City staff, and encouraged his colleagues to

1.  "trust" that the design of the Hinsdale-Tinkerbell project would be safe;

2.  disregard all information brought by Plaintiff-Landowner as untrustworthy;

3.  rubber-stamp the Hinsdale-Tinkerbell Project without considering its design defects, reasoning that City Council must accept the design on trust.

587. Responding to Plaintiff-Landowner's presentation alerting City Council that Hinsdale-Tinkerbell design on her property *violated the Clean Water Act, and threatened to destroy her house*, Councilman Bokhary said: "I'm not trying to get too deep into the weeds cause I don't want to be the engineer, the judge, the attorney, or the city manager. I know and trust until I've been given any other reason…"

588. Plaintiff-Landowner did gave the Councilman Bokhary and the rest of the City Council a serious reason to investigate the potential violation, and not to rely on "trust."

589. Plaintiff-Landowner presented the Business Meeting of City Council with the following, in support of her concern that, as currently designed, Hinsdale-Tinkerbell Project would result in dangerous erosion and injury to environment and property:

- 12/06/2018 Opinion Letter of Diamond Engineering, PLLC, a highly reputable Civil Engineering Firm specializing in municipal engineering, construction inspection, site planning, conceptual large project planning, site and subdivision planning, water and sewer design, storm water design and management, flood studies, erosion control, earthen dam design and breaching, roadway design.

- 06/17/2019 Opinion Letter of respected and competent Diamond Engineering, PLLC,, **Diamond Engineering, PLLC.**

110

- **Multiple photographs and charts, including Defendants' own erosion studies**

- information about critical comments made by the Clean Water Act Agents

- Plaintiff's 12/03/2019 Notice of Intent to Commence Civil Action under the Clean Water Act and the North Carolina Sediment Pollution Control Act of 1973

590. These documents were sufficient to alert members of he City Council that they had reason not to "trust" the design of Hinsdale-Tinkerbell Project, and that additional inquiry was appropriate.

591. Importantly, at the 01/27/20 Business Meeting, City Council did not call for and did not receive any rebuttal of Plaintiff' concerns by any means generally accepted in the engineering or legal industry — i.e. engineers' letters, studies, sealed opinions, or statements by the drafting or sealing engineers.

592. City Council members and other members of the meeting did not request such documents or demand to know the names of sealing / drafting engineers.

593. Charlotte City Mayor called a single person to respond to Plaintiff-Landowner's concerns, — the City Engineer.

594. The City Engineer spoke to the importance of Hinsdale-Tinkerbell generally, then promised that an unnamed "consultant," *at some future time*, which would accept all responsibility.

595. Specifically, City Engineer's only assurance of design compliance was: "at some point somebody's gotta seal a set of engineering drawings and become an engineer of record …

we put it … on our consultant engineer who is putting their seal … and so ultimately, we find confidence in that." (01/27/20 City of Charlotte Business Meeting.)

596. The "unnamed consultant" was not present to speak to City Council.

597. The City Council did not requested its presence, and did not ask to announce its name.

598. Throughout the meeting, the discussion leader Councilman Tariq Bokhari repeated not fewer than half a dozen times that City Council should "trust" that "right thing" would happen with Hinsdale-Tinkerbell Project, insisting: "I just encourage everyone to have confidence … Mike [Davis, City Engineer] and the team know what the right thing is… … I know and trust until I've been given any other reason…"[20]

599. The City of Charlotte and Charlotte City Council has arbitrarily developed different and diametral opposite policies for similarly situated construction operators.

600. For the City-Stormwater projects, Charlotte City Council follows a policy of "trust," "rubber-stamp any construction," and "hands-off confidence."

601. In contrast, the City of Charlotte and Charlotte City Council has adopted and exercises "hands-on" policy towards similarly situated construction projects by *private* builders, and does not rely on "trust" or "confidence."

602. The same Councilman Bokhari who advocates "hands-off trust" towards Hinsdale-Tinkerbell Project, and who reasoned that he was "not an engineer" and not equipped for

_____

[20]"I just encourage everyone to have confidence, … [Mike and the team] know what the right thing is… I'm not trying to get too deep into the weeds 'cause I don't want to be the engineer, the judge, the attorney, or the city manager. I know and trust until I've been given any other reason…"

112

any involvement in construction projects, exercised sharply different, "hands-on" policy for construction projects by non-City, non-stormwater developers.

603. For instance (to take a random example) on a project by *Blue Azela-Providence LLC* (hearing petition 2018-127), councilman Bokhari took hands-on approach and, in sharp contrast with his assertions during the Hinsdale-Tinkerbell discussion, declared himself fully equipped to demand, gather and process various construction information.

604. Speaking at the *Blue Azela-Providence LLC* discussion, Councilman Bokhari demanded: "I would like to engage the City Arborist and directly get him to look…" "I would like a [C-DOT] analysis…" "I would like [citizens opposing the development and developer] to … help me understand… I will come to any meeting that [citizens and developer] would like me to … I will help gather any information that you need."[21]

605. So long as the developers whose construction is discussed before City Council are *not Stormwater,* Councilman Bokhari and the rest of City Council do not, as a matter of policy, advocate to "trust" that construction will be done right, that developers will do "the right thing." Nor do members of City Council proclaim themselves unequipped to understand construction.

606. Charlotte City Council encourage and engage public input about construction, violations where the developer it *not* Stormwater, but stifle public input where the operator is Stormwater / City.

607. Three minute presentation is not a sufficient time for the affected landowner to present and adequately explain multiple construction defect to City Council.

_____

[21] May 20, 2019, Zoning Meeting, Minutes Book 148, Page 103-04.

608. Rebuttal and clarification opportunity is necessary for the affected landowner's meaningful presentation of evidence before City Council and other members of the meeting.

609. City Council's policy to rely only on one-sided information from Defendants' staff and to completely shut off landowner as a source of information is aimed at and results in and artificially closing off all critical information from landowners.

610. The City of Charlotte has adopted a discriminatory policy that treats the environment and landowners affected by the City and Stormwater's land-disturbing construction differently from the environment and landowners affected by all other construction operators. This policy is arbitrary and intended to deliberately injure or adopted with deliberate indifference to injuries caused by City-Stormwater construction.

611. At the 01/27/20 Business Meeting, despite the City's "policy of trust," Hinsdale-Tinkerbell Project design defects glared so obviously that even the three minute presentation by Landowner proved sufficient for 4 out of 11 City Councilpersons to observe that City Policy of "trust" was improper and to, ultimately, cast their vote <u>against</u> adopting the defective design.

612. Several City Council members observed that the policy of stifling information from Landowner presentation was unacceptable:

613. Councilwoman Dimple Ajmera insisted: "I'm not comfortable making a decision where I have something in front of me 5 minutes before the vote where it's a pretty complex issue we're talking about it someone's home. So I would like at least a little bit of time, maybe a week or two…"

614. Mayor Pro Tem Julie Eiselt stated that Landowner's evidence required review: "hard to digest this all while listening to comments" and refused to vote for rubber-stamping Stormwater's project: "I'm not comfortable with this at this point."

615. Indeed, the video of the proceedings (**Photo 9**, below) shows Mayor Pro Tem Julie Eiselt intently and conscientiously studying Plaintiff-Landowner's materials, even as the Charlotte City Mayor Vi Lyles just instructed the City Council to disregard all evidence of Clean Water violations in Defendants' construction design and to vote to "trust" Defendant Stormwater, and some City Council are voting to "trust."



616. Councilwoman Renee' Johnson also objected to the "blind trust" instruction: "there are a few of us that are not comfortable. Could we defer this for an independent … review?"

617. Councilperson Dimple Ajmera likewise requested an independent review of Hinsdale-Tinkerbell design.

618. While Landowner was precluded from offering a rebuttal by Charlotte's gag policy, City Engineer Davis and Councilman Bokhari falsely assured City Council and Ajmera's request had already been satisfied: an "*independent study*" had already been completed by an unnamed "*independent consultant*."

619. "For those who want independent study … our *third party* is independent … and that's the confidence I have there," misleadingly stated Councilman Bokhari.

620. No sealed "independent study" was presented to City Council on, before or after the 01/207/20 meeting.

621. No "independent study" was presented to Landowner.

622. Defendants did not conduct any "independent study" of Hinsdale-Tinkerbell Project design.

623. On information and belief, no "independent study" of Hinsdale-Tinkerbell Project exists.

624. No "independent third party," or "independent consultant" exists.

625. When City Engineer's and Councilman Bokhari's reference unnamed "independent third party," a.k.a. "independent consultant," they refer to the gagged project drafter Armstrong Glen, P.C, and the sealing engineer Josh Letourneau from Armstrong Glen who are completely dependent of the orders of their client and make no independent decisions, and who are disallowed any criticism for fear of losing employment.

626. Armstrong Glen is not "independent" in any sense of the word.

627. At the 01/27/20 business meeting, Plaintiff-Landowner repeatedly asked to clarify the identity of the alleged "independent," but the City Mayor enforced Charlotte City policy to prohibit rebuttal and clarification from Landowners.

116

628. As a result, misleading comments of the City Engineer and Council Member Bokhari stood undisturbed and served basis for the City Council's vote to condemn Plaintiff's land without reviewing the defective design.

629. The City's policy of gagging landowners prevented Landowner from correcting City Council's mis-understanding, resulting in a vote that was based on misinformation.

630. The City Council may have vote without benefit of knowing that:

    (a)   The unnamed "independent" "consultant" does not exist.

    (b)   "Consultant" is misnomer for Armstrong Glen, P.C. — the engineers employed to draft the project.

    (c)   Armstrong Glen, P.C. is not "independent" because it liable for the project.

    (d)   Moreover, Armstrong Glen, P.C. not "independent" because it is  contractually gagged from publicly admitting that the design is flawed.  "is in the City's judgment likely to cast doubt on the competence and.

631. As a result, on information and belief, some member of City Council were misled into believing that an unnamed "independent" engineer did an "independent study" of the project, prepared by a separate "independent" engineer.

632. Councilperson Dimple Ajmera pressed City Engineer Davis doggedly and repeatedly, in an attempt to clarify the matter, but in the end, the City Engineer managed to mislead her.

633. Councilperson Dimple Ajmera asked: "I know that we have a *consultant* who is doing *the actual work* [on Hinsdale-Tinkerbell Project]. Has the [same] *consultant* done the *independent study* for this work?"

634. True answer to Ajmera's question is that Armstrong Glen *was the same* "consultant," but City policy gaged Plaintiff-Landowner from offering this true answer.

635. As a result, and misleadingly, City Engineer Davis obfuscated, dodged and misdirected until Councilperson Ajmera was misled into believing that engineers who drafted the Hinsdale-Tinkerbell Project were a different group from those who later "independently" reviewed the project.

636. Councilperson Ajmera, and with her the rest of City Council, was mislead, summarizing City Engineer's answer: "So it does not necessarily mean that the same consultant would actually do the work who has done the study? It would be independent? OK."

637. Councilperson Ajmera was misled, despite her best efforts to get to the truth because of the City Council Policy that deliberately prevent the necessary information flow.

638. <u>First</u>, while City Engineer intentionally misled Councilperson Ajmera, Landowner was prohibited to rebut and clarify the falsity by City's policy of "no rebuttals."

639. <u>Second</u>, while City Engineer and Councilman Bokhari referenced obscure hearsay from unnamed "consultants," "parties," "team," City's policy prevented members of the council to demand names and documents instead of accepting obscure references to "same consultant" vs. "different consultant."

640. Another illustration of the the gagged after three minutes policy is a separate falsity about the design which City Engineer was able to supply in the absence of Plaintiff's ability to rebut:

641. Presenting a the 1/27/20 Business Meeting, the City Engineer told City Council that Defendants' staff had made design corrections requested by Plaintiff, including, — City

Engineer claimed, — the design of temporary driveway to provide access to Plaintiff's house during construction.

642. Landowner was prohibited not only from rebutting this false assertion, but even from directing City Council members' attention to the portion of Landowner's written submission to the Council where this false assertion was discredited. As a result, City Council members voted, relying on City Engineer's falsity.

643. Defendants' design of the temporary driveway is dangerous.

644. Defendants designed the temporary driveway to connect at 90 degrees to the existing driveway, where both legs of the driveway are at such high slopes, that maximum acceleration is required to use the driveway.

645. At the speed required to drive up the temporary part of the driveway, a 90 degree turn is impossible.

646. Emergency vehicles — fire engines, ambulances — will not be able to reach the house, and most definitely will not be able to back up at ninety degree angle.

647. Worse, the vegetation obstructs the drivers' field of vision, preventing an unfamiliar driver from timely reacting to the 90 degree turn.

648. The driver who misses this 90 degree turn, is aimed straight for the 20 plus foot drop down, onto the bedrock in the creek.

649. While safe alternative solution is easily available, and Plaintiff had requested City Engineer and all Defendants' staff to adopt it, they had refused to do sot.

650. Stormwater and the City Engineer refused to correct the death-trap driveway.

651. Nevertheless, the City Engineer misleadingly told the City Council that temporary driveway design on Plaintiff's land was successfully redesigned, while the City policy prevented Landowner from driving home to the City Council that Defendants' driveway design was not redesigned and continued to be dangerous to life and property.

652. Despite the City's policy of stifling Landowner's informational input, design defects in Defendants' construction are so glaringly dangerous that there were council members who opposed to rubber-stamping the design. But these conscientious members of the City Council are powerless because they lack a mechanism to stop the rubber-stamping and demand and to commence investigation into the Clean Water Act violation. The City Council's policy of "trusting" all Defendants' / Stormwater's construction designs requires the City Council not only close its eyes and ears to information about constructions violations, but to rubber stamp any design.

653. At the conclusion of the 1/27/20 Business Meeting discussion, Charlotte City Mayor Vi Lyles expressed the "rubber-stamp-vote," "no questions asked" policy.

654. Charging the City Council before the vote, the Mayor ordered them to to ignore any Hinsdale-Tinkerbell Project' violations of the Clean Water Act, ignore any design defects and limit their vote to only the general desirability of taking land for the project. The Mayor stated: "City Council vote is to either approve the property acquisition or not. It's just that simple."

655. Following the Mayor's charge, the 1/27/20 Charlotte City Council turned a blind eye to all design defects, approved the condemnation and washed its hands of the impeding Clean Water Act violations in City's construction.

120

656. With the City Council vote for condemnation finalized, the Mayor addressed Landowner directly and stated that Defendant Stormwater was the true decision-maker, and that all power to correct the defective design rested with the Stormwater. The City approved defective design, but, per Mayor, "It doesn't mean that Stormwater won't continue to work with [Plaintiff-Landowner]…"

657. Contrary to the Mayor's promise, Stormwater stopped all contact with Plaintiff-Landowner as soon as City Council approved the condemnation. All Defendants remained silent for approximately one year, until Landowner reached out to City Council member Ajmeera, who contacted City Engineer and requested Stormwater to negotiate.

658. In response, the City Engineer together with several members of City and Stormwater staff and an attorney for the City made a production of scheduling a video conference with Landowner to make point that Landowner's land was "taken," and all Landowner's "requests for favors" were denied.

659. As Stormwater's Keene and Lozner initially stated, "it all comes back to us,[Stormwater]."

660. Indeed, in violation of Clean Water Act, Defendants created a system where any construction design dreamed up by Stormwater staff is implemented without ever being questioned

661. The legislature of the City of Charlotte has no mechanism to ensure that Defendants the City of Charlotte, Stormwater, Armstrong Glen P.C. and Mr. Letourneau. P.E. abide by the Clean Water Act in designing construction. To the contrary, Charlotte's legislature encourages and covers up all Defendants' construction violations.

# CLAIMS FOR RELIEF

## GENERAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

662. Since November 1, 1993, the City of Charlotte operates MS4 (municipal separate

stormwater system) within the meaning of Section 402(p) of the Clean Water Act § 1342(p),

and 40 C.F.R. §122.26(b)(18). The permit was renewed several times. Presently, the City of

Charlotte is the permittee under the 10/10/2018 Permit No. NCS000240, authorizing

discharges of municipal stormwaters runoff to receiving waters of the Catawba basin, in

compliance with Permit's terms and conditions. This is also the permit that gives the City

supervisory power over private construction, as to the compliance with the Clean Water Act.

663. Hinsdale-Tinkerbell Project is a construction activity subject to the North Carolina

Sedimentation Pollution Control Act of 1973, and, consequently, must comply with the

conditions of NPDES General Permit No. NCG010000. North Carolina Department of the

Environmental Quality, Division of Energy, Mineral and Land Resources, named "City of

Charlotte Storm Water Services" as the permittee for the Hinsdale-Tinkerbell Project.

664. The Department of the US Army Corps of Engineers issued Regional General Permit

2016-00163 (RGP 163) effective April 24, 2017, expiring after 5 years to permittee "Charlotte

Storm Water Services," authorizing activities which "cause only minimal individual and

cumulative environmental impacts." All "authorized uses" under the permit must "comply

with the general and special conditions incorporated in the permits." U.S. Army Corps of

Engineers, Public Notice, SAW-2016-00163 (April 24, 2017).

665. The Department of the US Army Corps of Engineers determined that the Hinsdale-

Tinkerbell Project in the part relevant to this Complaint is eligible for coverage and must

comply with the conditions of Regional Permit 163, and designated "Charlotte-Mecklenburg Stormwater Services" as the permittee for the purposes of the Hinsdale-Tinkerbell Project verification.

666. North Carolina Department of the Environmental Quality, Division of Water Resources determined that Hinsdale-Tinkerbell Project must comply with the conditions of Water Quality General Certifications No. 4147 and 4133, and designated "Charlotte/Mecklenburg Storm Water" as the responsible permittee for the Project.

667. Each of Defendants' failures to comply with the requirements detailed herein violated and continue to violate the Clean Water Act, Section 301, the conditions of their permits under section 401, 402 and 404, and the North Carolina Sediment Pollution Control Act of 1973.

668. Any City of Charlotte's noncompliance with its NPDES Permit, NCS000240 is a violation of Clean Water Act and is grounds for … termination, revocation … of the Permit NCS000240, which endows the City of Charlotte, among other things, with power to oversee private construction. NPDES Permit, NCS00024, Part V, 1, at 1 of 5. By failing and refusing to abide by the Clean Water Act in its own actions, the City of Charlotte loses its supervisory power over private contractor's compliance with the Act.

669. An action for injunctive relief under Clean Water Act is authorized under Clean Water Act 33 U.S.C. § 1365(a). Defendants' joint unlawful conduct alleged herein directly and proximately caused and will cause Plaintiff to suffer damage, injuries and deprivations and will irreparably harm Plaintiff and the citizens of Charlotte and State of North Carolina, for which harm Plaintiff has no speedy, plain or adequate remedy at law.

670. The cost to remediate damage that government Defendants already cause on Plaintiff's land is not determined, but believed to be in excess of $250,000.00. If Defendants are not enjoined from further destroying Plaintiff's property, the cost to remediate the damages which Defendants threaten to Plaintiff are presently not determined, but believed to be able to reach in excess of $750,000.00, for which all Defendants are jointly and severally liable.

671. Pursuant to Sections 309(d) of the Clean Water Act, by committing the acts and omissions in violation of the Clean Water Act described herein, the Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act, occurring from the day the violation commenced and for each day they have violated and will continue to violate the Clean Water Act, not to exceed $25,000 for violations occurring prior to January 29, 1997, and not to exceed $27,500 for violations occurring after January 30, 1997 through March 15, 2004, and not to exceed $32,500 for violations occurring between March 16, 2004 and January 12, 2009, and not to exceed $37,500 for violations occurring between January 12, 2009 and November 1, 2015, and for violations occurring after November 2, 2015, not to exceed $55,800 per day for each violation. 33 U.S.C. 1319(d).

672. Pursuant to North Carolina Sedimentation Pollution Control Act of 1973, by committing acts and omissions alleged herein, Defendants are liable for injunctive relief pursuant to N.C. Gen. Stat. §113A-65, and for civil penalties up to $5,000 per day of violation pursuant to N.C. Gen. Stat. §113A-64.

673. Governmental Defendants' unlawful acts set forth in this Complaint are conscience-shocking, unreasonable, arbitrary, with no rational relation to any legitimate governmental objective and performed for improper motives with deliberate intention to allow harmful acts

124

and practices to remain undetected and to damage the environment, harm Plaintiff's property, safety and welfare, all intentionally and / or with deliberate disregard to consequences to Plaintiff and the environment, and, in fact proximately caused and will cause such intended damage, in violation of the United States Constitution, as enforced by 42 U.S. § 1983 and the North Carolina Constitution.

## FIRST CAUSE OF ACTION

**Ongoing violation - Defectively and Illegally designed and operating stormwater outfall at Hinsdale Street culvert**
**Discharge of Pollutants In Violation of the Clean Water Act Section 301, 401, 402 and 404, the conditions of the Permits and of the North Carolina Sedimentation Pollution Control Act of 1973**

**(Defendants City of Charlotte and Stormwater)**

674. All allegations of the preceding paragraphs are re-alleged and incorporated herein.

675. As part of Charlotte's MS4, Defendants City of Charlotte and Stormwater designed, constructed and operate stormwater outfall located on the left (facing downstream) downstream side of the Hinsdale Street culvert.

676. Defendants City of Charlotte and Stormwater violated and continue to violate the law and the conditions of their permits by designing and operating the Hinsdale Culvert Street Stormwater outfall which shoots stormwater nearly perpendicularly across the receiving stream (the opposite of "gradual transition") at the unprotected soil of the opposite bank (the opposite of protecting the suffering bank by dissipated stormwater energy through the use of end-walls).

677. The southwest bank (right side of the stream facing downstream) is not protected from the "outlet energy" by elongated "end-wall" to "dissipate energy" of the stormwater.

678. As a result of Defendants' violations, stormwater from the outfall has eroded and, with every rain event, continues to erode the southwest bank of the receiving stream, flowing through the Hinsdale Street Culvert.

679. A true and correct photo of scoured hole in the right bank at the point of contact with the stormwater shooting from the illegally / improperly designed outfall is provided as **Exhibit 20**, Photo 10A and 10 B.

680. Enforcement of the State laws, City and county ordinances and conditions of Defendants' permits are implemented by dynamic engineering manuals, which require defendants to adopt certain **designs and engineering methods** that achieve a stable, (i.e. nonsilting and nonscouring) channel, preclude turbidity by designing "smooth and gradual" transition of stormwater from outfall into the receiving stream and protect the suffering bank by extending end-wall. *Charlotte-Mecklenburg Stormwater Design Manual*, Ch. 3, §3.2.1(4), at 3.2 (Rev. January 1, 2014); *North Carolina Erosion and Sediment Control Planning and Design Manual,* Appendices, 8.05, at 8.05.1.

681. The outfall defies all requirements for smooth and gradual transition and energy dissipation.

682. Sediment is a pollutant, and discharge of sediment without permit or in violation of a permit is a violation of the Clean Water Act § 301, 33 U.S.C. 1311(a)

683. The erosion of the bank produces sedimentation pollution, which has adversely affected and continues to adversely affect human health and the environment.

684. Section 402(p) of the Clean Water Act mandates that municipal dischargee permits "**shall** include a requirement to effectively prohibit non-stormwater discharges into the storm sewers." 1342 U.S.C. (p)(3)(B)(ii).

685. Section 402(p) of the Clean Water Act further mandates that municipal dischargee permits "**shall** require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, **design and engineering methods…**" Clean Water Act Section 402(p)(3)(B)(iii).

686. Accordingly, as a condition of renewal of its current NPDES MS4 Permit No. NCS000240, the City of Charlotte promised and represented that the following conditions are made part of the permit:

- outlet energy is commonly **dissipated through the use of end-walls**

- Defendant City of Charlotte maintains channels to **reduce erosion** and maximize pollution reduction capabilities

- Defendant City of Charlotte conducts improvements, including **channel stabilization** and water quality enhancement.

- Defendant City of Charlotte targets "uncontrolled volumes of stormwater runoff," recognizing the danger of "scouring of stream banks resulting in increased sediment volumes in streams." City of Charlotte, *NPDES MS4 Permit Renewal Application & Stormwater Management Program Report,* Section 1.4, at 4-5, Section 7.1.2, Table 7-2, at 22 (August 2017).

687. Permit No. NCS000240, Part I (G) requires the City of Charlotte to develop and implement, a "Stormwater Management Plan" in order to comply with the requirements of Clean Water Act Section 402 (3)(B)(ii) and (iii).

688. Permit No. NCS000240, Part I (F) incorporates all provisions of Charlotte's "Stormwater Management Plan" and makes them enforceable as conditions of compliance with the Permit No. NCS000240.

689. In turn, Charlotte's "Stormwater Management Program Plan" incorporates compliance with Charlotte City stormwater, soil erosion /sedimentation and post-construction control implementing ordinances and all conditions of the *General Permit NCG010000* for Construction Related Activities.

690. City of Charlotte Stormwater Pollution Control Ordinance makes it a violation to "cause or allow the discharge of non-stormwater, either directly or indirectly, to the the stormwater system." Illicit discharges include "sediment/silt." City of Charlotte, Code of Ordinances, Code 1985, Chapter 18, Art. 3, §§ 18-80(a), 18-77.

691. Permit No. NCG010000, Part II, Section B, requires permittee to adopt design and construction standards to prevent off-site sedimentation damage.

692. Permit No. NCS000240, requires the City of Charlotte to

- manage stormwater runoffs from development that drains to MS4 and disturbs an acre or more of land surface (Permit No. NCS000240, Part I (F) (1) (a)

- ensure controls are in place to minimize water quality impacts (Permit No. NCS000240, Part I (F) (1) (c)

128

- meet the requirements of post-construction program for construction project that are performed by, or under contract, for [the City of Charlotte]. (Permit No. NCS000240, Part I (F) (2) (5))

- "meet the objectives of the Pollution Prevention and Good Housekeeping Program" aimed at preventing or reducing polluted stormwater runoff from its MS4s (Permit No. NCS000240 Part II, Section G(2)).

- ensure compliance of construction (including City's own construction) with the *North Carolina Sediment Pollution Act of 1973* and Chapter 4 of Title 15A of the North Carolina Administrative Code. (Permit No. NCS000240, Part II (E) (2))

- take all reasonable steps to minimize or prevent any discharge in violation of this permit that has a reasonable likelihood of adversely affecting human health and the environment

693. Permit No. NCS000240, Part IV (D) requires Permittee to maintain a record of any "illicit discharge that reaches waters of the state and may cause or contribute to a violation of water quality standards or constitute an imminent threat to health or the environment."

694. On information and brief, Defendants have violated and continue to violate these requirements.

695. Any permit noncompliance constitutes a violation of the Clean Water Act. Permit No. NCG010000, Part IV, Section A (3).

696. Defendant Charlotte Storm Water Services is a permittee under Regional General Permit No. 2016-00163 (RGP-13).

129

697. RGP 163 provides that "discharge of dredged and fill materials must be avoided or minimized to the maximum extent practicable." RGP, Section "Special Conditions" (l), at 5.

698. Redeposit of sediment without a permit is a violation of Section 404 and section **401** of the Clean Water Act. *U.S. v. Deaton*, 209 F.3d 331 (4th Cir. 2000).

699. **Permit No. NCG010000**, Part II Section G(3), mandates that if Permittee "identif[ies] a need of … corrective actions to control sediment … these actions shall be performed as soon as possible…"

700. Restoration of water and land is an appropriate remedy where a person engaged in land-disturbing activity and failed to retain sediment generated by his activity. *City of Charlotte Soil Erosion and Sedimentation Control Ordinance*, Section 17-69 (Code 1985, §18-35).

701. Moreover, "Restoration may be required [even] where there is no clear reason for failure of particular approved erosion control measures." *City of Charlotte & Mecklenburg County Soil Erosion and Sedimentation Control Ordinance Policy and Practices*, 17-69.

702. The permittee shall take reasonable steps to minimize or prevent any discharge in violation of this permit that has reasonable likelihood of adversely affecting human health or the environment. Permit No. NCS000240, Part V, Section A (2), at 2

703. Turbidity and erosion of streams adversely affects human health and the environment.

704. The above violations are ongoing.

705. Defendants is aware of the violation and refuses to take corrective measures. Moreover, as detailed below, Defendants plan to replicate the defective design.

706. Defendants' activities as alleged in this complaint have violated and continue to violate North Carolina water quality standards for turbidity, settleable solids and other pollutants.

130

Each of these quality standards has been adopted by North Carolina pursuant to Clean Water Act and made condition of the 401 certification permits. Violation of water quality standards certification violates Section 301 of the Clean Water Act.

## SECOND CAUSE OF ACTION

**Imminent violation - Defectively and Illegally designed and operating stormwater outfall at Hinsdale Street culvert will be replicated as part the Hinsdale-Tinkebell Project, to continue the damage**

**Discharge of Pollutants In Violation of the Clean Water Act Sections 301, 401, 402 and 404, the conditions of the Permits and of the North Carolina Sedimentation Pollution Control Act of 1973.**

**(All Defendants)**

707. All allegations of the preceding paragraphs are re-alleged and incorporated herein.

708. Defendants will and have commenced the unlawful act of replicate the illegal and faulty erosion-causing stormwater outfall design in their Hinsdael-Tinkerbell Project, in violation of the Clean Water Act, the North Carolina Sedimentation Pollution Control Act of 1973, the local ordinances and the conditions of Defendants' permits.

709. An action for injunctive relief under Clean Water Act is authorized under Clean Water Act 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged herein would irreparably harm Plaintiff and the citizens of Charlotte and State of North Carolina, for which harm Plaintiff has no speedy, plain or adequate remedy at law.

## THIRD CAUSE OF ACTION

**Imminent violation — defective and illegal grading design of steep slope**

131

**Discharge of Pollutants In Violation of the Clean Water Act Section 301, 401, 402 and 404, in violation the conditions of the Permits and of the North Carolina Sedimentation Pollution Control Act of 1973**

**(All Defendants)**

**Grading high steep at illegal and unstable configuration**

710. All allegations of the preceding paragraphs are re-alleged and incorporated herein.

711. All steep slope disturbance must be minimized. 40 CFR 450.21(a)(4).

712. If land disturbance of slopes is unavoidable, The North Carolina Sedimentation Pollution Control Act of 1973 mandates that "The angle for graded slopes and fills shall be no greater than the angle that can be retained by vegetative cover **or other adequate erosion-control devices or structures …** sufficient to restrain erosion." N.C. Gen, Stat. §113A-57(2)

713. The requirement for angles of graded slopes is incorporated into all permits with which Defendants must comply in Construction of Hinsdale-Tinkerbell Project.

714. Charlotte Storm Water Services is the sole Permittee of the U.S. Army Corps of Engineers General Permit 2016-00163 (RGP-163).

715. As a condition of General Permit 2016-00163 (RGP-163), Defendants are mandated to abide by "all aspects of the Sedimentation Pollution Control Act of 1973 (North Carolina General Statutes Chapter 113A Article 4)," including the above-cited mandatory requirement for angles of graded slopes of N.C. Gen. Stat. 113A-57(2). General Permit 2016-00163 (RGP-163), General Conditions (d), at  6.

716. NPDES Permit No. NCG010000 Part II, Section B(3) mandates that the "angle for graded slope **shall** be no greater than the angle that can be retained by vegetative cover **or other**

**erosion control devices or structures**."[1] Part II, Section B(3) at 5 of 26 (citing to N.C. Gen. Stat. 113A-57(2)).

717. It is a mandatory condition of the Section 401 Water Quality General Certification No. 4147, that Defendants abide by the condition that "all construction activities shall be performed in full compliance with G.S. Chapter 113A Article 4 (Sediment Pollution Control Act of 1973)," including the above-cited mandatory angle of grades slope requirement of N.C. Gen. Stat. 113A-57(2). GC4147 Water Quality General Certification No. 4147, Section I General Conditions, (5), at 3.

718. It is a mandatory condition of the Section 401 Water Quality General Certification No. 4147 that all projects shall incorporate Best Management Practices for the control of sediment and erosion so that no violations of state water quality standards, statues or rules occur. Water Quality General Certification No. 4147, Section I General Conditions, (5), at 3. (citing 15A NCAC 02H .0506(b)(3) and (c)(3) and 15A NCAC 02B .0200))

719. General Permit 2016-00163 (RGP-163) also mandates: "The permittee shall employ all sedimentation and erosion control measures necessary to prevent an increase in sedimentation or turbidity within waters and wetlands outside the permit area," and incorporates the Sedimentation Pollution Control Act of 1973 (North Carolina General Statutes Chapter 113A Article 4) by reference. General Permit 2016-00163 (RGP-163), General Conditions (d), at 6.

720. In violation of Clean Water Act, Defendants threaten intentionally harmful land-disturbing activity on the southwest slope immediately downstream of the Hinsdale Culvert culvert over

---

[1] Emphasis supplied, IA

the unnamed tributary to McMcMullen Creek ("Slope"): Defendants threaten to grade the

Slope in violation of the maximum angles and maximum slope length without terracing.

Defendants threaten to delegate decisions about configuration of the Slope to contractor in

violation of the requirement that high slopes be designed by professional geotechnical

engineer, all in violation of the North Carolina law, of section 301 of the Clean Water Act and

the conditions of Defendants' permits under sections 404 and 402 and 401 of the Clean Water

Act.

### Abandoning steep slope without adequate stabilization

721. Defendants threaten to disturb steep Slope unjustifiably high and wide, disturb it outside

legitimately justifiable construction area, and at legal angles. Defendants threaten

unjustifiable mechanized vegetation land-clearing, bedrock destruction, and replicating the

unjustifiable and illegal positioning of stormwater outfall waters such that the stream bank

scouring continues in perpetuity. After that, Defendants threaten to abandon the steep Slope

without proper stabilization, in violation of Clean Water Act.

722. Dependent's plan will result in destructive permanent erosion, which will pollute the

Nation's waters in violation of the Clean Water Act Section 301, 33 U.S.C. §1362(6), the

North Carolina Sedimentation Pollution Control Act of 1973 and the conditions of

Defendants' permits.

723. The Section 404 General Permit 2016-00163 (RGP-163), mandates "the immediate

stabilization of all disturbed areas." General Conditions (d), at 6.

724. The Section 404 General Permit 2016-00163 (RGP-163), mandates that "[c]ulverts **must** be designed and constructed in a manner that minimizes destabilization." Special Conditions, (h), at 3.

725. The Section 404 General Permit 2016-00163 (RGP-163) mandates that "Slopes … will … be provided with … cover, devices, or structures sufficient to restrain erosion" by incorporating the language of N.C. Gen. Stat. 113A-57(2). General Conditions (d), at 6.

726. General Permit 2016-00163 (RGP-163) also mandates: "The permittee shall employ all sedimentation and erosion control measures necessary to prevent an increase in sedimentation or turbidity within waters and wetlands outside the permit area," and incorporates the Sedimentation Pollution Control Act of 1973 (North Carolina General Statutes Chapter 113A Article 4) by reference. General Permit 2016-00163 (RGP-163), General Conditions (d), at 6.

727. The Section 404 General Permit 2016-00163 (RGP-163) underscores: "This permit does not authorize any injury to the property or rights of others." General Conditions, (j), at 7.

728. The Section 402 NPDES Permit No. NCG010000 requires Defendants to permanently stabilize ground after construction is completed. General Permit No. NCG010000, Part II, Sections E, at 7-8. Part V, 22, at 15. This ground stabilization must withstand storm. NPDES Permit No. NCG010000, Part II, Section B(5) and (7), at 5.

729. In addition to the required terracing, concrete retaining walls are appropriate stabilization methods. NPDES General Permit No. NCG010000, Part V, 22, at 25.

730. NCG010000 underscores that "the issuance of this general permit does not convey any property rights in either real or personal property, or any exclusive privileges, nor does it

authorize any injury to private property or any invasion of personal rights, nor any infringement of Federal, State, or local laws and regulations." Part IV, Section A (10), at 18 (citing 40 CFR 122.41(i)).

731. Defendants' activities as alleged in this Complaint threaten to violate North Carolina water quality standards for turbidity, settleable solids and other pollutants. Each of these quality standards has been adopted by North Carolina pursuant to Clean Water Act and made condition of the 401 certification permits. Violation of water quality standards certification violates Section 301 of the Clean Water Act.

## FOURTH CAUSE OF ACTION

### Imminent violation — unjustifiably grading steep slope outside of construction area and destroying bedrock
### Discharge of Pollutants in violation of the Clean Water Act Section 301, 401, 402 and 404, in violation the conditions of the Permits and of the North Carolina Sedimentation Pollution Control Act of 1973

#### (All Defendants)

732. All allegations of the preceding paragraphs are re-alleged and incorporated herein.

733. All steep slope disturbance must be minimized. 40 CFR 450.21(a)(4).

734. In violation of Clean Water Act, Defendants threaten intentionally harmful land-disturbing activity on the southwest slope immediately downstream of the Hinsdale Culvert culvert over the unnamed tributary to McMcMullen Creek ("Slope").

735. Defendant threaten to grade and disturb with vibrating machinery and leave without vegetative cover a large part of steep vulnerable Slope that is **outside of their justifiable construction are.**

136

736. Specifically, Defendants threaten to disturb the top band of land above the 616 contour line located directly above Hinsdale Culvert, and tapering into a band of land downstream of the Hinsdale culvert, added for land-disturbing after Plaintiff complained, as a retaliatory measure.

737. Defendants' threatened land-disturbing activity is unnecessary for their construction project and will rip out protective trees, shrubs vegetation cover, destroy terracing and displace rocks, threaten foundation of the retaining walls which presently hold up Slope, bulldoze and vibrate steep Slope with heavy machinery, and significantly increase slope angle at the top of the Slope, immediately under Plaintiff's house.

738. Defendants are capable of accomplishing the purpose of Hinsdale Culvert maintenance in an environmentally preferable way, i.e. without taking the described detour to vandalize Slope areas not justifiably related to construction. Defendants' design is arbitrary and intentionally harmful.

739. Additionally, Defendants threaten to unjustifiably destroy bedrock in the stream bed, in order to burry sewage pipe and send it in a zig-zag pattern across the creek and back again. As explained in the Complaint, sending sewage pipe straight along left (facing downstream) bank is a design available to Defendants. This design will avoid bedrock destruction, eliminate two unjustifiable water crossings, secure lines from potential washout, damage form floating debris and consequential pollution by raw sewage.

740. Blasting and nonconventional methods of bedrock destruction can poison ground water, pollute surface water, and threaten wildlife.  contaminate water resources.

741. As explained this Complaint, Clean Water Act agents repeatedly required Defendants to justify this unnecessary bedrock destruction, and Defendants made misrepresentations and omissions to the Agents in connection with their unjustifiable plan.

742. The Section 404 General Permit 2016-00163 (RGP-163) **mandates** that "permittee **must** make every reasonable effort to perform the work authorized herein in a manner so as to minimize any adverse impact on … natural environmental values.  General Conditions, (q), at 8.

743. The Section 404 General Permit 2016-00163 (RGP-163) requires that Defendants "**shall** employ all sedimentation and erosion control measures necessary to prevent an increase in sedimentation or turbidity within waters … outside the permit area." General Conditions (d), at 6.

744. The Section 404 General Permit 2016-00163 (RGP-163) mandates that "[t]ree and shrub cover along the stream should be retained as much as possible in order to stabilize the stream banks." Special Conditions, (p), at 5.

745. The Section 404 General Permit 2016-00163 (RGP-163) mandates that "discharges of dredged or fill materials into waters of the US … **must** be minimized to the maximum extent practicable." Special Conditions, (l), at 5.

746. The Section 404 General Permit 2016-00163 (RGP-163) mandates that "Culverts **must** be designed and constructed in a manner that minimizes destabilization… Destabilizing the channel … should be considered and appropriate actions incorporated in the design and placement of the culvert." Special Conditions, (h), at 3.

747. The Section 402 NPDES Permit No. NCG010000 mandates that "Erosion and sedimentation control measures shall be designed and constructed to prevent off-site sedimentation damage." Part II, Section B(1), at 4.

748. It is a mandatory condition of the Section 401 Water Quality General Certification No. 4147, that "all construction activities shall be performed in full compliance with G.S. Chapter 113A Article 4 (Sediment Pollution Control Act of 1973) and Permit No. NCG010000. GC4147 Water Quality General Certification No. 4147, Section I General Conditions, (5), at 3.

749. It is a mandatory condition of the Section 401 Water Quality General Certification No. 4147, that construction projects must performed in full compliance with conditions of Section 402 Permit No. NCG010000. GC4147. Water Quality General Certification No. 4147, Section I General Conditions, (8), at 4.

750. It is a mandatory condition of the Section 401 Water Quality General Certification No. 4147 that all projects shall incorporate Best Management Practices for the control of sediment and erosion so that no violations of state water quality standards, statues or rules occur, and that "[d]esign, installation, operation and maintenance of all sediment erosion control measures shall be equal to or exceed the requirements specified in the most recent version of the North Carolina Sediment and Erosion Control Manual." Water Quality General Certification No. 4147, Section I General Conditions, (5), at 3. (citing 15A NCAC 02H .0506(b)(3) and (c)(3) and 15A NCAC 02B .0200)).

751. Defendants' activities as alleged in this complaint have violated and continue to violate North Carolina water quality standards for turbidity, settleable solids and other pollutants. Each of these quality standards has been adopted by North Carolina pursuant to Clean Water

Act and made condition of the 401 certification permits. Violation of water quality standards

certification violates Section 301 of the Clean Water Act.

752. An action for injunctive relief under Clean Water Act is authorized under Clean Water Act

33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged herein would

irreparably harm Plaintiff and the citizens of Charlotte and State of North Carolina, for which

harm Plaintiff has no speedy, plain or adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Imminent violation — construction without permit in violation of the Clean Water Act Section 301, 401, 402 and 404, and in violation of the North Carolina Sedimentation Pollution Control Act of 1973

#### (All Defendants)

753. All allegations of the preceding paragraphs are re-alleged and incorporated herein.

#### False representations, placing fill in the stream without permit

754. In the construction maps and information, submitted as part of their Pre-Construction

Notification packages for approval/verification of the Clean Water Act Agents, Defendants

knowingly misrepresented and intentionally omitted the following material information:

misrepresented (a) the existing and proposed contours of the stream bank downstream of

Hinsdale Culvert, (b) omitted to notify about their intent to place fill in the stream and (c)

misrepresented / omitted the total lack of justification for bedrock disturbance and zig-zagged

sewage placement under the water.

755. In their construction maps, Defendants knowingly misrepresented the conditions of the bank

and intentionally concealed their plan to fill the stream. Defendants did not disclose their

intent to illegally place fill even in response to Clean Water Act Agents' direct queries, as explained in this Complaint.

756. The Stream bank along the entire Plaintiff's property downstream of Hinsdale culvert has eroded to the point of 5-6 foot vertical / concave drop. In contrast, Defendants presented the Agents construction maps that do not show the vertical erosion. Defendants also intimated to the Agents that the slope was gentle. These were knowing material misrepresentations and omissions.

757. Defendants refused to correct construction maps, although Plaintiff has repeatedly called their attention to the vertical eroded drop of the severely eroded and unstable bank, not explicitly shown on the maps.

758. Clean Water Act permits require construction strictly in accordance with the submitted plans, as signed by permittees and as reviewed / approved by the Clean Water Agents.

759. On or about 01/27/21, at the Webex conference with Defendants' staff, Plaintiff repeated her request to correct the maps and to stabilize the vertically slouched slope of the eroded streambank. Stormwater's Doug Lozner, speaking for all Defendants, revealed to Plaintiff that Defendants refused to correct the contour maps. Instead, Defendants intended to direct the contractor to place fill in streambank, adding rip-rap and / or dirt into the stream along the bank. In response to Plaintiff's incredulous question "don't you need a permit for that?!" Mr. Lozner responded "No," as the City Engineer and the Deputy Attorney listened on without objection.

760. On information and belief, Defendants intend to place fill of mud and / or rip-rap inside the stream along the entire duration of the stream on Plaintiff' property (the entire stream is

eroded) for the purpose of creating a temporary, Potyomkin village 1.5-1 slope. The mud and

rip-rap fill will be eventually washed away because of the unsustainable angle of 1.5-1 and of

the conditions of the stream. Rip-rap and mud wash away from bedrock.

761. Defendants did not disclose and did conceal from the Clean Water Act Agents their intent to

place fill into the stream.

762. Defendants made the same misrepresentation to the public, only disclosing to Plaintiff their

intention to illegally place fill into the stream at the eleventh hour, long after Plaintiff's land

was taken and Defendants' submissions to Clean Water Act Agents were made and reviewed.

763. Existing and proposed contours of the terrain where construction will occur are material to

the construction.

764. Section 402 Permit No. NCG10000 mandates that topographic maps submitted for the

permit application must include the following minimum correct information:

- Existing and proposed contours (topographic lines)

- Planned and existing … elevations Permit No. NCG1000, Part II, Section A(3), at 2-3.

765. Application approvals of all permits are strictly conditioned on providing true and accurate

information.

766. By misrepresenting existing and proposed contours (topographic lines) and by omitting to

report their intention to fill the stream, Defendants obtained permit approvals under false

pretenses. The falsified part of their construction will effectively be built without permit,

unless Defendants are stopped by this Court.

767. Clean Water Act prohibits false statements and misrepresentations in submissions to the

Clean Water Act agents, and makes them punishable by fines and imprisonment. Section 308

142

of the Clean Water Act provides: "Any person who knowingly makes any material false statement, representation, or certification in any application, record, report, plan, or other document filed on requires to be maintained under this Act or who knowingly falsifies, tampers with, or renders inaccurate any monitoring device or method required to be maintained under the Act, shall upon conviction, be punished by a fine of not more that $10,000 per violation, or by imprisonment for not more that two years per violation, or both." 33 USC 1319(c)(4). Permit No. NCG010000, IV (A)(14), (25), at 18-19

768. Section 404 of the Clean Water Act prohibits discharge of dredged and fill materials without a permit.

769. The Section 404 General Permit 2016-00163 (RGP-163) mandates: "The dimensions, pattern, and profile of the stream above and below a pipe or culvert should not be modified by altering the width or depth of the stream profile in connection with the construction activity." Special Conditions, (h), at 3.

770. The Section 404 General Permit 2016-00163 (RGP-163) mandates: "The placement of riprap shall be limited to the areas depicted on work plan drawings. The riprap material shall be clean and free from loose dirt or any pollutant except in trace quantities that would not have an adverse environmental effect; It shall be of a size sufficient to prevent its movement from the authorized alignment by natural forces under normal conditions." Special Conditions, (j), at 4-5.

771. Vertical drop at Hinsdale bank averages 5-6 foot high along the stream bank. To bring the slope to the unsustainable 1.5-1, per Defendants' plan, Defendants will surreptitiously throw dirt n the stream, adding a 9.5 wide, 6 foot high dirt band inside the stream along the entire

duration of the eroded southwest Slope on Plaintiff's property. Because the creek is largely encased in bedrock along this stretch, the Potyomkin village slope will be quickly washed downstream, adding to the pollution.

## Misrepresentations, bedrock destruction, place sewage under water without justification

772. In addition to polluting the stream by placing unstable pile of rip-rap and mud, Defendants intend to destroy bedrock of stream-bed in order to zig-zag sewage pipe under the water, and refuse to sent the sewage pipe straight along the soft left (facing downstream) bank.

773. When Clean Water Act Agents demanded justification for bedrock destruction / blasting, Defendants misled / omitted the Agents and / or encouraged them to look the other way.

774. Defendants' construction will place fill in the stream and unjustifiably destroy bedrock in violation Clean Water Act and should be enjoined as land-disturbing activity without permit.

775. In the alternative, Defendants' land-disturbing activity violates conditions of their permits.

## Construction of culvert without approved construction plan

776. The Section 402 Permit No. NCG10000 mandates that the following minimum correct information is submitted for the Section 402 Clean Water Act agents' review: "soil information throughout the site **and below culvert storm outlets**, including soil type and special characteristics." Permit No. NCG1000, Part II, Section A(4), at 3.

777. The Section 401 Water Quality General Certification No. 4147 requires that "notification, including supporting documents such as … **geotechnical report** ... shall be provided to DWR a minimum of 60 days prior to the installation of the culvert." Section I (11), at 5.

778. Soil data from points at each end of the proposed culvert position is necessary for safe design of wingwalls and footing of headwall of culverts. Boring at each end of culvert is necessary or recommended method of obtaining the necessary data for safe design of the culvert. A geotechnical investigation of soil under proposed culvert is required for safe design of culverts.

779. Defendants have no justifiable reason to exclude Hinsdale Street culvert from soil sampling / geotechnical investigation, and to build Hinsdale culver blind.

780. Defendant Armstrong Glen said so itself.

781. In 2014, Defendant Armstrong Glen prepared a Planning Study for Hinsdale-Tinkerbell Project. Defendant Armstrong Glen, P.C. reported: "A **geotechnical investigation will be required** at the headwalls of the proposed [Hinsdale culvert replacement.] ... borings at each end of the culvert will provide **soil data necessary to design** the proposed wingwalls and footings of the headwall." Armstrong Glen, P.C., Planning Study, Hinsdale-Tinkerbell Storm Drainage Improvement Project, Selected Alternative, City Project No. 671-12-015, at 9 (January 23, 2104).

782. Soil investigation is especially critical for Hinsdale culvert because it may or may not be positioned or partially on bedrock.

783. The Section 401 Water Quality General Certification No. 4147 requires: "If bedrock is discovered, then DWR shall be notified by phone or email within 24 hours of discovery." Section I (11), at 5

784. Defendants refused to conduct geotechnical investigation at Hinsdale Street Culvert.

785. Defendants deliberately and without justification excluded Hinsdale culvert from the investigation.

786. In or about 2014, Defendants conducted geotechnical investigation of all other culverts of the Project, but deliberately excluded both sides of Hinsdale Street culvert.

787. In 2019, responding to Plaintiff's request for information, Stormwater's Daryl Hammock of Stormwater admitted that Hinsdale culvert was deliberately excluded from the sampling order. Mr. Hammock confirmed that Defendants "approved a scope of services … aimed at testing soils at two (2) locations for each of three culverts for a total of six (6) samples. The scope of services [is] to study soils for three named culverts: Highview Road, Champaign Street and Covered Bridge Lane.

788. In the same 2019 email, Mr. Hammock admitted that: "[T]here was no sampling request or analysis at Hinsdale by the team members, and as a result, there is no soils report on Hinsdale Culvert. We have no indication that samples were taken or any report was written for Hinsdale Culvert at any time."[2]

789. On information and belief, Defendants never took soil samples, conducted geotechnical investigation, in violation of the conditions of their permits.

790. In 2019, plaintiff repeated her request that soil sampling be done under Hinsdale Culvert. Defendants refused.

791. In response or mockery to Plaintiff's legitimate request, Mr. Hammock of Stormwater suggested that Defendants collect soil samples outside of their legitimate construction area, way from the culvert, high up on the Slope of Plaintiff's land.

---

[2] 10/03/2019 e-mail from Daryl Hammock to Plaintiff

792. Hinsdale Street Culvert is located at the stream largely encased in bedrock, but Defendants have no data whether bedrock or different soil type is located under the culvert itself and under the concrete flume, which Defendant will pull out for their new construction.

793. Without geotechnical investigation and soil boring at each end of the culvert, it is impossible to know whether bedrock is or is not present under the concrete flumes, which Defendants will rip out to replace the culvert in the course of the Hinsdale-Tinkerbell Project.

794. Knowing whether bedrock is or is not present is critical for satisfying the requirement of Defendants' Clean Water Act permits, including designing the width of the culvert, the benches in the culvert, the installation of the culvert, whether or not three-sided culvert is allowed, or burial of the culvert is required, etc.

795. As described in this Complaint, the Section 401 and 404 Clean Water Act Agents have repeatedly expressed concern about this bling building and expressed skepticism, concerned that Defendants would not be able to build per design because Defendants design blind, without soil data.

796. In their Pre-Construction Notification and response to comments from the Section 401 and 404 Agents, Defendants admitted that they have no confidence that they can build Hinsdale Culvert as designed, and stated that they might build differently from what they designed. This violates conditions of Defendants' permits.

797. Defendants admitted that they may or may not build the inside of the Hinsdale culvert as per drawings they submitted for Clean Water Act Agents' approval.

798. Clean Water Act permits require construction covered by the permits to be completed exactly as designed and as approved by the Clean Water Act Agents, not "improvised during construction."

799. Hinsdale-Tinkerbell Project requires written notification and approval of Clean Water Agents of documentation that includes construction plans.

800. Hinsdale-Tinkerbell Project must be constructed per construction plans approved by the Clean Water Act Agents, and any deviations constitute violations of the Clean Water Act:

801. The Section 401 Permit, Water Quality General Certification No. 4147 states: "…the plans and specifications for the project are incorporated in the authorization by reference and are an enforceable part of the Certification. Any modification to the project require notification to the DWR and may require application submittal to DWR with the appropriate fee." Section I (1), at 2.

802. The Section 402 Permit No. NCG10000 states: "Deviations from the approved E[rosion]&S[edimentation] C[ontrol] plan ... shall constitute a violation of this permit… . Minor adjustments hall be noted on the approved E&SC plan and maintained at the job site." Section G (1), at 9-10

803. The Section 404 permit verifications by ISACE, including RGP-163 authorize construction only "provided it is accomplished in strict compliance with the conditions of the permit and submitted application ... and ensuring record. Any … deviations from your submitted plans may subject the permittee to a stop work order, a restoration order, a Class I administrative penalty, and/or appropriate legal action."

148

804. Defendants' plan to "improvise" the design, in violation of the Clean Water Act equals building Hinsdale Culvert without a proper permit.

805. In the alternative, Defendants plan to construct the Project in violation of the conditions of their permits.

## SIXTH CAUSE OF ACTION

### Ongoing violation — failure to provide information to the public, in violation of the Clean Water Act

**(All Defendants)**

806. All allegations of the preceding paragraphs are re-alleged and incorporated herein.

807. Recognizing that there are insufficient government resources to combat pollution of nation's waterways, Congress directed that private citizens' enforcement of Clean Water Act must play vital role in ensuring the cleanup of nation's waterways. 33 U.S.C. § 1365(a).

808. Recognizing that success of enforcement of the the 1972 Clean Water Act hinges, in a large part, on private citizen's enforcement, the Clean Water Act requires its permittees to be transparent with the citizens.

809. Section 308 of the Clean Water Act, known as the "Records and reports" provision, mandates transparency and availability to the public of all information necessary to investigate and enforce Clean Water Act violations. 33 U.S.C. 1318 (b)(2), (a)(2)-(4).[3]

---

[3] Section 308(b)(2) of Clean Water Act *mandates* making available to the public "[a]ny records, reports, or information" which is, per Section 308(a) "required to carry out the objective of this Act, including but not limited to […] (2) determining whether any person is in violation of … effluent limitation, or other limitation, prohibition or effluent standard … or standard of performance; (3) any requirement established under this section. or (4) carrying out sections 402, 404 (relating to State permit programs)… of this Act…" 33 U.S.C 1318(a),(b).

810. As a corollary, by misinforming, deceiving citizens and obfuscating relevant information, permittees violates the Clean Water Act.

811. Defendants concealed and / or conspired to conceal from the public information and documents necessary for to which the citizens are entitled under Section 308 of the Clean Water Act.

812. Since late 2017, Defendant misinforming Plaintiff, withholding relevant information from her, and bullied her in an attempt to frustrate her attempts to ascertain that Hinsdale-Tinkerbell Project land-disturbing activities on her land occur in compliance with the Clean Water Act.

813. On information and belief, such actions are Defendants' regular policy and practice directed at all public and affected landowners, in Hinsdale-Tinkerbell Project and in all other Defendants' construction projects.

814. Throughout all stages of the Hinsdale-Tinkerbell Project, Defendants provided no information and false information to the public, the affected landowners and even to the members of the City Council.

815. Defendants aimed to deceive and, in fact, succeeded in deceiving the affected landowners, the public and, on information and belief, even some members of the City Council regarding their violations of the Clean Water Act.

816. A non-exclusive list of information Defendants withheld or delayed follows. Information scarcity enabled Defendants and their staff to make misrepresentations and push falsities to the uninformed public and the affected landowners.

(A)    Defendants *failed to inform* the affected landowners (including the Plaintiff), the

citizens and the general public

- that Clean Water Act *governs Defendants' construction project and that Hinsdale-Tinkerbell Project is unable to proceed without review and approval of the Clean Water Act enforcing Agents,*

- the types of Clean Water Act permits and Clean Water Act approval process required for the *Hinsdale-Tinkerbell Project* construction

- make available the names and contact information for Clean Water Act Agents who oversee the Project. These names are kept in secret to the point that even Program Administrator of Charlotte Stormwater Services Ms. Desai pretended that she did not know and had to research the answer to Plaintiff's direct question: "For Stormwater projects, who is the permitting / compliance authority under Section 402 of the Clean Water Act on the issuing side?"

- of status and schedule of the field conferences, submissions of pre-construction notifications, permit verifications / permit approvals by the Clean Water Act Agents

- complete copies of permit applications

*Correspondingly, Defendants knowingly made false statements to* the affected landowners (including the Plaintiff), the citizens and the general public

- that they had obtained Clean Water Act permit approvals / verifications

- that City inspectors and Stormwater staff could act as enforcers of all relevant construction requirements

(B) Defendants *failed to inform* the affected landowners (including the Plaintiff), the citizens and the general public

- of the Schedule and results of pre-constructon conferences (*preliminary field reviews)* with Clean Water Act agents,

- prevented the affected landowners from participating in all and any pre-construction conferences, even when held on landowner's own land

- concealed c*ritical comments, recommendation, information requests* made by the Clean Water Act Agents

*Correspondingly, Defendants knowingly made false statements to* the affected landowners (including the Plaintiff), the citizens and the general public that

- Clean Water Act agents supposedly expressed unconditional approval of the Hinsdale-Tinkerbell Project, while the truth is that Clean Water Act Agents had made strongly critical comments and required objections to be resolved before Defendants would be allowed to proceed to construction

(C) Defendants *failed to inform* and provide to the the affected landowners (including the Plaintiff), the citizens and the general public

- true and accurate construction maps

- True and accurate terrain maps

- true and accurate soil reports

152

*Correspondingly, Defendants knowingly made false statements to* the affected landowners (including the Plaintiff), the citizens and the general public about the nature and boundaries of their land-disturbing activity and attempted to obtain and, on information and belief, indeed, obtained easements under *false representation of the true nature and extent of land-disturbing activity*

(D)     Defendants <u>*boldly rebuffed*</u> with "you are not supposed to know that" all questions about the identity of the purported "man behind the curtain" whom Defendants' staff called "consultant."

*Correspondingly, Defendants knowingly made false statements to* the affected landowners (including the Plaintiff), the citizens, the general public and even to the members of the *City Council that some* "independent consultant" exists and performed an independent review of the Hinsdale-Tinkerbell Project. This statement is false, and would be immediately exposed as such, if Defendants made identity of "consultant" available.

817. Transparency is mandated to the Clean Water Act permittees involved in construction that disturbs in excess of one acre.

818. Permit No. NCG10000, mandates that at a minimum, the following information must be included in the construction maps to make construction proposal understandable:

- Existing and proposed contours (topographic lines)

- Planned and existing building locations and elevations

- Limits of disturbed area

153

- Planned and existing road locations and elevations. Permit No. NCG10000, Part II, Section A(3), at 2-3.

819. Consequently, "construction maps" that (i) do not show planned grading contours and (ii) omit and distort structure contours, which Defendants offered to landowners of Hinsdale-Tinkerbell are a sham. Relying on this sham, Defendants collected multiple easements agreements from the affected landowners who could not know the true extent of land-disturbing activity Defendants planned on their property.

820. By offering to the public and the affected landowners incomplete and inaccurate topographic maps which excluded and falsified proposed topographic lines, existing buildings and structures and existing locations and elevations, and limits of disturbed areas, Defendants violated the Clean Water Act and the conditions of their permit.

821. The Clean Water Act entitles landowners affected by construction to participate in all pre-construction conferences. The conditions of Defendants' permits require Defendants to offer opportunity to participate in pre-construction conferences to the landowners affected by Defendant's constriction.

822. Throughout the duration of the Hinsdale-Tinkerbell Project, Defendants mock and violate this requirement.

823. North Carolina Sedimentation Pollution Control Act 1973, N.C. Gen. Stat. § 1**13A-51**, which is incorporated into and made condition of Defendants permits under Sections 401, 402 and 404, provides: "In recognition of the desirability of early coordination of sedimentation control planning, it is the intention of the General Assembly that preconstruction conferences be held **among the affected parties**… ."

154

824. The City of Charlotte *Soil Erosion and Sedimentation Control Ordinance* (compliance with which is incorporated into the City of Charlotte's NPDES NCS000240 MS4 permit) mirrors the requirement in Section 17-2: "In recognition of desirability of early coordination of Sedimentation control planning, it is the intention of the City Council that **pre-construction conferences** be held among **the affected parties**." Code 1985, § 18-22

825. Section 17-33(5) of the ordinance explains the purpose of the pre-construction conference: (a) on-site meeting with (b) person in charge of enforcement of the permit conditions is: "The purpose is to arrange an on-site meeting with the [Responsible Party for enforcement of Construction Site Stormwater Control and permit conditions][4] or duly authorized representative to review and discuss the approved Plan and the proposed Land-disturbing Activity." Code 1985, § 18-28 (5).

826. As detailed in this Complaint, Defendants created a mockery of the requirement of pre-construction field conferences.

827. Defendants first arrange for landowners to meet with real estate agents, who are incompetent to discuss land-disturbing activity.

828. When Plaintiff demanded to speak with true decisions makers, people with knowledge, or at least people with free access to construction maps, Defendants pushed her around from one staff person to another, all of which claimed lack of direct knowledge, decision making

---

[4] The Ordinance's reference to "City Engineer" as the person in charge of enforcement of permit conditions for private contractors would constitute a conflict of interest. For projects involving the City of Charlotte, reference to "City Engineer" as enforcer should be read as "State and Federal Agents charged with permit enforcement and compliance." *See, e.g.,* City of Charlotte, NPDES MS4 Permit Renewal Application & Stormwater Management Program Report, Section 6.0, "Reliance on Other Government Entity," at 20 (2017).

155

power or access to information about Hinsdale-Tinkerbell Project, as detailed in this complaint.

829. Defendants conspired to make the person with direct access to the construction maps — Armstrong Glen, P.C. — unavailable to the public and the affected landowners, including Plaintiff. The result of the gag provision in Armstrong Glen, P.C.'s contract with the City of Charlotte is that Armstrong Glen's engineers refuse to speak to the public except when supervised by co-Defendants, and only for a few minutes. Plaintiff's phone calls and emails to Armstrong Glen, P.C. all went unanswered.

830. In violation the conditions of Defendants' construction permits as well the City of Charlotte's NPDES NCS000240 MS4 permit Defendants deliberately exclude landowners from all contact with personas in charge of pre-construction conferences with the Clean Water Act agents. Defendants go to great length to do so by concealing the time, the place and the fact that such conferences occur.

831. Defendants went as far as insisting that Plaintiff must leave the room when Plaintiff happened to be at the right place at the right time to participate in the conference with Clean Water Act Agents which specifically concerned her property. Plaintiff requested to be allowed to stay, but the City Engineer forcefully asked Plaintiff to leave.

832. On information and belief, the deliberate concealment of relevant information about Clean Water violations and compliance from citizens and affected landowners is Defendants' regular procedure and practice.

833. By restricting access of the public and the affected landowners to the true pre-construction conferences with Clean Water Act Agents, Defendants are able to conceal and mislead the

156

public, the affected landowners, and even some members of the City Council regarding the existence and content of Agents' critical comments, also in violation of the Act.

834. The City of Charlotte is a permittee of the conditional NPDES Permit No. NCS000240.

835. As a material condition of its NPDES Permit No. NCS000240, the City of Charlotte, acting as a legislative body, must promulgate and maintain "adequate legal mechanisms, such as regulations, ordinances, policies and procedures to implement all provisions of the Stormwater Management Plan." Permit No. NCS000240, Part II, Section A (1), at 1 of 16.

836. "EPA recommends that [NPDES] Permit include provisions addressing the need for the public to be included in developing, *implementing*, and reviewing the storm water management program…" 40 CFR §122.34 (b) (2) (ii).

837. Accordingly, 40 CFR §122.34 (b) (2) (i) mandates that the NPDES "permit must identify the minimum elements and require implementation of a public involvement/participation program… ."

838. On of the such "minimum elements" of the Stormwater Management Plan Program, which Charlotte must "implement" is ensuring the flow of true information to and from its citizens regarding pollution of "Construction Erosion," and "Stream Bank Erosion" as a pollutant.

839. In its 2017 renewal application for the NPDES Permit No. NCS000240, the City of Charlotte identified "sediment pollution," "construction erosion" and "stream bank erosion" as the "target" issues about which Defendant City of Charlotte **obligated itself** to "public education," "outreach," and, generally, awareness and transparency. City of Charlotte, NPDES MS4 Permit Renewal Application & Stormwater Management Program Report, Section 7.1.2, at 22 (2017).

840. Specifically, Charlotte obligated itself to keep informed the "homeowners ages 25 -
55" (reasoning that such homeowners "have the greatest potential for affecting stormwater
quality" for "pollution reporting." City of Charlotte, NPDES MS4 Permit Renewal
Application & Stormwater Management Program Report, Section 7.1.3, at 23 (2017).

841. Defendants continuously and repeatedly fed Plaintiff (incidentally, a **homeowners** between
the ages of 25 - 55) with a mix of misinformation, mocking refusal to provide information
("You're not supposed to ask," "You are not supposed to know") and delays that lingered
months and years.

842. Misinforming landowners affected by Hinsdale-Tinkerbell Project and similar government
projects on the subject of "sediment pollution," "construction erosion" and "stream bank
erosion" squarely violates conditions of Defendant City of Charlotte's NPDES Permits No.
NCS000240.

843. In its application for the NPDES Permit NCS000240, the City of Charlotte represented and
promised that relevant Clean Water Act information is disseminated through multiple
websites. Defendant City of Charlotte promised: "The City involves the public in …
implementation of its permit though … website … **available** to the public for review and
comment **at any time**." City of Charlotte, NPDES MS4 Permit Renewal Application &
Stormwater Management Program Report, Section 7.2.5, at 28 (2017).

844. In its application for the NPDES Permit NCS000240, the City of Charlotte represented and
promised that "The City's Erosion Control Program maintains a website to assist with the
dissemination of information to … general public." City of Charlotte, NPDES MS4 Permit

Renewal Application & Stormwater Management Program Report, Section 7.4.4, at 38 (2017).

845. Disclosing relevant construction information on this existing website would require Defendants minimal effort and expense.

846. The City of Charlotte makes available information as to private builder's construction compliance with the Clean Water Act. In contrast, the City deliberately withholds information about its own construction compliance with the Clean Water Act.

847. Defendant City of Charlotte failed to create a mechanism to implement the transparency requirement of Clean Water Act.

848. Quite the opposite, instead of making accurate and timely information available to the public and the affected landowners, Defendant City of Charlotte intentionally and in violation of the Clean Water Act entered into "gag" contracts with defendant Armstrong Glen, P.C., to conceal all and any information related to potential violations of Clean Water Act, and, indeed, any information that might "cast doubt on the competence and integrity of the City or [Armstrong Glen, P.C.]"

849. Instead of a mechanism of transparency, Defendant City of Charlotte intentionally created and supports mechanisms, policies and practices that create ripe grounds for misinforming the public and frustrating citizen's efforts to enforce the Clean Water Act.

## SEVENTH CAUSE OF ACTION

**Ongoing violation — failure to create a mechanism for receipt and consideration of information submitted by the public reporting Defendants' own violations of the Clean Water Act**

**(Defendants City of Charlotte and Stormwater)**

850. All allegations of the preceding paragraphs are re-alleged and incorporated herein.

851. By Congressional intent, a new mechanism of enforcement of the Clean Water Act of 1972 draws on the input of the public.

852. Accordingly, the City of Charlotte's permission to to maintain its municipal stormwater system is conditioned, among other things, on creating and maintaining a mechanism that empowers the public to report violations of the Clean Water Act to "appropriate" person, in position to resolve such violations. 40 CFR § 122.34 (b) (4) (E) (mandating that "[a]t a minimum" NPDES Permits must require the permittee to develop and implement … [p]rocedures for receipt and consideration of information submitted by the public."

853. Specifically, Charlotte's NPDES Permit No. NCS000240 mandates that the City of Charlotte **shall** "maintain a hotline(s) or helpline(s) … for the public to report illicit … discharges, etc." Permit NCS000240, Part II, Section C (2)(c), at 3 of 16.

854. In violation of this condition, Defendants City of Charlotte and Stormwater deliberately created mechanisms, policies, procedures and practices to hinder citizens from reporting Clean Water Act violations in those instances when Defendants themselves are the violators.

855. First, Defendants **intercept** all reports of their own violations and put themselves in a position of deciding whether to react to such reports or to ignore them.

856. As a matter of policy, procedure, and practice, Defendants do not address reports of their own violations, only paying lip service to the public who reports them.

857. Instead of informing the public of the conflict of interest, the City of Charlotte, in concert with Mecklenburg County directs all citizens to report violations to the same 311 phone number, regardless of who the violator is. "All reported pollution problems are [accepted only at the 311 number and] recorded as a "citizen request for service." *See* City of Charlotte, *NPDES MS4 Permit Renewal Application* & *Stormwater Management Program Report*, Section 7.3.4, at 33 at  (August 2017)

858. At the 311 number, **the staff** of Defendant Stormwater and/or Defendant City intercepts the citizen's complaints, and decides in the sole discretion, which complaints to pursue, and which to dismiss without further consideration. *Id.*, Section 7.3.6, at 34.

859. The City of Charlotte failed the promise it gave in the Application for NPDES Permit No. NCS 000240 to:

- make sure that citizens' reports of pollution are directed to appropriate personnel and handled in a timely manner. *Id.*, Section 7.3.6, at 34.

- ensure that erosion control related issues **are directed *to appropriate staff* for resolution**. *Id.*, Section 7.4.4, at 38.

- **inform the public ... how to report illicit discharges**, so the public can report suspected pollution problems Id., Section 7.3.4, at 33.

860. Defendants' 311 "Public Reporting Hotline," improperly empowers Defendants-violators to police themselves.

861. Thus, Defendant City of Charlotte failed to create a proper mechanism to direct "erosion-related issues" to an "appropriate person" for resolution, and Defendant Stormwater assist it in making a sham of the 311 "reporting."

862. Second, Defendant City of Charlotte has an openly announced policy to ignore and deny Defendants' violations, even when such violations are presented in front of the City Council.

863. As detailed in this Complaint, the City of Charlotte has adopted the policy and procedure to "trust" that Defendants' construction "will be all right," and to ignore all reports to the contrary. In addition, the City of Charlotte and the City Council adopted procedures that prevent landowners from meaningfully presenting evidence of Clean Water Act violation to the Council.

864. The City of Charlotte's policy and practice of closing its ears to the information of Clean Water Act violations by Defendants and to declare that the Council and the Mayor "trust" that everything will be all right is not a proper mechanism for processing citizens' reports of Clean Water Act violations.

865. Defendant City of Charlotte failed to provide and promote an adequate mechanism for public input into enforcement of Clean Water Act. Instead, Defendant City of Charlotte, conspiring with Stormwater, intentionally created and supports mechanisms, policies and practices that create ripe grounds for sweeping under the rug all public input and frustrating citizen's efforts to enforce the Clean Water Act.

## EIGHTH CAUSE OF ACTION

### Imminent violation — intentional damage to property

**(All Defendants)**

866. All allegations of the previous paragraphs are re-alleged and incorporated herein.

867. Since 2017, Plaintiff has repeatedly requested and Defendants repeatedly refuse to refrain from injury of Plaintiff's property in at least three respects: Defendants insist on destroying mailbox topped with lion figure, on placing extremely unsafe temporary driveway and on allowing contractor to remove and re-sell the native boulders and dirt from the Slope downstream of Hinsdale Culvert, including boulders and dirt outside of Defendants' legitimate construction area.

868. Most recently, Plaintiff addressed these issues during the 1/27/21 Webex conference with the City Engineer, Defendants' deputy attorney and members of Stormwater staff.

869. Plaintiff repeatedly requested assurance the native materials (excavated boulders and dirt), remain on her land, including the materials excavated from the top of the slope, which is outside Defendant's legitimate construction area. Defendants refused, explaining that contractor might have plans to sell Plaintiff's boulders and dirt for personal profit, and Defendants wished to give contractor that opportunity. Defendants discriminatorily singled out Plaintiff's land for this unlawful instruction to constructor.

870. Additionally, Plaintiff repeatedly requested that Defendants' contractor abide by its statutory duty to "remove, preserve and reset her mailbox." Defendants specifically instructed their contractor to violate its duty to "remove, preserve, reset." Defendants intentionally refused to compensate Plaintiff for mailbox/lion as part of property destroyed by the taking. In fact, Defendants' appraisal and construction plans ignored mailbox with lion figure, as though it did not even exist. On 2/22/2020, long after the taking had occurred, and after repeated demands from the Plaintiff, City Engineer e-mailed Plaintiff, effectively notifying her that Defendants singled Plaintiff's mailbox/lion for refusing preservation or compensation: "…it

163

makes the most sense for you to take whatever actions you think are best to preserve it …

I'm not sure how that works on compensation." During the 01/27/2021, the City Engineer

and the Deputy attorney repeated the same message. Importantly, in their submissions to

Clean Water Act Agents, Defendants obfuscated their intent, marking on the construction

drawing: "City contractor to coordinate mailbox removal with owner at 2813 Hinsdale St."

Defendants did not overtly state to the Clean Water Agents that "coordinate removal" stands

for "make it Plaintiff's burden or bulldoze without compensation."

871. Plaintiff repeated her concerns that the temporary driveway, planned by Defendants. The

proposed driveway is planned as a steep ramp, which will require driver to accelerate,

meeting at a ninety degree the turn into the remaining part of the existing driveway, which

has up to 16% climb. This treacherous construction not only will prohibit access and backing

out of all emergency vehicles, but also will place in grave danger the unaware accelerating

drivers. A driver who happens to miss the ninety degree turn into the 16% angled second leg

of the driveway and continues straight, will be in imminent danger of bodily injury or death

because straight line is aimed onto the bedrock-covered stream some 20 feet below. The

angle of the temporary driveway is so steep enough to require acceleration, at which veering

off the straight pass down into the creek will be unlikely or impossible.

872. A safe alternative placement of driveway is available.

873. Since 2017, Plaintiff has repeatedly pointed out this construction defect and requested the

alternative placement. to Mrs. Keene and Lozner responded that even if temporary driveway

resulted in death and litigation, Stormwater was not concerned, because the City would pay.

The City Engineer and deputy city attorney responded that Plaintiff's received sufficient

amount of favors, and her request to place temporary driveway into a safe place was a favor which Defendants chose to deny.

874. North Carolina Department of Transportation *Standard Specifications* is incorporated in the conditions of Defendants' permits.

875. *Standard Specifications* requires contractors to "protect and reset" mailboxes and the like private property and prohibits contractors from damaging private property or selling it for contractor's profit.

876. Section 107-11, entitled "Protection and Restoration of Property" provides: "the Contractor shall be responsible for the removal, preservation and resetting of all mailboxes disturbed by the construction operations. The mailboxes and their supporters, when reset, shall be left in as good a condition as they were before removal. The Contractor shall not be required to furnish new material except as required to repair damage resulting from construction operations. The Contractor shall be held responsible for all damage or injury to property of any character resulting from any act, omission, negligence, or misconduct in the prosecution of the work. When any direct or indirect damage or injury is done to public or private property, he shall … either restore at his own expense such property to a condition similar or equal to that existing before such damage, or shall make good such damage or injury in a manner acceptable to the owner of the damaged property and to the Department." North Carolina Department of Transportation, Standards for Roads and Structures, known as "Standard Specifications", 107-11, at 1-59 (Raleigh, January, 2018)

877. Section 402 Permit No. NCG010000 warns: Any person who knowingly violates section 301, 302, 303, 306, 307, 318 or 405 of the Act, or any permit, condition or limitation

implementing any of such sections, and who knows at that time, that he thereby places another person in imminent danger of death or serious bodily injury, shall, upon [first] conviction, be subject to a fine of no more that $250,000 or imprisonment of not more than 15 years…" Part IV, Section (A)(3) (e), at 16 of 26.

878. On information and belief, out of approximately 86 landowners affected by the Hinsdale-Tinkerbell Project, Defendants intentionally singled out Plaintiff for vague and illegal mailbox handling procedure. Defendants actions are with deliberate intention to harm Plaintiff and disregard of Clean Water Act and the conditions of their permits.

879. Clean Water Act and the conditions of their permits explicitly caution Defendants to refrain from just such unjustified injuries to life and private property.

880. The Section 404 RGP 163 Permit underscores: "This permit does not authorize any injury to the property or rights of others." General Conditions, (j), at 7.

881. Section 402 Permit No. NCG010000 warns: "The issuance of this general permit does not convey any property rights in either real or personal property, or any exclusive privileges, nor does it authorize any injury to private property or any invasion of personal rights, nor any infringement of Federal, State, or local laws and regulations. Part IV, Section A (10), at 18 (c*iting* 40 CFR 122.41(g)).

882. Charlotte City Soil Erosion and Sedimentation Control Ordinance is incorporated in the conditions of Defendants' permits and provides: "Persons conducting Land-disturbing Activity shall take all reasonable measures to protect all public and private property from damage caused by such activity and associated Sedimentation." Code 1985, § 18-26.

883. Defendants selectively and arbitrarily excluded Plaintiff-Landowner from the protection of the laws and regulations and instructed the contractor whom they hired to implement the Hinsdale-Tinkerbell Project to to injure Plaintiff's property, threaten her safety, as well as safety of her family, friends and invitees and the environment on her land.

## NINTH CAUSE OF ACTION

### Ongoing violation — violation of Plaintiff-Landowners' right to control erosion on her own land, in violation of the North Carolina Sedimentation Control Act of 1973

**(All Defendants)**

884. All allegations of the preceding paragraphs are re-alleged and incorporated herein.

885. *North Carolina Sedimentation Control Act of 1973* prohibits land-disturbing activity without landowner's written consent to (1) the activity itself and (2) the particular **erosion and sedimentation control plan that will govern the activity.**[5]

886. Section 17-35(a)(3) of the *City of Charlotte Soil Erosion and Sedimentation Control Ordinance* mirrors the requirement: "…the draft erosion and sedimentation control plan must include owner's written consent for the applicant to submit a draft erosion and sedimentation control plan and to conduct the anticipated Land Disturbing Activity." Section 17-35(a)(3). Defendants have violated *North Carolina Sedimentation Control Act of 1973* and the conditions of their permits by (a) deceiving and attempting to deceive Plaintiff-Landowner;

---

5 Approved **Erosion sedimentation control plan** is required for disturbing over one acre N.C. Gen. § 113A-57(4) and, when submitted for approval, draft **erosion sedimentation control plan** must include **the owner's written consent** … to submit a draft erosion and sedimentation control plan and to conduct the anticipated land-disturbing activity." N.C. Gen. Stat § 113A-54.1(a)

(b) depriving Plaintiff-Landowner of information and/or of timely information regarding land-disturbing activities on her land; (c) preventing Plaintiff-Landowner from contact and/or meaningful contact with the persons with decision-making authority about Defendants' construction, including Armstrong Glen, P.C.'s engineers who are in charge of drafting, the Clean Water Act Agents, who are in charge of enforcement, and the unknown people in the Defendant's employ who are the decision-makers behind the project.

887. On information and belief, such violations are part of Defendants' policy and practice when acquiring easements and construction easement from private landowners for Defendants' own construction. By excluding landowners from discussion and depriving landowners of information, Defendants are empowered to selectively violate engineering requirements on such uninformed landowner's land.

888. On information and belief, Defendants Stormwater and the City of Charlotte not only have constructed multiple structures in the city in violation of conditions of Clean Water Act, but also have engaged in construction without ever notifying, and / or receiving approval from Clean Water Act Enforcement Agencies, where notification and approval were required.

889. Defendants policy and practice of using their eminent domain powers to deliberately and methodically deprive landowners of their right to be *fully, truthfully* and *timely* informed and to timely provide input regarding about land-disturbing activity on their land is a an arbitrary and despotic policy that has no reasonable relation to the public purpose of erosion or flood control or to any legitimate public purpose but, instead, has been adopted by Defendants in order to be able to violate Clean Water Act.

890. Compliance with the *North Carolina Sedimentation Control Act of 1973* is incorporated in the conditions of the Defendants' Clean Water Act Construction permits. Violation of the *North Carolina Sedimentation Control Act of 1973* constitute violations of conditions of Defendants' construction permits and violation of the Clean Water Act.

## TENTH CAUSE OF ACTION

### First Amendment

### The "non-disparagement provision" or "gag" in Armstrong Glen P.C.'s employment contract with the City of Charlotte violates the First Amendment

**(Defendants City of Charlotte and Stormwater)**

891. All allegations of the preceding paragraphs are re-alleged and incorporated herein.

892. Defendant City of Charlotte as a government entity violates First Amendment by purporting to purchase silence or otherwise gag Armstrong Glen, P.C. and its engineers as to all issues, which, "in the City's judgment" are "likely to cast doubt on the competence or integrity of the City or Armstrong Glen, P.C."

893. A municipality that makes a gag provision prohibiting critical speech a mandatory and *material* condition of employment for professional engineers violates the First Amendment on its face. The purported sale of professional engineers' silence as to any defects of construction (or, indeed, as to anything the City wishes) is inherently coercive and void as an unconstitutional condition on government benefit and unconstitutional prior restraint.

894. Armstrong Glen, P.C. and its engineers are the drafting engineers of the Hinsdale-Tinkerbell Project (as well as several other stormwater projects for the City of Charlotte).

895. As such, Armstrong Glen, P.C. and its engineers are the engineers with first-hand knowledge of the Hinsdale-Tinkerbell Project's construction details, drawings, maps, permit information, soil analysis requirements, soil analysis reports, construction defects, potential and actual violations (including permit and environmental) violations in design and construction. The information they may have that is "likely to cast doubt on the competence or integrity of the City or Armstrong Glen, P.C." is of public concern.

896. Plaintiff-Landowner has a legally protected interest in receiving information empowering her to safeguard her property and safety from environmental and health hazards.

897. Additionally, Plaintiff, as a member of the public and a citizen and resident of Charlotte and North Carolina, has a legally protected interest in uninhibited, robust debate on public issues. Without a doubt, it is a "public issue" that Charlotte municipality engages in construction which, even in its own view, is so likely to call into question the engineers' and its own "competence or integrity," that the municipality invested millions of dollars in hush money to conceal this lack of competency or integrity in the various stormwater projects' design and construction.

898. The likelihood of hazardous and illegal conditions on the City's bridges, culverts, roads and private water-side properties, as well as the circumstances under which the City of Charlotte has gagged and continues gagging the engineers it employs, assuredly fall into the "public issues" category.

899. The discovery that Armstrong Glen, P.C. has been "gagged" and paid hush money every year since 2011, the question of just which construction practices and structures are so shoddy that the City of Charlotte is afraid they will "cast doubt on the City's and Armstrong Glen P.C.'s

170

competence and integrity" and is willing to paying millions of dollars to conceal, — all these topics would certainly promote a lively public debate.

900. The First Amendment protects Plaintiff's right to receive information and ideas from a willing speaker. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817 (1976); *Stephens v. County of Albermarle*, 524 F.3d 485, 491 (4th Cir. 2008); *Overbey v. Mayor & City Council of Balt.*, No. 17-2444 (4th Cir. July 11, 2019).

901. Professional engineers working on municipal projects, regardless of their purported promise to keep silent, are nevertheless willing speakers because the purported sale of *professional engineers'* silence is impossible.

902. To begin with, professional engineers' licensing is incompatible with keeping the public in the dark about defect of municipal construction. A professional engineer who shirks its or his "primary obligation to protect the public" is unlikely to remain a professional engineer. *See* N.C. Gen. Stat. §89C-20, 21 N.C. Admin. Code 56.0701(b) ("The licensee shall at all times recognize **the primary obligation to protect the public** in the performance of the professional duties.")

903. The gag in Armstrong-Glen P.C.'s 2011 *Contract for Engineering Services* with the City amounts to an improper waiver of Armstrong-Glen's and the public's First Amendment rights.

904. Indeed, Armstrong Glen P.C. is unable to contractually waive its professional obligation and First Amendment right to warn Plaintiff about its or City's integrity and incompetence in the construction on Plaintiff's land because because such waiver is incompatible with the

professional requirements to "safeguard the life, healthy, property and welfare of the public" and the requirement of "competence." 21 N.C. Admin. Code 560701(a), (b) (c) (1979).

905. Strong public interests rooted in the First Amendment make such purported waiver unenforceable and void.

906. Indeed, professional engineers' duties, the environmental legislation, including the Clean Water Act and the local laws that implement the Act all dictate transparency and public participation in enforcement.

907. The sealing engineer Joseph ("Josh") H. Letourneau, P.E, during the brief exchange with Plaintiff (which his co-Defendants reluctantly allowed under tight supervision) demonstrated willingness to discuss the Project and to brainstorm design solutions.

908. On information and belief, Joseph ("Josh") H. Letourneau, P.E and Armstrong Glen, P.C. and its engineers are "willing speaker," and would have willingly discharged their duties to be truthful with the public, if it were not for the contractual "gag."

909. In the alternative, contract engineers working on "various stormwater projects" in the city of Charlotte is a position. As such, it can easily be filled with engineers who are willing to discharge their professional duties to the public in accordance with N.C. Gen. State §89C-2.

910. Defendant City of Charlotte's conduct in gagging the engineers with knowledge is intentional, willful and oppressive and violates clearly established law.

911. Defendants' conduct is wholly without any justifiable cause in fact or law, and without rational basis. No public interest, compelling public good or other legitimate government aim is served by concealing construction information, construction defects and information about environmental damage from the affected landowners, the public, and the press.

172

912. Defendant Stormwater and City of Charlotte have used and continue using Armstrong Glen's gag for the unlawful purpose.

913. When Defendant City of Charlotte takes of private land for its projects, it is Defendants' policy and practice to purposefully fail and refuse to provide the affected landowners with necessary and relevant information about construction, and construction defects, in order to prevent the affected landowners from ensuring that Defendants' construction abides by the rules of good engineering and complies with the environmental laws and permitting requirements.

914. Plaintiff-Landowner is damaged by the "gag provision" in Armstrong Glen P.C.'s contract in several respects.

915. First, only the repeated FOIA document requests, intensive research, repeated information requests to the Clean Water Act agencies and consultations with her own engineer opened Plaintiff's eyes to the defects of Defendants' construction. The details of Defendants' shoddy construction and improper information exchange procedures supports a strong inference that the defects described in this Complaint are just a few of many. Plaintiff lacks funds, time and connections to perform full exposure of all the skeletons of the Hinsdal-Tinkerbell Project and all construction projects by Defendants around the city, which might "cast doubt on the competence and integrity of the City Charlotte and Armstrong Glen, P.C."

916. Without knowing which parts of the City of Charlotte are constructed and built in a way that "casts doubt on the competence and integrity" of their drafting engineers and builders, Plaintiff and the public are left wondering which bridge or culvert might collapse under their curs or feet, and which buildings might slide down the stream. Plaintiff-Landowner placed

several phone calls and sent an email to Armstrong Glen, P.C. requesting information. Armstrong Glen, P.C. and Mr. Letourneau did not respond until briefly allowed by co-Defendants.

917. Additionally, Plaintiff is injured as a landowner and member of the public by loss of trust in the construction process in the city of Charlotte.

918. Armstrong-Glen P.C.'s employment contract with the City, as a practical matter, effectively blocks all and any meaningful uncensored information flow from the engineers of Armstrong Glen, P.C. to the public, the affected landowners and the press. This further empowers the government's retaliatory, discriminatory and arbitrary actions agains selective landowners, as described in this complaint. With Armstrong Glen, P.C. engineers' gagged and unavailable to disclose to the public and the affected landowners any documents or information and / or speak for itself, Defendants Charlotte and Stormwater block landowners' access to relevant information, misinform the public and the affected landowners, mystify and confuse the public and the affected landowners (and even, on information and belief, some members of the City Council) all with the purpose of concealing the defects and violations of Defendants' construction projects.

919. Declaring "gag provision" in Armstrong Glen P.C.'s contract with the City void, enjoining the City from using gag provisions in its contracts with private engineers and allowing Armstrong Glen P.C. or its replacement and other contract engineers currently operating under "gag provisions" to make disclosures required by the law and engineer's rules of professional conduct will, on information and belief, (i) serve to unmask the existing engineering and construction defects in the construction and practices around the City of

174

Charlotte (including Plaintiff's land), (ii) alleviate the maze that presently blocks access of the affected landowners to information about construction on their land (iii) serve to improve the public trust in the safety of municipal construction.

920. "Famously, one of the interests at the heart of the First Amendment is 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . .'" *Overbey v. Mayor & City Council of Balt.*, No. 17-2444, at *11 (4th Cir. July 11, 2019) (*citing N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).)

921. "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Overbey,* No. 17-2444, at *12 (4th Cir. July 11, 2019) (*citing Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010).

922. "Standing shoulder to shoulder with the citizenry's interest in uninhibited, robust debate on public issues is this nation's cautious "mistrust of governmental power." *Overbey*, at *12 (4th Cir. July 11, 2019).

923. This mistrust is one of the "premises" of the First Amendment and it is well-warranted here, because the gag provision is a government-defined and government-enforced restriction on government-critical speech.

924. The City of Charlotte here (1) purchases the silence of the engineers who draft the projects and obtain the permits, i.e. the engineers at the core and most knowledgeable about the construction details, shortcomings, violations and defects, including criminal violations; (2) retains for itself the unilateral ability to determine whether the engineers have broken their promise to stay silent about their and City's incompetence and / or lack of integrity; and (3)

enforces the engineers' "promise" by threats and multi-million dollar compensation, and (4) misrepresents to the public, the press, and the City Council the purported actions and opinions of these gagged engineers through an invented mythical figure of "Consultants."

925. The city government here has used its power in an effort to curb speech that is not to its liking. The First Amendment is meant to serve as a bulwark against such exercises of government power.

926. Accordingly, the "gag provision" in Armstrong Glen P.C.'s contract with the City of Charlotte, as well as the like provisions in the City's contracts with its other engineers is contrary to the citizenry's First Amendment interest in limiting the government's ability to target and remove speech critical of the government from the public discourse. *See Overbey* at \*13 (4th Cir. July 11, 2019).

## ELEVENTH CAUSE OF ACTION

## Violation of Public Policy

### (Defendants City of Charlotte and Stormwater)

927. All allegations of the preceding paragraphs are re-alleged and incorporated herein.

928. Defendant City of Charlotte, a government entity, entered into a void contract by attempting to purchase silence of Armstrong Glen, P.C. and its engineers as to all issues the "likely to cast doubt on the competence or integrity of the City or Armstrong Glen, P.C." or, as a practical matter, as to all and any information concerning the Hinsdale-Tinkerbell Project and all other projects performed by Armstrong-Glen P.C.'s engineers under the 2011 "Contract for Engineering Services."

929. Contracts are void and not susceptible of enforcement to the extent they are against public policy and "injurious to the public or against the public good," which at a minimum includes statutorily prohibited conduct.

930. "At the very least, public policy is violated when an employee is fired in contravention of express policy declarations contained in the North Carolina General Statutes." *Amos v. Oakdale Knitting Co.,* 331 N.C. 348, 353, 416 S.E.2d 166, 169 (1992).

931. The contractual gag provision in Armstrong Glen P.C.'s Contract with the City of Charlotte, and, on information and belief, in Charlotte' contracts with other private engineers employed by the City, violates The North Carolina Engineering and Land Surveying Act, The Rules of Professional Conduct of Professional Engineers & Land Surveyors and several established public policies.

932. First, it is "**the primary obligation**" of licensed professional engineers to "at all times" "protect the public health safety and welfare" in the performance of its/his professional duties. 21 N.C. Admin. Code 56.0701(b). This obligation can not be contracted away in a side deal with a local government.

933. In North Carolina, the practice of professional engineering is declared one of the core professions integral to the public's life, health, property and welfare and, therefore, subject to regulation in the public interest, "[i]n order to safeguard life, health, and property, and to promote the public welfare." N.C. Gen. Stat. 89C-2; N.C. Gen.Stat. § 89C–2 (2011).

934. Professional engineers' obligation to the public is paramount, regardless of who signs the engineer's check. 21 N.C. Admin. Code 56.0701(b). ("The licensee …shall at all times

recognize the primary obligation to protect the public in the performance of [his] professional duties.")

935. Chapter 89C of the North Carolina General Statutes delineates the Legislature's intent to regulate the practice of professional engineering and land surveying "in the public interest" (N.C. Gen.Stat. § 89C–2), and authorizes administrative regulations to promulgate professional rules to protect "safety, health, and welfare of the public" by the Board of Examiners for Engineers and Land Surveyors. N.C. Gen.Stat. § 89C–20.

936. "All individuals licensed by the Board must observe the rules of professional conduct which should be adopted "[i]n the interest of protecting the safety, health, and welfare of the public." N.C. Gen.Stat. § 89C–20 (2011)" *In re Surveying*, 742 S.E.2d 574, 578 (N.C. Ct. App. 2013)

937. North Carolina public policy mandates that licensed professional engineers must:

- be objective and truthful in professional reports, statements, or testimony

- include all relevant and pertinent information in … reports, statements, or testimony 21 N.C. Admin. Code 56.0701(d)(1)

- at all times recognize the primary obligation to protect the public in the performance of the professional duties 21 N.C. Admin. Code 56.0701(b)

- if the licensee's judgment is overruled under circumstances where the safety, health and welfare of the public is endangered, the licensee shall inform the … *affected parties* and any appropriate regulatory agency of the possible consequences of the situation where safety health or welfare are endangered 21 N.C. Admin. Code 56.0701(b)

- perform services in an ethical ... and ... lawful manner. 21 N.C. Admin. Code 56.0701 (g).

- Finally, included among administrative rules governing the engineering are regulations establishing that licensed engineer must perform services only in the areas of [his] competence and shall not undertake projects requiring education or experience outside of [his/its] own field of competence. 21 N.C. Admin Code 56.0701 (c), and that professional engineer "shall not affix the signature or seal to any engineering … plan or document … not prepared under the licensee's direct supervisory control." 21 N.C. Admin Code 56.0701 (c) (3)

938. The North Carolina Statute and attendant administrative regulations of the Board of Examiners for Engineers and Land Surveyors thus evidence a clear public policy in North Carolina to protect public the safety, life, health, and property, and to promote the public welfare by maintaining minimum engineering standards incompatible with the City of Charlotte's contractual attempt to gag Armstrong Glen and silence all and any revelations to public / press and / or criticism of defendants's projects. *See In re Surveying*, 742 S.E.2d 574, 578 (N.C. Ct. App. 2013) (concluding licensed engineers must observe rules adopted in the interest of protecting the safety, health, and welfare of the public.)

939. North Carolina Supreme Court observed: [a]lthough the definition of "public policy" approved by this Court does not include a laundry list of what is or is not "injurious to the public or against the public good," at the very least public policy is violated [by an act] in contravention of express policy declarations contained in the North Carolina General Statutes." *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 353 (1992); *Deerman v. Beverly*

*California Corporation*, 135 N.C. App. 1, 5 (N.C. Ct. App. 1999) (terminating a nurse for criticism of treatment by the doctor and alerting her patient that they should seek another doctor was a violation of public policy) (internal citations omitted.)

940. Second, the gag provision frustrates the purpose, the spirit and the letter of the *Clean Water Act of 1972*, which hinges on public involvement and, therefore, mandates that all relevant information about possible violation of the Act be made available to the public. Gag provision, consequently, frustrates the transparency obligations adopted by the City of Charlotte and by Stormwater pursuant to their Clean Water Act Permits, as well as the transparency requirements of *The North Carolina Sedimentation Pollution Control Act of 1973*, and the erosion and pollution control ordinances of the City of Charlotte and Mecklenburg County, including the City of Charlotte Stormwater Pollution control Ordinance, Soil Erosion and Sedimentation Control Ordinance, and Post-Construction Controls Ordinance.

941. Third, the gag provision contravenes the well-established policy that contracts should not be used to prevent disclosure of criminal activity. It is the public policy in every state, including North Carolina, to encourage disclosure of criminal activity, and non-disclosure agreements are void if they require silence in the face of unreported crime. Violations of Clean Water Act and State and the enacting local laws, including some of the violations alleged herein, are criminal offenses.

942. Fourth, the one-sided gag provision in Armstrong Glen's contract with the City undermines the public trust in safety of Charlotte's infrastructure, especially when regarded against the backdrop of Hinsdale-Tinkerbell Project, which brought to light, e.g.:

- salient engineering drafting defects secreted from the public and the affected parties and only ferreted out by Plaintiff. But for Plaintiff's interference, these defects would not have been addressed, and

- salient engineering drafting defects which Defendants refuse to correct

- Defendants push landowners into signing over land easements without providing true construction information

- Defendants obfuscate and misrepresent terrain and construction information

- Defendants violate conditions of their permit

943. Fifth, the "gag provision" interferes with and frustrates the North Carolina public policy, as articulated in the Public Records Act, of promoting the disclosure of information related to transaction of public business by any agency of North Carolina or its subdivison. *See* N.C. Gen. Stat. §132-1.

944. Sixth, the pointed prohibition that threatens to fire Armstrong Glen in retaliation for candidly speaking to the media, impairs the public safety and government accountability by frustrating the media's vital role as a government watchdog and, consequently, threatens public safety, and erodes public trust in City's governance.

945. Because the "gag provision" violates the law and public policy, it is unlawful and void ab initio.

946. Plaintiff-Landowner, as a member of the public, as a resident and citizen of Charlotte and as the landowner affected by Hinsdale-Tinkerbell Project has the right to free exchange of and receipt of information concerning construction-caused dangers and challenges to the environment, health, and structures.

947. Plaintiff-Landowner is damaged by having to expand effort, time and funds to conduct private investigation necessary to uncover the environmental (erosion ) and other hazards and dangers of Hinsdale-Tinkerbell Project to herself, her family, her guests, invitees and others.

948. On information and belief, the City of Charlotte includes such "gag provision" as a standard provision in contracts with all private engineers retained to work on City's Projects and, consequently Plaintiff and the members of the public are damaged by being exposed to the secretly incompetent and hazardous engineering in the City of Charlotte.

949. In the alternative, the "gag provision" is unique to the Armstrong Glen P.C.'s contract with the City of Charlotte, and the City of Charlotte hired Armstrong Glen P.C. for uniquely shoddy construction, especially "likely to cast doubt on the competence or integrity" of the engineers involved, in which case Plaintiff has been and continues to be damaged by non-disclosure of uniquely vile hazards and dangers in construction.

## TWELFTH CAUSE OF ACTION

## Equal Protection clause of the Fourteenth Amendment

### (Defendants City of Charlotte and Stormwater)

950. All allegations of the preceding paragraphs are re-alleged and incorporated herein.

951. The City Engineer Michael Davis admitted on more than one occasion that *all* design corrections which Plaintiff requested were of the sort "routinely allowed," "not extraordinary," — something that "the team" could have granted, but just happened, in their discretion, to deny.

952. Plaintiff did not request Defendants for any "favors." Instead, as detailed in this Complaint, Plaintiff requested Defendants to conduct construction on her land in accordance with the Clean Water Act, the implementing North Carolina State law, the City ordinances and the conditions of Defendants' permits.

953. Defendants repeatedly underscored Stormwater's and its contractor's *discretion* to "grant or deny," Plaintiff's request.

954. Speaking at the 01/27/2020 City Council Business Meeting, the City Engineer likewise presented Plaintiff's demands as requests for favors, to be addressed as a matter of discretion, as follows:

955. Plaintiff's request to not erode the slope by digging in a sewage manhole was "allowed." On the other hand, Plaintiff's request to comply with the Statutorily mandated slope angles maximum and structurally stabilize the steep slopes with the use of culvert extension, and / retaining wall, are discretionary denies, as was Plaintiff's request of reducing grading area (in their discretion, Defendants *increased* it), of providing safe temporary driveway, of protecting mailbox, of not storing equipment and vibrating machinery on steep slope, etc. as described in this complaint.

956. Defendants routinely *but selectively* "grant" the "favors" of proper engineering practices to similarly situated landowners.

957. When Defendants engage in construction on private land, they offer preferential treatment to some favored landowners, but they injure others, even in violation of the law.

958. As detailed in this Complaint, in selected instances of Defendants' construction on or affecting the land of similarly situated landowners, Defendants have designed to minimize

erosion, and to ensure land and structural stability. Constructing on steep slopes owned by or affecting land of similarly situated homeowners, Defendants utilize: (a) helical piers to support structures and houses, (b) retaining walls and (c) culvert extensions to support steep slopes. *In their discretion*, and when they prefer, Defendants follow the engineering rules and permit conditions requiring them to return steep  slopes to better, more stable than pre-construction state, reducing erosion.

959. Reducing erosion is the stated goal of Hinsdale-Tinkerbell Project. Defendants selectively reduced erosion on the land of some landowners, but on Plaintiff's land their project increases erosion.

960. Similarly, on the land of similarly situated landowners affected by their construction, Defendants abide by North Carolina Department of Transportation, Standards for Roads and Structures, known as "Standard Specifications,"  107-11, at 1-59 (Raleigh, January, 2018) and conditions of their Clean Water Act permits and protect landowner's property, including mailboxes. Yet in Plaintiff's selected instance, Defendants refuse to follow the *Standards* and intentionally set out to damage Plaintiff's property.

961. Ignoring Diamond Engineering PLLC's opinion that Defendants' construction is likely to cause erosion and threaten structural stability of Plaintiff's house, the Charlotte City Mayor led the City Council to ratify the taking of Plaintiff's land, *only to turn around and instruct the Plaintiff to "continue negotiating" with Stormwater's and Defendants' employees*.

962. This underscores the pervasiveness of City's discriminatory policy and practice: Stormwater and Defendants' employees are *empowered full discretion* to arbitrarily "grant" or "deny"

proper engineering practices in City's construction, and the Mayor publicly acknowledges that landowner's only hope is to beg for their discretion.

963. Structural stabilization, property protection and even post-construction improvement, — is all discretionary granted or withheld by Defendants, without any reasonable justification, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S. § 1983.

964. By refusing to follow correct engineering practices on Plaintiff's land and by going out of their way to violate multiple engineering requirements and to injure Plaintiff's property, yet utilizing best engineering practices and protecting property in other selected instances of construction on the land of similarly situated landowners, Defendants, under the color of law, have applied facially neutral laws, regulations, ordinance, engineering recommendations detailed in this Complaint, as well as the City of Charlotte's municipal authority of eminent domain for the acquisition of property for economic development purposes under provision of Article 9 of Chapter 36 of the General Statutes of North Carolina in a discriminatory manner in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S. § 1983.

965. By refusing and halting informational exchange and transparency as to Defendants' own construction details and violations, yet demanding transparency with regard to the like information concerning private construction, Defendants City of Charlotte and Stormwater created and maintain discriminatory policies, practices and rules, all for the purpose of blocking informational exchange related to Defendant's own violation of laws and

regulations, in a discriminatory manner in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S. § 1983.

966. Defendants engaged, continue to engage and imminently threaten to continue to engage in bad faith misconduct, gross abuse of government power and fundamentally unfair procedures and practices, selective enforcement of environmental laws, wholly arbitrary acts, discriminatory acts, and acts undertaken of improper motives of retaliation, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S. § 1983.

## THIRTEENTH CAUSE OF ACTION

## Substantive Due Process of the Fourteenth Amendment

### (Defendants City of Charlotte and Stormwater)

967. All allegations of the preceding paragraphs are re-alleged and incorporated herein.

968. Governmental Defendants' unlawful acts set forth in this Complaint are conscience-shocking, unreasonable, arbitrary, retaliatory, with no rational relation to any legitimate governmental objective and performed for improper motives with deliberate intention to damage the environment, harm Plaintiff's property, safety and welfare, and to allow harmful practices to remain undetected, all intentionally and / or with deliberate disregard to consequences to Plaintiff and the environment, and, in fact proximately caused and will imminently cause such intended damage, in violation of Substantive Due Process clause of the Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S. § 1983.

## FOURTEENTH CAUSE OF ACTION

## Procedural Due Process Clause of the Fourteenth Amendment

**(Defendants City of Charlotte and Stormwater)**

969. All allegations of the preceding paragraphs are re-alleged and incorporated herein.

970. Governmental Defendants' unlawful acts set forth in this Complaint are conscience-shocking, unreasonable, arbitrary, retaliatory, with no rational relation to any legitimate governmental objective and performed for improper motives with deliberate intention to damage the environment, harm Plaintiff's property, safety and welfare, and to allow harmful practices to remain undetected, all intentionally and / or with deliberate disregard to consequences to Plaintiff and the environment, and, in fact proximately caused and will imminently cause such intended damage, in violation of Procedural Due Process clause of the Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S. § 1983.

## FIFTEENTH CAUSE OF ACTION

## Freedom of Speech and Press

**(Defendants City of Charlotte and Stormwater)**

971. All allegations of the preceding paragraphs are re-alleged and incorporated herein.

972. Defendants City and Stormwater's conduct towards Plaintiff was intentional, willful and oppressive.

973. There was no compelling governmental interest which warranted Defendants' conduct, and Defendants' conduct violated clearly established law.

974. Governmental Defendants' conduct is wholly without any justifiable cause in fact or law. There was no rational basis for Defendants' conduct.

975. Defendants' conduct implemented a gross abuse of governmental power in violation of North Carolina Constitution. The joint unlawful conduct of Defendants proximately caused and continues to cause Plaintiff to suffer injuries and deprivations as set forth in this Complaint.

976. Governmental Defendants employed unlawful acts to silence and restrict free expression about matters of public concern and safety and deprived Plaintiff of protected interests in violation of Plaintiff's rights under Article 1, Sections 1, 14, 35 and 36 if the North Carolina Constitution.

## SIXTEENTH CAUSE OF ACTION

## State Equal Protection

### (Defendants City of Charlotte and Stormwater)

977. All allegations of the preceding paragraphs are re-alleged and incorporated herein.

978. Governmental Defendants engaged in bad faith misconduct, gross abuse of government power, created and employed discrimination and fundamentally unfair rules, processes and procedures and have applied facially neutral laws in a discriminatory manner thus depriving Plaintiff of her equal protection rights, in violation of the Equal Protection Clause of Article 1, Sections 19, 35 and 36 of the North Carolina Constitution.

## SEVENTEENTH CAUSE OF ACTION

## State Substantive Due Process

### (Defendants City of Charlotte and Stormwater)

979. All allegations of the preceding paragraphs are re-alleged and incorporated herein.

980. Governmental Defendants deprived Plaintiff of protected rights, in violation of the Plaintiff's substantive due process rights of Article 1, Sections 19, 35 and 36 of the North Carolina Constitution.

## EIGHTEENTH CAUSE OF ACTION

## State Procedural Due Process

### (Defendants City of Charlotte and Stormwater)

981. All allegations of the preceding paragraphs are re-alleged and incorporated herein.

982. Governmental Defendants deprived Plaintiff of protected rights, in violation of the Plaintiff's procedural due process rights of Article 1, Sections 19, 35 and 36 of the North Carolina Constitution.

## SIXTEENTH CAUSE OF ACTION
## Conspiracy

## (All Defendants)

983. In the alternative, Defendants acted in concert with each other in an orchestrated effort to intentionally and wrongfully violate the Clean Water Act, the conditions of Defendant's permits, North Carolina Sedimentation Pollution Control Act, the City of Charlotte local ordinances and regulations implementing environmental protection in construction, as well as Plaintiff's constitutional rights detailed in this Complaint. As a proximate cause of Defendants' unlawful actions, Plaintiff and the environment were damaged and Defendants continue to act in concert to cause Plaintiff and the environment additional damage. Defendants' acts are unlawful and illegal and violation of the North Carolina common law prohibiting civil conspiracy.

189

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

984. Enter judgement in favor of Plaintiff against Defendants.

985. Pursuant to 33 U.S.C. 1319(d) and N.C. Gen. Stat. §113A-64, access civil penalties against Defendants, as permitted by law, up to the date of judgment herein.

986. Pursuant to 33 U.S.C. § 1365(a) and N.C. Gen. Stat. §113A-65 enjoin Defendants from any and all ongoing and future violations of the Clean Water Act and the Sedimentation Pollution Control Act of 1973.

987. Order Defendants to take all steps necessary to redress and mitigate the effects of their violations, including restoring and stabilizing the banks of the stream located downstream of Hinsdale Street Culvert on Plaintiff's land and correcting the stormwater outfall.

988. Grant declaratory relief, temporary restraining order and preliminary and permanent injunctive relief sufficient to compel Defendants to take all steps necessary to bring the construction of their "Hinsdale-Tinkerbell Project" on Plaintiff's land in compliance with Section 301(a) of Clean Water Act, with the North Carolina Sedimentation Pollution Control Act of 1973 and all terms and conditions of Defendants' permits, including compliance with the city ordinances.

989. Grant declaratory relief, temporary restraining order and preliminary and permanent injunctive relief sufficient to compel Defendants City of Charlotte and Stormwater to take all steps necessary to come into permanent and consistent compliance with the information transparency and citizens' and landowners' participation and enforcement requirements of

190

Section 308 of the Clean Water Act, 33 U.S.C. § 1318, and of the conditions of the City of Charlotte's NPDES MS4 Permit No. NCS000240, and of the conditions of Defendants' construction permits pursuant to Sections 401, 402 and 404 of the Clean Water Act, and of the North Carolina Sedimentation Pollution Control Act 1973, N.C. Gen. Stat. § 113A-51 and N.C. Gen. Stat § 113A-54.1(a).

990. Grant declaratory relief, temporary restraining order and preliminary and permanent injunctive relief sufficient to compel Defendants City of Charlotte and Stormwater to take all steps necessary to comply with North Carolina Department of Transportation, Standards for Roads and Structures, known as "Standard Specifications," as incorporated in the conditions of their permits.

991. Grant Plaintiff damages in the amount to be proved at trial.

992. In the alternative, if this Court determines that Defendant Stormwater is not a listed Clean Water Act Section 505(a)(1) litigant, then grant declaratory relief, temporary restraining order, preliminary and injunctive relief sufficient to halt and prevent Stormwater from holding out itself as a "person" for the purposes of maintaining and obtaining Clean Water Act permits in its own name, and declare all construction conducted and completed under permits in the name of Stormwater to have been constructed without a permit, in violation of Clean Water Act, and access fines for violation of Clean Water Act Section 301 and at the maximum extent allowed by the law.

993. Declare, pursuant to 28 U.S.C. §§ 2201-2202 that the "gag provision" of the City of Charlotte – Armstrong Glen P.C.'s 2011 Contract for engineering services, as extended to present time, is void, illegal, unenforceable and unconstitutional under the First Amendment

of the United States and the North Carolina Constitution, violates North Carolina State Law and is void as against public policy.

994. Enjoin Defendant City of Charlotte from further use of or reliance on the gag provision in its contract with Armstrong Glen, P.C. and allow Armstrong Glen, P.C. and its engineers to reveal all previously concealed information which "in the City's judgment likely to cast doubt on the competence or integrity of the City or Armstrong Glen, P.C."

995. Declare all like gag provisions in all contracts of the City of Charlotte with its engineers void, illegal, unenforceable and unconstitutional and enjoin the City of Charlotte from further use or reliance on such gag provisions.

996. In the alternative, if the Court determined that Armstrong Glen, P.C. and / or Mr. Joseph ("Josh") H. Letourneau, P.E are not "willing speakers," then issue a temporary restraining order and preliminary and permanent injunction enjoining Defendants from continuing to conspire to interfere with Plaintiff's civil rights and to conspire to violate The North Carolina Engineering and Land Surveying Act, N.C. Gen.Stat. § 89C–2, and the 21 N.C. Admin. Code 56.0701(b), and the Clean Water Act, and the North Carolina Sediment Pollution Control Act, and the implementing City ordinances, and the conditions of Defendant's Clean Water Act permits, by concealing from the Plaintiff, the public and the media all acts, circumstances, all occurrences which are "in the City's judgment likely to cast doubt on the competence or integrity of the City or Armstrong Glen, P.C.," including those acts, circumstances and occurrences relating to the Hinsdale-Tinkerbell Project, and issue an order sufficient to compel Defendants to take all steps necessary to disclose and publicize all information previously concealed from the Plaintiff, the public and the media pursuant to the conspiracy.

997. Grant Plaintiff a declaratory judgement adjudging that governmental Defendants' policies and practices complained of herein are unconstitutional on their face and as applied.

998. Award judgment against Defendants jointly and severally for Plaintiff's damages.

999. Award Plaintiff her costs, expenses, expert fees and reasonable attorneys' fees, including as provided in 33 U.S.C. § 1365, 42 U.S.C. § 1988.

1000. Award Plaintiff such other and further relief as the Court deems appropriate.

1001. Plaintiff hereby demands a trial by jury on all claims for which there is a right to jury trial.


Dated: May 18, 2021

/s/ Ilonka Aylward
Ilonka Aylward, Esq.
N.C. State Bar 31933
1645 Scotland Ave
Charlotte, North Carolina 28207
aylward@aylwardfamilylaw.com
(704) 560-4854